# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| In re<br><br>CHARLES STREET AFRICAN METHODIST EPISCOPAL CHURCH OF BOSTON,<br><br>　　　　　　　　　Debtor | Chapter 11<br>Case No. 12-12292-FJB |

### MEMORANDUM OF DECISION AND ORDER ON
### MOTION OF ONEUNITED BANK TO DISMISS CHAPTER 11 CASE

This case is before the court on the motion of creditor OneUnited Bank ("OneUnited") under 11 U.S.C. § 1112(b)(1) to dismiss the case on the basis that the debtor, Charles Street African Methodist Episcopal Church of Boston ("CSAME"), is not eligible under 11 U.S.C. § 109(d) to be a debtor in this bankruptcy case. OneUnited argues that CSAME, though in form a corporation, is in essence, by virtue of the discipline of the larger church to which it belongs, a Massachusetts nominee trust and one that, notwithstanding that it continues to do such business as a church usually does, does not conduct business. In short, OneUnited argues that CSAME is a nonbusiness trust and, as such, ineligible to be a debtor. CSAME opposes the motion, arguing among other things that the debtor church is not a trust but a corporation and, as such, eligible *per se*, whether or not it happens also to be the trustee of a trust, nominee or otherwise. After an evidentiary hearing, the Court now enters the following findings and rulings and, on the basis thereof, concludes that CSAME is eligible.

### PROCEDURAL HISTORY and ARGUMENTS OF THE PARTIES

CSAME is an incorporated congregation or, in the parlance of the denomination, "society" or "local church" of the larger African Methodist Episcopal Church (the "AME Church"). OneUnited is a creditor of CSAME, by far its largest creditor, having extended to it two loans that, as of January 2012,

were in default.  On March 20, 2012, CSAME filed a petition for relief under Chapter 11 of Title 11 of the

Unites States Code (the "Bankruptcy Code").

On May 18, 2012, OneUnited filed the present motion, a motion under 11 U.S.C. § 1112(b)(1) to

dismiss this chapter 11 case for cause, the stated cause being the petitioner's ineligibility to be a debtor.

In the motion, OneUnited argued (i) that by virtue of rules set forth in the AME Church's *Book of*

*Discipline of the African Methodist Episcopal Church 2008* (the "*Book of Discipline*"),[1] CSAME holds all its

property in trust for a Pennsylvania non-profit corporation known as the African Methodist Episcopal

Church, Incorporated ("AMEC")[2]; (ii) that the trust so established is of the kind known in Massachusetts

law as a nominee trust, one in which the trustee has no power to act in respect of the trust property,

but, under the rules of the AME Church, may act only at the direction of the beneficiary,  (iii) that CSAME

is the nominee trustee, (iv) that although CSAME is organized as a corporation under Mass. Gen. Laws. c.

180, it may nonetheless operate as the trustee of a nominee trust; (v) that under the analysis set forth in

*In re Village Green Realty Trust*, 113 B.R. 105 (Bankr. D. Mass. 1990), the trustee of a nominee trust is

not eligible to be a debtor under the Bankruptcy Code; and (vi) that ineligibility to be a debtor is "cause"

for dismissal within the meaning of § 1112(b)(1).

On June 22, 2012, CSAME objected to the motion to dismiss.  CSAME disputes parts (i) and (ii) of

OneUnited's argument, disputes part (iii) insofar as it contends that CSAME holds its assets as a nominee

trustee (but does not deny that if a trust relationship is established, then CSAME is indeed the trustee),

concedes part (iv) but disputes its relevance, disputes part (v), and concedes part (vi).  CSAME's

arguments may be summarized as follows.  First, CSAME is a corporation and, as such, is a "person"

---

[1] Every four years, the AME Church publishes a Book of Discipline, a compendium of its doctrine, rules, and discipline.  At the evidentiary hearing on the present motion, the parties used the 2008 edition, published in 2009 to reflect amendments made through the AME Church's 2008 General Conference.
[2] AMEC should not be confused with the larger AME Church, of which AMEC, a corporation, is only one part of many, albeit a central one.

within the meaning of §§ 101(41), 109(b), and 109(d) of the Bankruptcy Code[3] and therefore may be a

debtor under chapter 11.  Second, although case law holds that a nominee trust is ineligible to be a

debtor, no case law holds that an otherwise eligible entity is rendered ineligible because it happens to

serve as the *trustee* of a nominee or other trust; the trustee is not the trust itself.  Third, the provisions

of the AME Church's *Book of Discipline* are church doctrine, are intended to and do govern only internal

church matters, and, by First Amendment prohibition, may not be used or interpreted by a civil court to

determine the relation of CSAME to its creditors.  Fourth, if the Court may consider and interpret the

relevant provisions of the *Book of Discipline*, those provisions do not create a trust; rather, their purpose

is only to govern in the event of disaffiliation of a local church from the AME Church.  Fifth, even if the

provisions create a trust relationship, the trust is not a nominee trust because CSAME performs more

than the perfunctory duties to which a nominee trustee is restricted, acts autonomously, makes

decisions with respect to its own property, and was not created solely or primarily to hold title to

property for another.   Sixth and last, even if church rules effect a conveyance to AMEC of an equitable

interest in all CSAME's property, CSAME, as a debtor-in-possession in chapter 11, can avoid that

conveyance by exercise of the so-called "strong-arm power" supplied in 11 U.S.C. § 544(a)(3).

On August 9, 2012, OneUnited sought and, with the assent of CSAME, was granted leave to file a

reply brief, both to reply to CSAME's arguments and to address facts discovered after OneUnited filed its

motion to dismiss.  In the reply brief, which is considerably longer and more detailed than the original

motion, OneUnited recharacterized its original motion:   "OneUnited contends that CSAME is a trust that

was created solely to accomplish the non-business, religious purposes of the [AME Church] and its legal

representative, [AMEC Corporation]."[4]  In so doing, OneUnited advanced three new contentions:  that

CSAME is a trust (it had previously contended only that CSAME is a trustee), that its purposes are non-

---

[3] 11 U.S.C. §§ 101(41) (defining "person" to include "corporation"), 109(b) (permitting certain persons to be debtors under chapter 7), and 109(d) (permitting certain persons who may debtors under chapter 7 to be debtors under chapter 11).
[4] Reply Brief, p.1.

business, and that its purposes are not its own but entirely another's.  In addition, OneUnited also articulated the following new causes and arguments for dismissal.  First, CSAME is not in fact a "corporation" within the meaning of § 101 of the Bankruptcy Code; for purposes of determining eligibility, the focus should be not on what the debtor is called but on what it is and what its purpose is, and these reveal CSAME to be a trust.  Second, restrictions in Massachusetts law, in CSAME's corporate charter, and in the AME Church's discipline limit CSAME's activities to public worship and other religious purposes, and these purposes, being both not-for-profit and religious in nature, are not and cannot be in the nature of business.  That is, by definition, nonprofit entities and religious entities cannot be business entities and therefore may not be debtors.   OneUnited also answered CSAME's last argument—that under § 544(a), it may avoid any transfer of a beneficial interest in its assets to AMEC—by arguing that no proceeding for that purpose has yet been commenced, and any ruling on the issue would be advisory and therefore is constitutionally prohibited.[5]

The Court held an evidentiary hearing on the motion.  At the hearing, OneUnited offered for the first time two reasons why CSAME's corporate status under Massachusetts law should not be treated as valid for purposes of bankruptcy eligibility:  CSAME cannot be a nonprofit corporation because (1) by virtue of the fact that it holds all its property in trust for AMEC, it has an equity holder, but a nonprofit corporation is prohibited by law from having an equity holder; and (2) upon dissolution of CSAME, its assets would, by AME Church rules, be deemed abandoned to an agency of the AME Church, but by state law, the distribution of a dissolved nonprofit corporation's assets must be determined by state authorities.  CSAME responded that insofar as OneUnited argued in its reply brief (a pleading to which no response was required) and later that a religious corporation is somehow illegitimate because of the features of its denominational polity, this position may run afoul of the Free Exercise provision of the Massachusetts Declaration of Rights, which argument it wanted to preserve for fuller briefing should the

---

[5] OneUnited offers no explanation as to why the same logic would not apply to the determination it now seeks as to the extent of CSAME's property rights vis-à-vis AMEC Corporation, which is not a party to the present motion.

Court find OneUnited's argument to be otherwise meritorious.[6]   CSAME did not otherwise object to

OneUnited's articulation of new arguments and new grounds of dismissal in a brief to which no

response was required and later, at the evidentiary hearing.


**FINDINGS OF FACT**

1.      The AME Church was formed in Philadelphia, Pennsylvania in 1816.

2.      Under a different name, CSAME was incorporated by act of the Massachusetts General

Court on January 28, 1839.  The act reads:

> Be it enacted by the Senate and House of Representatives in General
> Court assembled, and by the authority of the same, as follows:
>   Sect. 1.  Noah C. Cannon, Henry Carroll, and Daniel Laing, their
> associates and successors, are hereby made a corporation, by the name
> of the First African Methodist Episcopal Society in the City of Boston,
> with all the powers and privileges, and subject to all the duties,
> restrictions and liabilities, contained in the twentieth chapter of the
> Revised Statutes, relating to parishes and the support of public worship.
>   Sect. 2.  Said society shall have power to hold real and personal
> estate, to an amount not exceeding five thousand dollars, exclusive of
> their meeting-house:  *provided*, that the whole annual income thereof
> shall be appropriated to parochial purposes.

Chapter 4 of the Acts of 1839.  In 1978, the "Society" amended its name to Charles Street African

Methodist Episcopal Church of Boston.  CSAME has remained continuously incorporated in the

Commonwealth of Massachusetts since its incorporation.

3.      At all times from its incorporation through the present, CSAME has been and remains a

congregation, or local church, of the AME Church and in good standing as such.   It has no plans to sever

its affiliation with the AME Church.

4.      At present, CSAME has approximately 1,000 active members.  It employs a pastor and

other religious and administrative employees and pays their salaries.  It conducts regular worship

---

[6] As it happens I do not, and no further briefing is necessary, but in view of the timing of these arguments, CSAME
would be entitled to an opportunity for further briefing (and evidentiary hearing, if necessary) were the court
otherwise inclined.

services, provides pastoral care and counseling, provides religious education, and engages in charitable

activities of various sorts, much of it in the nature of activities, education, and support for children.  It

raises money through congregational giving in remarkable sums, to support its regular program and also

to support special projects.  It has expenses that  it must and does pay.  It has borrowed money under

two commercial loans from OneUnited that it is obligated to repay.  CSAME owns and maintains its

church building and other improved real estate, all of which serves its religious ministry and purposes in

one way or another.

5.      CSAME has undertaken to develop certain of the real estate it owns into a community

center to be known as the Roxbury Renaissance Center ("RRC").  Though the RRC will be operated by a

nonprofit corporation that is separate and distinct from CSAME, its creation and the development of the

building it will occupy are charitable initiatives of CSAME.

6.      One of the two outstanding commercial loans from OneUnited to CSAME is a loan for

construction of the RRC (the "RRC Loan") in the original principal amount of $3.652 million.   The other,

which was originated at the same time as the RRC loan, is a term loan in the original principal amount of

$1.115 million (the "Church Loan"), which refinanced a then-existing loan from another bank.  When it

entered into these two commercial loans with OneUnited, CSAME gave promissory notes and mortgages

on its real estate to OneUnited.  The decision and initiative to enter these loan agreements and give

mortgages on its real estate to OneUnited were the decision and initiative of CSAME.  The rules of the

AME Church required that the granting of these mortgages be approved by two ecclesiastical

authorities—the Quarterly Conference and the Annual Conference (about which more below)—and the

necessary permissions were granted, but the higher authorities did not direct that mortgages be

granted.  Their role was limited to oversight and permission; the initiative resided in the local church,

CSAME, not in any other authority of the AME Church at any level.

7.      The AME Church is structured, in its own nomenclature, as "a connection" or "connectional church."  That is, although its "local churches," such as CSAME, may be separately incorporated, they are connected through a multi-tiered network of "conferences" of various regional breadths and of "episcopal districts," each having such authority as is specified in the AME Church's Book of Discipline.  Local churches meet on their own, in Local Church Conferences presided over by the local church's minister in charge.  For each local church, the pastor, ministers, and certain officers also meet in special quarter-annual meetings knows as Quarterly Conferences, presided over by a "presiding elder" for a given presiding-elder district (to be distinguished from an episcopal district).  Each Quarterly Conference sends a representative to an annual District Conference for the presiding-elder district.  Also annually, there is held a meeting of an Annual Conference, which is both an incorporated entity and a meeting, for the oversight of the local churches within the presiding-elder districts within the Annual Conference.  The Annual Conferences are themselves organized into Episcopal Districts, of which (according to the 2008 *Book of Discipline*) there are twenty, each presided over by a bishop.  Finally, the whole AME Church is overseen by a quadrennial General Conference, a legislative meeting of the bishops and an equal number of ministerial and lay delegates, which constitutes "the supreme body of the AME Church," and, between General Conferences, by a Council of Bishops, which is "the executive branch of the connectional church."[7]  CSAME belongs to the Boston-Hartford District of the New England Annual Conference of the First Episcopal District.

8.      The AME Church relies on the connections among its congregations to accomplish its mission and purpose and regards its various parts as interdependent.  It defines "connectional" as "[a] structural organizational principle that all (national and international) AME church congregations are a connected network of unique, compatible, interdependent relationships to accomplish the mission and

---

[7] *The  Book of Discipline of the African Episcopal Methodist Church 2008* ("*Book of Discipline*"), pp. 8, 133-134

purpose of the church."[8]  The term is more than neutrally descriptive and clearly has ecclesiological

significance for the denomination.

     9.     The structure and regulations of the AME Church are set forth in *The Book of Discipline*

*of the African Methodist Episcopal Church*, the most-recently published being that of 2008.  Subject to

certain exceptions, the General Conference may make and amend the rules and regulations of the AME

Church that are set forth in the *Book of Discipline*.

     10.     Part III of the *Book of Discipline* governs property rights.  It specifies:

> The title(s) to all real, personal and mixed property held at the
> General, Annual Conference level or by the local churches, shall be
> held IN TRUST for [AMEC], and subject to the provisions of The Book
> of Discipline of the African Methodist Episcopal Church.

*Id*. p. 55 (hereinafter, the "In Trust Rule").

     11.     Part III also contains the following relevant provisions:

     a.     When a local church is incorporated, "all property—real, personal, and mixed—shall be

deeded to it in its corporate name, IN TRUST for [AMEC]."[9]

     b.     The duly elected board of trustees of a local church may purchase, mortgage, sell, and

transfer real and personal property, PROVIDED that such transfer has been duly

approved by the resolution in Quarterly Conference of the said church, and also by the

trustees of the Annual Conference in which the property is located, and of which the

presiding bishop is president."[10]  The *Book of Discipline* does not require AMEC approval

for a purchase, mortgage, sale, or transfer so approved.

     c.     The Board of Trustees of a local church may also mortgage or encumber property of the

local church by a majority vote of those present at a properly called and noticed local

church conference, provided such action is approved in a regular session of the

---

[8] *Id.* p  673.
[9] *Id.* p. 56.
[10] *Id.* p. 56.

Quarterly Conference.[11]  "When a local church complies with the requirements set forth in this section, consent for the same is not necessary to be obtained from [AMEC]."

d.  "If any church property is abandoned in consequence of the disbanding of the society, the title of said property shall be vested in the Annual Conference in which it is located."[12]

e.  In the glossary section of the Book of Discipline, "abandoned property" is defined as follows:  "When a congregation is dissolved, disbanded, or otherwise ceases to function as a church in the African Methodist Episcopal Church, the rights to all real property, personal property, and fixtures are automatically transferred to the Annual Conference Trustee in which they are located."

12.  The entity for which the In Trust Rule specifies that property is held in trust is AMEC, a nonprofit corporation incorporated under the laws of Pennsylvania in 1936.  The *Book of Discipline* includes AMEC's articles of incorporation.  AMEC, also known historically as The Board of Incorporators or The General Board of Trustees, "has the supervision, In Trust, of all Connectional property of the church, and is vested with authority to act in behalf of the Connectional Church whenever necessary" in that regard.[13]  Immediately after the articles of incorporation, the *Book of Order* reiterates that the purpose of AMEC is "to hold in trust" all property interests that it holds.[14]  The articles of incorporation specify that the purpose of AMEC is "to invest in [AMEC] sufficient power and authority in all matters concerning property rights of said African Methodist Episcopal Church so that said Corporation may have as the representatives of the aforesaid church competent legal authority to represent it and said church shall have competent legal representatives in all matters where in the property rights and other

---

[11] *Id.* pp. 56-57.
[12] *Id.* p. 57.
[13] *Id.* p. 133.
[14] *Id.* p. 49.

interests of the aforesaid church should be protected and guarded[.]"[15]  AMEC is also charged with the

duty to quiet adverse claims to church property, including claims and usages by departments and

societies of the AME Church that are contrary to the *Book of Discipline*.[16]

13.      OneUnited has adduced no evidence that the In Trust Rule has ever been invoked

except to resolve a dispute over property ownership between the AME Church and a disaffiliating local

church.  The witnesses who testified on that issue testified credibly and uniformly, and each with many

years' experience in the denomination, that they have never known it to have been used except in

circumstances of disaffiliation.

14.      As a condition of making the RRC Loan, OneUnited insisted on receiving a guarantee of

the loan from the First Episcopal District, and the First Episcopal District, at the request of CSAME, did

guarantee the RRC Loan.

15.      Before the RRC Loan closed, the First Episcopal District supplied to OneUnited a financial

statement.  The statement, which was prepared by an independent accountant, included the following

note, known as "Note 1": "The African Methodist Episcopal Church organization grants to the bishop of

the First Episcopal District the authority to transfer funds at his discretion between organizations and

member churches of the First Episcopal District and/or the district's central office.  This authority also

extends to any organization created or controlled by the district."  This same statement, or a close

variant thereof—modified only by substituting "direction" for "discretion"—appeared in several

financial statements of the First Episcopal District for succeeding years.  It is unclear whether, and to

what extent, the bishop of the First Episcopal District, or any bishop of the AME Church, has the

authority represented in Note 1.  One witness testified that the authority so described exists by

---

[15] *Id.* p. 45.
[16] *Id.* pp. 45-46, 50.

tradition.[17]  None of the four who were asked about it,[18] at least three of whom had considerable and

long familiarity with the *Book of Discipline*, knew of authority for Note 1 in the *Book of Discipline*.  Rev.

Gregory Groover, the pastor of CSAME, who also served as first vice-chairperson on the revisions

committee of the 2008 and 2012 General Conferences, for revisions to rules and regulations that appear

in the *Book of Discipline*, testified that Note 1 was inconsistent with his understanding, and that a bishop

who attempted to invade the accounts of a local church would meet resistance in doing so.  Another

witness also testified that it was his understanding that a bishop's ability to transfer funds from a local

church's accounts would be contingent on the local church's consent.[19]

16.      The *Book of Discipline* specifies that "a bishop shall travel at large throughout the

episcopal district . . . and oversee the spiritual and temporal business of the churches or congregations

within the district to which assigned"[20] and "shall preside in all of the Annual Conferences within the

episcopal district where assigned[.]"[21]  The *Book of Discipline* defines "Annual Conference" as follows:

"A geographical grouping of congregations in a specified geographical area to form the legal entity of

Methodist polity.  This is where mission, resource personnel (clergy and lay), and property are

administered and where a bishop is the president."[22]

---

[17] Deposition of Rev. Vernard Leak, pp. 55-56.  This testimony raises the question of whether tradition, or long-standing practice, is a separate source of authority, alongside the *Book of Discipline*, in the AME Church.
[18] They are: (i) Dr. Clement Fugh, presently a bishop, who has been involved in the revision and compilation of the Doctrine and Discipline of the AME Church since 1980; (ii) Rev. Vernard Leak, administrator for bank relations for the First Episcopal District and a presiding elder; (iii) Clarence Fleming, chief financial officer for the First Episcopal District since 1998; and (iv) Rev. Gregory Groover, pastor of CSAME since 1994 and a pastor in AME churches since 1987.
[19] Deposition of Rev. Vernard Leak, pp. 55-57.
[20] *Id.* p. 137.
[21] *Id.* p. 136.
[22] *Id.* p. 670.

**DISCUSSION**

**a**.    **Dismissal**

Under § 1112(b)(1), the court "shall convert a case under this chapter [chapter 11] to a case

under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and

the estate, for cause unless the court determines that the appointment under section 1104(a) of a

trustee or an examiner is in the best interest of creditors and the estate."  11 U.S.C. § 1112(b)(1).

Ineligibility to be a debtor is cause to dismiss a chapter 11 case (albeit not one included in the non-

exhaustive list of circumstances that constitute cause that appears in § 1112(b)(4)); CSAME does not

contend otherwise.  Nor does any party argue here that conversion to chapter 7 or the appointment of a

trustee or examiner is a viable alternative to dismissal.  In the circumstances presented here, if CSAME is

not eligible to be a debtor in chapter 11 for the reasons that form the basis of this motion to dismiss—

that CSAME is not a "person" within the meaning of 11 U.S.C. §§ 101(41), 109(b), and 109(d)—then

neither would it be eligible to be a debtor in chapter 7.  And ineligibility to be a debtor in chapter 11

would make appointment of a chapter 11 trustee or examiner pointless.  If CSAME is ineligible to be a

debtor under chapter 11, the case must be dismissed.[23]  The court therefore turns to the issue of

eligibility.  The burden of proof is on the party asserting cause for dismissal.  *In re Pittsfield Weaving Co.*,

393 B.R. 271 (Bankr. D. N.H. 2008).

**b.**    **Eligibililty**

Eligibility to be a debtor is governed by § 109 of the Bankruptcy Code.  In relevant part,

subsection (d), which governs eligibility for chapter 11, states that "[o]nly a person that may be a debtor

under chapter 7 of this title . . . may be a debtor under chapter 11 of this title."  11 U.S.C. § 109(d).

Subsection (b), which governs eligibility for chapter 7, states that, subject to exceptions not relevant

---

[23] Even where cause for dismissal exists, a debtor may avoid dismissal if it satisfies certain requirements set forth in
subsection 1112(b)(2), but CSAME does not invoke that subsection here.

here, "a person may be a debtor under chapter 7 of this title[.]"  11 U.S.C. § 109(b).  "Person," a defined

term, "includes individual, partnership, and corporation[.]"  11 U.S.C. § 101(41).  CSAME is not an

individual and does not contend that it is a partnership.  Therefore, if it is eligible to be a debtor at all, it

must be as a corporation, and CSAME contends that it is eligible precisely as a corporation.


1.      **Corporation**

"Corporation," too, is defined.  Section 101(9) supplies the following definition for purposes of

title 11:

> The term "corporation"
> (A) includes—
>> (i) association having a power or privilege that a private corporation, but not an
>> individual or a partnership, possesses;
>> (ii) partnership association organized under a law that makes only the capital
>> subscribed responsible for the debts of such association;
>> (iii) joint-stock company;
>> (iv) unincorporated company or association; or
>> (v) business trust; but
> (B) does not include limited partnership.

11 U.S.C. § 101(9).  This definition has at least four notable features.  The first is that it does not actually

attempt to define corporation but merely specifies that certain entities that are not normally considered

corporations will be deemed corporations in the Bankruptcy Code; it assumes that corporations

themselves are "corporations" within the meaning of the definition.  It exists primarily to include certain

non-corporation entities in the fold.  The second is that it employs, in parts (A)(i) and (A)(iv), the very

word it purports to define, a practice that, in the definition business, is a faux-pas, involving an

inescapable circularity.  The definition thus assumes a preexisting, extrinsic notion of what constitutes a

"corporation" and of what it means to be "incorporated."  The third notable feature is that the

definition, such as it is, is expansive, including within "corporation" even entities that are defined only as

"*unincorporated* companies or associations."[24]  11 U.S.C. § 101(9)(A)(IV) (emphasis added).  Fourth, by

using the word "includes," it indicates that the list in § 101(9)(A) is not exhaustive.  11 U.S.C. § 102(3) (in

the Bankruptcy Code, "includes" is not limiting).

The meaning of corporation, as the term is used in the Bankruptcy Code, a federal statute, is

clearly a federal question.  Therefore, it is not necessarily dispositive that an entity is a corporation

under state law.  Still, in view of the deliberately nondefinitional and expansive character of § 101(9),

when an entity is considered a corporation under state law, it must enjoy a presumption of being a

corporation for purposes of § 101(9) and the Bankruptcy Code, and the burden of proof is on the party

asserting that its characteristics somehow disqualify it from being a § 101(9) corporation.

CSAME is a corporation as that term is used in Massachusetts law.  "Corporation" is used in the

1839 act of the Massachusetts General Court by which CSAME was incorporated:  "Be it enacted . . . as

follows:  Noah C. Cannon, Henry Carroll, and Daniel Laing, their associates and successors, are hereby

made a corporation."  Corporation also appears in the Massachusetts statute that codifies

Massachusetts law regarding (among other things) the incorporation of religious parishes and societies,

by which CSAME is itself governed, MASS. GEN. LAWS, ch. 67 (governing parishes and religious societies).

Notably, section 40 of that chapter states:

> The Trustees of any society of the United Methodist Church, or of the
> African Methodist Episcopal Church, appointed according to the
> Discipline or usages thereof, respectively, or as such society chooses,
> may organize and become a corporation with the powers and duties
> prescribed by chapter one hundred and fifty-five, subject, however, to
> account to the charge conference of such society according to the
> aforesaid Discipline and usages.

MASS. GEN. LAWS, ch. 67, § 40.  CSAME is a corporation under this section and under chapter 67 generally

and therefore under Massachusetts law.

---

[24] Noah Webster is surely turning in his grave.

OneUnited does not dispute the validity of CSAME's incorporation under Massachusetts law or that its corporate status remains in good standing.  Nor does it contend that CSAME, or a religious corporation under MASS. GEN. LAWS ch. 67, lacks, in the language of 11 U.S.C. § 101(9)(A)(i), "a power or privilege of a private corporation."  CSAME and religious corporations under MASS. GEN. LAWS ch. 67 enjoy the powers, privileges, and attributes of private corporations.  They have existence as separate entities from their incorporators, officers, and members.  They have the powers enumerated in MASS. GEN. LAWS ch. 67, § 46 (to receive, hold, manage, sell, convey, and hold in trust all real and personal property belonging to such church).  Pursuant to MASS. GEN. LAWS ch. 67, § 40, they have the powers and duties set forth in MASS. GEN. LAWS ch. 155, § 6 (to sue and be sued, elect officers, determine their duties and compensation).  They also have the powers specified in MASS. GEN. LAWS, ch. 180, § 6 (rights regarding burial grounds; and, by reference to MASS. GEN. LAWS ch. 155B, § 9, the power "to make donations, irrespective of corporate benefit, for the public welfare or for community fund, hospital, charitable, religious, educational, scientific, civic or similar purposes").  Plainly a religious corporation such as CSAME does not lack the powers and privileges of corporations in Massachusetts or of corporations in general.  By virtue of these various powers, CSAME is at least "an association having a power or privilege that a private corporation, but not an individual or a partnership, possesses," and therefore a corporation by operation of § 101(9)(A)(i).

OneUnited nonetheless contends that the characterization of CSAME as a corporation by Massachusetts law is inconsistent with the meaning of "corporation" in § 101(9) of the Bankruptcy Code, and that the latter employs a functional definition that looks beyond "mere labels."  OneUnited has not specified the distinguishing features of a corporation in its proposed functional definition, but it has advanced four reasons why CSAME should not be deemed a corporation:  (i) that CSAME holds its property in trust for AMEC; (ii) that CSAME, both because it is religious in purpose and because it is not-for-profit, is not engaged in business, and engagement in business is an essential attribute of a

corporation for purposes of § 101(9); (iii) that a nonprofit corporation is prohibited by state law, MASS.

GEN. LAWS, ch. 180 (no section was specified), from having an equity holder, but by virtue of its alleged

trust relationship to AMEC, AMEC is a de facto equity holder; and (iv) that upon dissolution of CSAME, its

assets would, under AME Church rules, be deemed abandoned to the New England Annual Conference

of the First Episcopal District of the AME Church, but by Massachusetts law, MASS. GEN. LAWS, ch. 180

(again no section was specified), the distribution of a dissolved nonprofit corporation's assets must be

determined by state authorities.

None of these is cause to conclude that CSAME is not a corporation.  In fact, none of these

reasons is close to the mark.


### (i)    CSAME as Trustee

First, even if CSAME does, by virtue of the rules of the AME Church, essentially and at all times

hold all its property in trust for AMEC (I need not and do not decide this issue), CSAME is no less a

corporation for it.  A corporation may serve as the trustee of a trust; and when it does so, it does not

cease to be a corporation and to enjoy all the powers and privileges thereof.  OneUnited has adduced no

authority to the contrary, and I know of none.  In addition, Massachusetts law expressly contemplates

that a religious corporation may hold gifts and grants to the church in trust.  MASS. GEN. LAWS ch. 67, § 40

("such corporation may hold in trust gifts, grants, bequests or devises to such church for the support of

public worship and for other religious purposes").  And Massachusetts law specifically contemplates that

when a local church of the AME Church becomes incorporated, it shall "account to the charge

conference of such society according to the aforesaid Discipline and usages."  MASS. GEN. LAWS, ch. 67, §

40.  That is, Massachusetts law incorporates AME churches subject to their obligations to their larger

church; it does not view the rules of AME polity, including the In Trust Rule, as imperfections of or

detractions from corporate form.  Moreover, if CSAME were deemed a trustee of its assets for the

benefit of AMEC, CSAME's essence and purpose would not be reduced to its trusteeship.  CSAME has

purposes of its own: its corporate worship, care for its members, outreach to its community.  These are

initiatives of the local church.  That they are consistent with the mission and purpose of the larger

church makes them no less the work and purpose of CSAME.  In sum, even as a trustee, CSAME would

remain a religious corporation in its own right.


### (ii)  Engagement in Business

Second, engagement in business is not an essential attribute of a "corporation" for purposes of

§ 101(9), only of a trust that would qualify as a corporation under § 101(9)(A)(v) on the basis that it is a

"business trust."  The word business appears only in § 101(9)(A)(v)  ("the term 'corporation' includes . . .

business trust").  It should not be read to modify "corporation" itself.

Even if engagement in business were deemed a requirement of a corporation under § 101(9), it

would be an unreasonably and unnecessarily narrow definition of business that excluded such business

as is conducted by churches and other religious congregations and by the myriad other forms of not-for-

profit corporations.  "Business," which is not defined in the Bankruptcy Code, refers at root to simple

"purposeful activity," "busyness."  Miriam-Webster's Collegiate Dictionary, p. 167 (11th ed. 2003).  That

definition, though listed first in Miriam-Webster's definition, is archaic, and "business" today requires

"commercial or mercantile activity," or "dealings or transactions esp. of an economic character."  *Id*.

Still, though these are usually conducted for profit, they often are not; and no part of Miriam-Webster's

definition of business, or the common usage of the term, requires that they be for profit.  Hospitals,

private primary and secondary schools, universities, international relief organizations, and major

symphony orchestras are often nonprofit corporations; no one would say they are not also businesses.[25]

---

[25] Nor have they been excluded from petitioning for relief under chapter 11 of the Bankruptcy Code, as evidenced
in this district by the recent case of Quincy Medical Center, Case No. 11-16394.

The ability of investors to extract a profit from a particular economic enterprise is not common to all businesses and is hardly the *sine qua non* of business.

Nor is there a principled reason that "business" should exclude the economic activity of religious congregations.  OneUnited offers none.  CSAME hires and pays employees, raises income from member donations and from rents, fashions a budget, owns and maintains a church building and other real estate, supports the mission of the larger AME Church through contributions of labor and money, and, not least, provides services to its members and its community in the form of corporate worship, pastoral counseling, education, community building, and charitable outreach.  This is no more than the usual and ordinary activity of any church or religious corporation, and it is business plain and simple.[26]  OneUnited contends that a religious corporation is prohibited by law from using its property for any purpose other than "for the support of public worship and for other religious purposes," as if by definition this excludes business of any kind.  Mass. Gen. Laws, ch. 67, § 41 (defining purposes for which trustees of religious corporations may receive, hold, manage, sell, and convey property).  It does not follow, however, that being a church, furthering "religious purposes," even public worship, is not, in addition to whatever else it is, economic activity.  "Public worship," for example, usually requires real estate (rented or owned), heat (in New England for half the year) and electricity, a paid worship leader, one or more paid musicians, literature (music, orders of worship, and the like), and the collection of donations to (among other things) pay for all of the above.  The Venn diagram that shows no overlap between business and the religious activity of a church is unrealistic and invalid.

### (iii)    Equity Holder

OneUnited argues, with virtually no development at all, that CSAME cannot be a valid nonprofit corporation because Massachusetts law (One United does not specify the provision) prohibits a

---

[26] In reaching this conclusion, I need not rely on such business as CSAME may be deemed to do by virtue of its efforts to create the RRC.

nonprofit corporation from having an equity holder, but, by virtue of certain provisions in the *Book of*

*Discipline*—the In Trust Rule and the abandonment provision—CSAME has an equity holder.  OneUnited

does not identify the alleged equity holder, perhaps because the cited rules would create different

"equity holders."  The In Trust Rule specifies that local church property is held in trust for AMEC, which

itself holds it in trust for the AME Church.  The abandonment rule, on the other hand, specifies that

upon dissolution of a local church, abandoned property vests in the local church's annual conference.

In addition to the difficulty it encounters in identifying the equity holder, OneUnited's argument

falters for the following reasons.  First, when a nonprofit corporation holds property in trust for another,

the other is simply a beneficiary of the trust.  It does not thereby become an equity holder of the

nonprofit.  Second, if the abandonment rule would govern in the event of dissolution or disbanding of

CSAME (I make no ruling on the issue), that would be nothing but consistent with Massachusetts law,

MASS. GEN. LAWS, ch. 67, § 40, under which (as explained above) Massachusetts law incorporates AME

churches *subject to* their obligations to their larger church.  The In Trust Rule and the abandonment rule

are not imperfections of corporate form but entirely consistent with it.  Third, the alleged "equity

holders" are themselves nonprofit corporations.  And fourth, although OneUnited repeatedly alleges, in

support of this argument, that the features of AME polity that create this defect in corporate form also

remove CSAME from compliance with § 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3),

OneUnited has adduced no argument on that point.  Nor has it shown evidence of a single instance in

which the IRS or a court of law has so held, despite the fact that AME churches are numerous, and all

would suffer from the same defect (as, I suspect, would a great many other churches in hierarchical

denominations).  Fifth, it is hardly clear that a corporation whose nonprofit character is somehow

defective (I do not suggest that that is the case here) ceases to be a corporation; OneUnited has

adduced no authority for that proposition, which is implicit in its argument

### (iv)      Abandonment Upon Dissolution

OneUnited further argues that CSAME cannot be a nonprofit corporation because the

abandonment rule is inconsistent with state law for nonprofit corporations (again OneUnited has not

specified the law), under which the distribution of a dissolved nonprofit corporation's assets must be

determined by state authorities.  This argument is just a variant on the last.   It is sufficient to reiterate

that CSAME's adherence to AME polity cannot be a defect of corporate form where Massachusetts law

incorporates AME churches *subject to* their obligations to their larger church.

For these reasons, I am satisfied that OneUnited's arguments are unavailing.  CSAME is a

"corporation" per se within the meaning of § 101(9); and, if it were not a corporation per se, it would be

"an association having a power or privilege that a private corporation, but not an individual or a

partnership, possesses," and therefore a corporation by operation of § 101(9)(A)(i).  Either way, it is a

corporation under § 101(9) and therefore a "person" eligible under § 109(d) to be a debtor in a case

under chapter 11.


### 2.      Nominee Trust

Having determined that CSAME is eligible as a corporation, OneUnited's contention that CSAME

is the trustee of a nominee trust, or at least of a trust that is not a business trust, is moot.  As explained

above, even a corporation that serves as the trustee of a trust is eligible to be a debtor.[27]  The above

discussion also settles the issue of whether CSAME is a nominee trust:  CSAME is a corporation, not a

---

[27] As OneUnited appears to have recognized, its original contention—that the trustee of a nominee trust is
ineligible to be a debtor—is flat wrong.   The case law at most has ever held that a nominee trust itself may not be
a debtor.  I am aware of no case that has ever held that an individual or corporation that serves as its trustee is
ineligible by virtue of that trusteeship.  Indeed such individuals regularly appear as eligible debtors.  Hence
OneUnited's strenuous and refocused reply brief, an attempt to find an alternate footing for the motion.  In view
of the fact that CSAME is a corporation, a status to which no substantial challenge ever was offered, which status
has clearly been dispositive from the start, it would be unreasonable and inappropriate for OneUnited to recover
any portion of the fees and expenses for this motion from CSAME or the guarantor First Episcopal District.

trust of any kind, and at most might be the trustee of a trust.  I therefore need not decide the issue of whether CSAME is the trustee of a nominee trust or a trust that is not a business trust.

There are other reasons not to reach that issue.  First, it concerns internal church matters, but the other relevant authorities in the AME Church—AMEC, the First Episcopal District, and the New England Annual Conference—are not parties to this contested matter.  The Court could decide the issue as between OneUnited and CSAME, but the decision would not be binding on the church authorities.  Second, without their participation, the issues are less carefully developed,[28] and I cannot not know whether the words and positions that OneUnited is articulating as their position vis-à-vis CSAME are words or positions that they themselves would invoke.  Third, no specific property is in issue; this is a controversy about property ownership that involves no live controversy about a specific asset.  And fourth, the decision of this matter would necessarily involve interpretation of the *Book of Discipline*, which, at least at certain points, would require determination of religious doctrine (for example, the nature and extent of a bishop's authority) or at least of unsettled matters of polity (as, for instance, the validity or not of Note 1's representation as to the authority of a bishop).  First Amendment considerations dictate that, at least as a matter of prudence, a court should not undertake to decide these issues if it need not to resolve a controversy.[29]  Here I need not.

### ORDER

For the reasons set forth above, the Motion of OneUnited Bank to Dismiss is hereby DENIED.

Date:  September 11, 2012

_____
Frank J. Bailey
United States Bankruptcy Judge

---

[28] The First Episcopal District did participate in the evidentiary hearing but was not a party to it.  A proceeding to determine the validity or extent of an interest in property is an adversary proceeding and requires an adversary complaint, service of process, and the procedure prescribed in Part VII of the Federal Rules of Bankruptcy Procedure.  OneUnited has not commenced an adversary proceeding or joined the other church authorities.

[29] I make no ruling as to whether the First Amendment would permit me to decide these issues even if that were necessary.