# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re**<br><br>**CHARLES STREET AFRICAN METHODIST EPISCOPAL CHURCH OF BOSTON,**<br><br>        **Debtor** | **Chapter 11**<br>**Case No. 12-12292-FJB** |

### MEMORANDUM OF DECISION ON
### DEBTOR'S OBJECTION TO PROOF OF CLAIM OF ONEUNITED BANK

The matter before the Court is the Objection of the Debtor, Charles Street African Methodist Episcopal Church of Boston ("CSAME"), to proof of claim no. 10 (the "Claim"), filed by OneUnited Bank ("OneUnited").  CSAME objects to the default interest portion of the claim, arguing that it is amounts to an unenforceable penalty.  After an evidentiary hearing[1] and on the basis of the findings and rulings set forth below, I will sustain the objection by disallowing interest in excess of the nondefault rate.

## I.      FINDINGS OF FACT

### A.      The Church and Construction Loans

On October 3, 2006, Charles Street executed two promissory notes in favor of OneUnited.  The first, the "Church Loan," is a fixed-rate promissory note through which Charles Street refinanced an existing mortgage.  Under the Church Loan, CSAME borrowed $1,115,000 for five years at the rate of 7.875 percent per annum,[2] with principal and unpaid interest due in full on December 1, 2011.  Upon

---

[1] I held an evidentiary hearing on August 15-16, 2012.  With regard to this Objection, Charles Street submitted four exhibits.  OneUnited submitted one exhibit and offered the testimony of its President and Chief Operating Officer, Teri Williams.

[2] *See* Debtor's Ex. 4.

maturity or an earlier event of default, the interest rate "shall be increased to the greater of eighteen

percent (18%) per annum or 5% greater than the then floating prime rate, if permitted by law."[3]

The second loan, the "Construction Loan" (together with the Church Loan, "the Loans") was a

non-revolving line of credit of up to $3,652,000 for the purpose of constructing a community center, the

"Roxbury Renaissance Center" ("RRC").  The promissory note for this loan had a term of 18 months.  For

the first six months, interest accrued at a fixed rate of 8 percent per annum.[4]  After the first six months,

the interest rate would vary according to a floating "Prime Rate"[5] but could never be less than 7 percent

or greater than 14 percent per annum.[6]  The promissory note further stated that "from and after any

Event of Default, the unpaid principal balance of all advances shall, at the Bank's option, bear interest at

the rate of eighteen percent (18%) per annum or, if higher, at the floating rate equal to five (5%) percent

above the Prime Rate, if permitted by law until paid in full."[7]  At the evidentiary hearing, the parties

stated that they agreed that, because the promissory note capped the nondefault rate at 14 percent,

and the default interest could never be more than 5 percent above that, the default interest rate on the

Construction Loan could never be higher than 19 percent per annum.  However, there is no evidence

that this interpretation was shared by OneUnited at the time of contracting.  As the promissory note for

the Construction Loan reads, the 14 percent cap applies to the nondefault interest rate but is not part of

the definition of "Prime Rate" and does not limit that rate.  I must conclude that OneUnited believed at

---

[3] *See id.*

[4] *See* Debtor's Ex. 5.

[5] *See id*.

[6] *See id.* Monthly payments of interest only at 8 percent commenced on January 1, 2007 and continued for six
months.  In July, the rate jumped to the then-prime rate of 8.25 percent, before dropping below 8 percent in the
fall of 2007 and below 7 percent by January of 2008 where it remained through the day CSAME filed for
bankruptcy relief.  *See* Debtor's Ex. 6.  Therefore, since January of 2008, the effective nondefault interest rate on
the Construction Loan has been 7 percent per annum.

[7] *See* Debtor's Ex. 5.

the time of contracting that the default interest provision in the Construction Loan was not subject to a 19 percent cap.

The Loans are secured by real property. The Church Loan is secured by mortgages on 551 and 553-565 Warren Street, Roxbury, Massachusetts and on 70 Summer Street, Milton, Massachusetts. The property at 551 Warren Street is the church building itself. It is undisputed that the current value of the properties securing the Church Loan exceeds the amount of OneUnited's Claim on the Church Loan as of the date of the bankruptcy filing. The Construction Loan is secured by mortgages on 567-575 Warren Street, which is the site of the RRC, and on 5-15 Elm Hill Avenue in Roxbury, Massachusetts.[8] It is undisputed that the current fair market value of the properties securing the Construction Loan is less than the amount of OneUnited's Claim on the Construction Loan as of the date of the bankruptcy filing.

Before it committed to the Construction Loan, OneUnited generated a Real Estate Loan Underwriting Memorandum (the "Underwriting Memorandum"), in which it assessed the strengths and weaknesses of extending a $3,652,000 line of credit to CSAME.[9] The Underwriting Memorandum set forth appraised values for the two properties securing the Construction Loan. It stated that the value of the property at 5-15 Elm Hill Avenue was $405,000 and that the value of the property at 567-575 Warren Street—which in 2006 was an undeveloped shell—was approximately $585,000, but that "as constructed" its value would increase to $3,400,000.[10]

### B.     The Guarantee on the Construction Loan

The Underwriting Memorandum indicated that monthly debt service on the Construction Loan would be $24,913 and noted that CSAME did not have sufficient excess cash flow to meet this obligation. Although the Underwriting Memorandum foresaw that CSAME would have difficulty with

---

[8] *See* OneUnited Proof of Claim No. 10, Ex. B-7 and C-2.

[9] *See* OneUnited's Ex. G-43, "Income Property Real Estate Loan Underwriting Memorandum."

[10] *See id.*

repayment, it noted that this problem was mitigated by the involvement of the First Episcopal District of

the African Methodist Episcopal Church ("FEDAME" or "First Episcopal District") in two respects.[11]  First,

FEDAME pledged a certificate of deposit in the amount of $850,000 to secure the Construction Loan,

which certificate was deposited with OneUnited and would help to cover deficiencies in debt service on

the Construction Loan.  Second, FEDAME executed a guaranty of CSAME's performance under the

Construction Loan (the "Guaranty").[12]  The Guaranty provides that, "[u]pon any default by [CSAME] in

the full and punctual payment and performance of the Obligation, the liabilities and Obligation of the

Guarantor [i.e., FEDAME] hereunder shall, at the option of [OneUnited], become forthwith due and

payable to [OneUnited] without demand or notice of any nature."[13]

> **C.      The Loans Go Into Default**

Construction on the RRC began in November, 2006.[14]  The contractor, Thomas Construction

Company, Inc., submitted drawdown requests on the Construction Loan directly to OneUnited and did

draw down on the loan, though not to its full extent.  Construction was plagued by delays and by June 1,

2008, the date upon which Charles Street was to repay all sums advanced under the Construction Loan,

the RRC was not complete.  The parties extended the Construction Loan several times, most recently to

December 1, 2009.[15]  OneUnited formally declared the Construction Loan in default on April 19, 2010, at

which time interest began to accrue at the default rate of 18 percent.[16]

---

[11] *See id.*  FEDAME is an unincorporated association of seven separately incorporated non-profit organizations, known as Annual Conferences, which oversee a combined 330 local churches of the AME Church, including CSAME. CSAME belongs to New England Annual Conference of the First Episcopal District.

[12] *See OneUnited's* Ex. H-60, "Guaranty by First Episcopal District of the African Methodist Episcopal Church."

[13] *See id.*

[14] *See* Debtor's Ex. 19 "RRC Business Plan," p. 6.

[15] *See* OneUnited's Proof of Claim No. 10, Ex. B.  For each extension, Charles Street paid OneUnited a "modification fee" of several thousand dollars.

[16] *See Joint Pre-Trial Statement of Debtor Charles Street AME and Creditor OneUnited Bank* [Doc. 304], Ex. K, *OneUnited Pre-Hearing Memorandum*.

On December 1, 2011, when the Church Loan matured and CSAME was unable to make the required balloon payment, OneUnited declared that loan too in default.[17]  OneUnited began the foreclosure process on the properties securing the Church Loan in February, 2012.[18]  According to OneUnited, the Church Loan has accrued interest at the default rate of 18 percent since December 1, 2011.[19]

In order to avert OneUnited's foreclosure on several of the mortgaged properties, including the church in which it conducts its religious services, CSAME filed a petition for relief under Chapter 11 of the Bankruptcy Code on March 20, 2012.[20]  On June 1, OneUnited filed its Claim, asserting an outstanding balance on the Church and Construction Loans totaling $5,004,358.60 as of the date of CSAME's bankruptcy filing.[21]  This total includes "default/maturity interest" of $792,425.92 on the Construction Loan and of $58,416 on the Church Loan.  In addition to the prepetition balances on the Church and Construction Loans, OneUnited's Claim also asserts entitlement to "post-petition interest, attorney's fees and costs, pursuant to 11 U.S.C. § 506(b)."  OneUnited has not offered evidence on these postpetition amounts.

---

[17] *See id.*

[18] *See OneUnited Bank's Opposition to Debtor's First Objection to Proof of Claim* [Doc. 277].

[19] *See supra* note 16.

[20] 11 U.S.C. § 101 *et seq.*

[21] OneUnited's Claim breaks down as follows:

| Construction Loan | | Church Loan | |
|---|---|---|---|
| Outstanding principal balance | $2,851,689.00 | Outstanding principal balance | $1,062,120.13 |
| (Loan in process balance) | -34,775.13 | | |
| Accrued interest | 30,893.11 | Accrued interest | 21,142.94 |
| **Accrued default/maturity interest** | **792,425.92** | **Accrued default/maturity interest** | **58,416.60** |
| Attorney's fees and costs | 171,512.80 | Attorney's fees and costs | 41,533.23 |
| Property inspection, appraisal fees | 4,050.00 | Property inspection, appraisal fees | 5,350.00 |
| Total Claim as of March 20, 2010 | $3,815,795.70 | Total Claim as of March 20, 2010 | $1,188,562.90 |
| Total Proof of Claim | | | **$5,004,358.60** |

D.    **Setting the Default Interest Rate**

OneUnited's president and chief operating officer, Teri Williams, testified as to the Bank's policy-making decisions in 2006 and spoke in general as to how OneUnited set its interest rates at that time.  At the time OneUnited made the Church and Construction Loans, Ms. Williams served on the Asset Liability Committee ("ALCO") and the Senior Loan Committee and was involved in determining and setting interest rates for OneUnited's commercial loans.[22]  Default interest rates were determined in the first instance by the ALCO; the ultimate approval of loans was made by the Senior Loan Committee.

In setting the non-default rate of interest on the Loans, the ALCO looked at the market prime rate and the ten-year treasury rate.  Risk was also a factor.  The ALCO considered the borrower's ability to repay the Loans, but "we try to keep our rates low because we focus on community development lending, and a lot of our borrowers don't have a lot of resources."[23]  On cross, Ms. Williams testified that OneUnited considered the Construction Loan to be riskier than the Church Loan.[24]  She also stated that the ALCO took the FEDAME Guaranty into consideration in setting the 7 to 14 percent range for the non-default interest rate on the Construction Loan.[25]

At several points in her testimony, Ms. Williams indicated that risk was also a factor in setting the default interest rates on loans.[26]  However, she did not explain how risk can be viewed as an element of damages, a loss to be recovered or compensated for.  Nor did she explain how this factor affected the quantification of the default rate (if at all).  From her testimony it appears that risk, when it

---

[22] See Tr., Aug. 15, 2012, pp. 151-52.

[23] Id. pp. 152-53.

[24] See Tr., Aug. 16, 2012, p. 8.

[25] See Tr., Aug. 16, 2012, p. 27.

[26] See id. p. 7: "Q. Ms. Williams, when the bank set default rates back in 2006 was that in part determined by how risky the loan was?  A. To some degree, yes.  We have default rates for some loans, but not all so, yes, to some degree, yes."

was a factor at all, did not affect the default rate itself but only whether the loan would include a default

interest rate at all.[27]

Ms. Williams did not testify that the default rate was designed in part to recover for OneUnited

either the benefit of its bargain (such as interest that would accrue during prematurity periods of

default) or the time value of money (the cost to it of the money it had loaned and not been repaid) or

lost opportunity costs (profits it would have made with the principal had it been timely repaid).

Nonetheless, from the default interest clauses themselves I conclude that damages of these kinds did

figure into OneUnited's design of those clauses.  This is evident from the fact that each loan expressly

required that default interest be no less than five percent above the floating prime rate.  It is not clear

that OneUnited believed that the floating prime rate would by itself be sufficient to fully address these

categories of damage, but OneUnited's use of the default interest clauses is at least an implicit

indication that it believed that the floating prime plus five percent would be sufficient to address these

categories and all other categories of damages it might suffer.

It is clear from Ms. Williams' testimony as a whole that one of the most important purposes of

charging interest at a default rate was to compensate OneUnited for the operating costs it incurs in

managing defaulted loans.  "[I]f a loan is a performing loan it typically doesn't involve anyone but a –

sort of payment processor, someone who's getting the checks on the loan and processing them."[28]  In

contrast, once a loan goes into default, the additional efforts can be significant.  Ms. Williams testified

extensively, but in general, on these costs:

> [T]he internal costs we considered are the fact that we are going to
> have to use more people, more staff to work on a loan when it goes into
> default.  That includes collection time.  We have collectors that call
> borrowers. . . .  We have individuals that are called asset managers and
> they are sort of the equivalent of an underwriter, so they are a more
> senior position and they are going to work with a borrower to try to get

---

[27] *See id.*

[28] *See* Tr., Aug. 15, 2012, pp. 159-160.

them back on track.  We have an asset management department that has a vice-president of the asset management and it's going to take some of that individual's time to work with the borrower to get them on track, as well as our chief lending officer, myself as president, our CEO, and even up to our board.  . . . And that's just in the lending area.  If a borrower goes into default, it also takes time out of our finance department because the accounting of the loan is very different than a performing loan, so our accounting department has to ensure that the loan is actually accounted for correctly and reported to the FDIC as well as to our external accountants correctly.  It takes also time out of internal audit.  We have a staff of internal auditors that will actually look at the loan file and make sure that we are accounting for the loan correctly and actually working out the loan correctly. . . . Our compliance department will look at the loan.  So there are a lot of different staff members.  Our legal department, we have two attorneys on staff.  All of those costs are not–that we incur are not included in any fees that we could charge a borrower if they are in default.  These are just internal costs that we have that the Bank would incur that are not actually included in the external fees.[29]

OneUnited also has external costs associated with defaulted loans.  Ms. Williams testified that independent auditors came in three times a year and "spend most of their time on–I'd say, 90 percent of their time on loans that are in default."[30]  Nonetheless, most of the work on defaulted loans was performed by salaried employees of OneUnited.  Ms. Williams estimated that in 2006, there were more than ten employees working in the Loan Servicing department, a "few" asset managers, two internal auditors who worked on defaulted loans, and two in-house attorneys whose responsibilities extended to dealing with defaulted loans.[31]  She did not in any way quantify—by range, average, or otherwise—the time these employees, individually or as a group, might spend on a given loan.

Ms. Williams also testified that OneUnited is regulated by the Federal Deposit Insurance Corporation (FDIC), and that when a bank has a large problem loan portfolio, that fact will increase the bank's FDIC premium costs.  She did not testify that these increased premiums were among the damages that OneUnited sought to address with its default interest rates, much less that they had an

---

[29] *See* Tr., Aug. 15, 2012 pp. 158-59.

[30] *See id.* at p. 162.

[31] *See id.* at pp. 23-25.

appreciable effect on the rate. OneUnited offered no evidence to quantify this element of damages, to quantify the extent to which it is properly allocated to CSAME's Loans or any one loan in default, or to explain its role in setting or justifying the default rate.

Ms. Williams explained that defaulted commercial and construction loans are more costly than defaulted consumer loans. "It's not so much the size of the loan," she testified, "as much as it is the work that we have to do to bring the loan . . . back on track."[32] With these costs in mind, for both the Church and Construction Loans, OneUnited settled on a default interest rate of prime plus five percent, but with a minimum of 18 percent. That is, the default rate could never be less than 18 percent, regardless of the floating prime. On cross-examination, Ms. Williams stated that OneUnited used an 18 percent default rate for a number of its commercial loans from 2004 through 2007.[33] From this and other evidence, I conclude that 18 percent was the default rate that OneUnited applied generally, at least as a minimum default rate, to its commercial loans from 2004 into 2007 (it ceased making commercial loans in 2007), and that OneUnited did not calculate the rate separately for these particular loans. OneUnited adduced no evidence of having calculated the anticipated cost to OneUnited—in any way, whether in general, on average, per defaulted loan, for the Loans in particular, or otherwise—of the various labors and expenses that constitute the kinds of damages that Williams testified the default rate was intended to liquidate.

---

[32] *See id.* at pp. 165-66.

[33] *See* Tr., Aug. 16, 2012, pp. 11-12. Ms. Williams testified to her general knowledge that other banks in 2006 were charging between 17 and 24 percent in default interest on similar commercial loans. *See* Tr., Aug. 15, 2012, p. 171. However, the basis for these figures was not firmly established. Ms. Williams stated, "[t]he Bank gathers information on what other banks are doing through phone calls, but also we get information from brokers—actual paper information from brokers. We get information from customers that are shopping their loan." *See* Tr., Aug. 16, 2012, p. 27. No "paper information" was offered or admitted into evidence to corroborate this testimony. On cross-examination she could not name any banks OneUnited had surveyed when investigating interest rates. *See id.* p. 32. Consequently, I give little weight to her testimony that the range of default interest rates in the commercial lending market in 2006 was 17 to 24 percent. I nonetheless find that this was her and OneUnited's belief at the time.

Ms. Williams also testified that, in setting its default rate, OneUnited considered what other lenders are charging for default interest in the marketplace.[34] She gave this consideration priority, even before internal costs.[35] I find that OneUnited set a floor of 18 percent on its default rates simply because others were setting similar rates and it believed it could.

The default rates in the Loans were not actually negotiated between the parties.   There is no evidence or even suggestion that the default interest rates were actually negotiated or were otherwise the result of reasoned quantification on the part of the borrower.  The default rate was not even mentioned in the very detailed commitment letter that OneUnited sent to CSAME for the Construction Loan.

At the time of contracting in October 2006, the prime rate was 8.25 percent, had been below 10 percent since 1991, and had been below 13 percent at all times since 1982.  Clearly, the floor on the rate was written with the expectation that prime, at the time of a possible default on the Loans, could very well be much lower than 13 percent.

## II.      DISCUSSION

In its Objection, CSAME focuses on the "default/maturity interest" components of OneUnited's Claim:  $792,425.92 on the Construction Loan and $58,416 on the Church Loan.  CSAME argues that these amounts—the result of applying an 18 percent default interest rate to the principal balance on the Loans from the date of default through the date of the bankruptcy filing—should be disallowed pursuant to 11 U.S.C. § 502(b)(1) because the default interest rate is, for reasons detailed below, unenforceable

---

[34] *See* Tr., Aug. 15, 2012, pp. 158, 165.

[35] *See* Tr., Aug. 15, 2012, pp. 158: "Q: Now, what cost factors were considered by the Asset Liability Committee and the Senior Loan Committee when you determined the rate of default interest to be used for commercial loans during the year 2006? A: Well, first of all, the ALCO Committee looks at the marketplace, as well as what our internal costs are."

under Massachusetts law.[36]  CSAME further argues that, because the default interest rate is
unenforceable, and for additional equitable reasons, to the extent OneUnited is entitled to any post-
petition interest, it should accrue at the nondefault contractual interest rates on both the Church and
Construction Loans.  In its response, OneUnited argues that an 18 percent default interest rate is not *per
se* unenforceable and in fact is reasonable under the circumstances of this case.  OneUnited also asserts
that it is entitled to postpetition interest at 18 percent.

CSAME's Objection attacks two discrete rights of OneUnited:  its entitlement to prepetition
interest under the terms of the Loans and applicable state law, and its entitlement to postpetition
interest under § 506(b) of the Bankruptcy Code.  Because OneUnited's rights regarding pre- and
postpetition interest turn on different law, I will deal with each separately.

### A.   Whether OneUnited Can Enforce Prepetition Interest at the Default Rate

The burdens with respect to a proof of claim are as follows:

> A proof of claim executed and filed in accordance with the Federal Rules
> of Bankruptcy Procedure constitutes prima facie evidence of the validity
> and amount of the claim. FED. R. BANKR. P. 3001(f); see also *Juniper
> Dev. Group v. Kahn* (*In re Hemingway Transp., Inc.*), 993 F.2d 915, 925
> (1st Cir.1993).  In order to rebut this prima facie evidence, the objecting
> party must produce "substantial evidence."  *United States v. Clifford (In
> re Clifford)*, 255 B.R. 258, 262 (D. Mass. 2000) (*Hemingway Transport*,
> 993 F.2d at 925).  If the objecting party produces substantial evidence in
> opposition to the proof of claim and thereby rebuts the prima facie
> evidence, the burden shifts to the claimant to establish the validity of its
> claim.  *Hemingway Transport*, 993 F.2d at 925 ("Once the trustee
> manages the initial burden of producing substantial evidence . . . the
> ultimate risk of nonpersuasion as to the allowability of the claim resides
> with the party asserting the claim.").

*In re Long*, 353 B.R. 1, at 13 (Bankr. D. Mass. 2006).

In relevant part, § 502(b)(1) of the Bankruptcy Code states that the court "shall allow" a claim to
which an objection has been filed "except to the extent that such claim is unenforceable against the

---

[36] *See Debtor Charles Street AME's First Objection to Proof of Claim No. 10 File by OneUnited Bank* at p. 5.

debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1). A

debtor may therefore assert any defense to a claim that is available outside of bankruptcy. *See*

*Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 450 (2007) ("creditors'

entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the

debtor's obligation") (Internal citation omitted). In order to determine whether to allow OneUnited's

prepetition default interest, I must consider whether the 18 percent default rate it charged on the

Church and Construction Loans would be enforceable under Massachusetts law.[37]

The default interest clauses in the Church and Construction Loans operate as liquidated

damages provisions. *In re 201 Forest Street, LLC*, 409 B.R. 543, 565 (Bankr. D. Mass. 2009). As such, they

are enforceable in Massachusetts under the theory that they compensate the lender for damages it

would incur if the borrower defaulted. *See Cummings Props., LLC v. Nat'l Comm. Corp.*, 449 Mass. 490,

494 (2007). However, should the sum resulting from the default interest be "grossly disproportionate to

a reasonable estimate of actual damages," *Kelly v. Marx*, 428 Mass. 877, 881 (1999), a court will not

enforce the interest rate under the theory that it is, effectively, a penalty. *See De Cordova v. Weeks*, 246

Mass. 100, 105 (1923). Charles Street, as the party challenging the default interest rates, bears the

burden of proving their unenforceability. *See Cummings Props.*, 449 Mass. at 494-95. Any reasonable

doubt as to whether a default interest provision constitutes a valid liquidated damages clause shall be

resolved in favor of the aggrieved party, OneUnited. *See id.*, citing *TAL Fin. Corp. v. CSC Consulting, Inc.*,

446 Mass. 422, 430 (2006).

The Supreme Judicial Court of Massachusetts articulated the analysis of liquidated damages

provisions in *NPS, LLC v. Minihane*:

> A liquidated damages provision will usually be enforced, provided two
> criteria are satisfied: first, that at the time of contracting the actual
> damages flowing from a breach were difficult to ascertain; and second,

---

[37] The parties agree that, insofar as state law governs this controversy, Massachusetts is the state whose law applies.

> that the sum agreed on as liquidated damages represents a "reasonable
> forecast of damages expected to occur in the event of a breach."
> [*Cummings Props.,* 449 Mass. at 421].

451 Mass. 417, 420 (2008). The inquiry is limited to the time of contract formation. Massachusetts

courts do not take a "second look" at the actual damages after a party breaches. *See Kelly*, 428 Mass. at

878. OneUnited is correct in arguing that no Massachusetts case has held that a default interest rate

that is double or more the nondefault rate is *per se* unreasonable. In fact, "[t]here is no bright line

separating an agreement to pay a reasonable measure of damages from an unenforceable penalty

clause." *TAL Fin. Corp. v. CSC Consulting, Inc.*, 446 Mass. at 430. Still, the magnitude of the default rate

is clearly relevant and, at some point, requires justification—a showing that what appears from its sheer

magnitude to be a penalty was in fact a reasonable forecast of expected damages; nonetheless, the

ultimate burden of proof always remains on the party seeking to invalidate the clause. The

reasonableness of the measure of anticipated damages depends on the circumstances of each case.

*NPS, LLC v. Minihane,* 451 Mass. at 420.

In sum, CSAME bears the burden of proving either of two things: that at the time of contracting,

the actual damages flowing from a future breach did not appear that they would be difficult to

ascertain; or that the sum agreed on as liquidated damages did not, at the time of contracting,

represent a reasonable forecast of damages expected to occur in the event of a breach. If either is

established, the default interest provision is not enforceable. If neither is established, the clause is

enforceable and the claim arising from it must be allowed. CSAME does not dispute that, at the time of

contracting, the damages flowing from a future breach appeared that they would be difficult to

ascertain. Therefore, the enforceability of each default interest provision turns on whether it

represented a reasonable forecast of damages expected to occur in the event of a breach.

There is cause here to view the default interest provisions in the Church and Construction Loans

as penalties. I will address each loan separately.

(i)        **Construction Loan**

First, the default interest provision in the Construction Loan shows that, at least for periods in which the prime rate is less than 13 percent, the default interest rate is excessive by design.  The Construction Loan's default interest clause actually creates two separate default interest rates:  an 18 percent rate that applies when the prime rate is 13 percent or lower; and a variable rate, equal to the floating prime rate plus 5 percent, that applies when the floating prime is higher than 13 percent. Therefore, the amount by which the loan's default rate exceeds the floating prime rate is not fixed but variable.  It can be as low as 5 percent, as it is whenever prime exceeds 13 percent, and it can be much higher:  for example, 11 percent when prime is 7 percent, and 14 percent when prime is 4 percent.  No testimony or other explanation was offered to explain why this "margin," the difference between prime and the default rate, should vary so, or how its variability would function to reasonably forecast the damages expected to occur in the event of a breach.  Implicit in this formula is a determination by OneUnited that a rate of 5 percent above prime is sufficient to cover OneUnited's anticipated damages, even when the cost of money (as reflected by the prime rate), and consequently those damages that vary with the cost of money, are *highest*.  Yet OneUnited did not use that formula for all values of the prime rate.  For all values of prime below 13 percent, the formula fixes the default rate at 18 percent. Where the default rate produces a margin that can vary from 5 percent to more than twice and three times that size without explanation, the Court is hard-pressed to conclude that the 18 percent figure for values of prime below 13 percent represented a reasonable forecast of damages.  It tends rather to establish that OneUnited was satisfied that a default rate of 5 percent above prime would suffice to cover its damages in the event of default.[38]

---

[38] How and when it arrived at this conclusion is not in evidence.  I do not find that OneUnited determined that the 5 percent margin over prime was a reasonable forecast of its damages, only that it believed its damages would be covered by this number.

Given these dramatic disparities, why should the court not conclude that, when the default interest formula yields a rate in excess of 5 percent above prime, the rest is "simply gravy," not part of a reasonable forecast of damages?  OneUnited offered no answer.  Ms. Williams testified that a principal purpose of the default interest rate was to assure OneUnited that it would cover the increased operating costs that it incurs when a loan goes into default.  She testified that a defaulted loan made various demands on its in-house staff, and to a lesser extent outside contractors, the cost of which is simply part of OneUnited's overhead and is not separately chargeable to the borrower (except as default interest).  These would be legitimate costs to recoup by liquidated damages.  Still, she and OneUnited offered no evidence in the nature of cost accounting or quantification, no indication that OneUnited had ever (i) quantified in any manner the demands in question—either for its commercial loans in general, for particular types of commercial loans, or this loan in particular—and the damages or range of damages that these would cause OneUnited or (ii) determined that a default interest rate of 18 percent was a reasonable forecast of those damages when prime was below 13 percent.  It is not enough to say that the actual damages would be difficult to quantify and then to pick a measure of liquidated damages without a basis for believing that it constitutes a reasonable estimate of actual damages.  If that were the test, any default rate would suffice, and the second prong of the test would be meaningless.  Under Massachusetts law, the default rate must also have constituted, as of the time of contracting, a reasonable forecast of damages.  There must have existed a reasonable justification for this particular quantification of damages.  Here, the evidence indicates that the default rate was not chosen for its merits as a reasonable estimate of actual damages.  OneUnited gives no indication of having gone through that exercise in estimation.  The evidence rather indicates that OneUnited first satisfied itself that 5 percent above prime would suffice, then surveyed the market and picked a more than generous floor that, as did the creditor *In re 201 Forest Street, LLC*, 409 B.R. at 568, it "thought the market would bear."  Nor has it shown that the default rate it settled upon, dictating an 18 percent rate

when prime is below 13 percent and well below, happened to constitute, as of the time of contracting, a reasonable estimate of actual damages.  The evidence shows that, at least for values of prime below 13 percent, it was not. [39]  For these reasons, the evidence clearly supports the conclusion that the default rate on the Construction Loan, as applied when prime is below thirteen percent, is an unenforceable penalty.

(ii)      **Church Loan**

For largely the same reasons, I conclude that the default interest clause in the Church Loan, too, was not a reasonable forecast of the damages expected to incur in the event of a breach.  The structure of the default interest provision in the Church Loan is, in the dispositive respects, identical to those in the Construction Loan.  It imposes an 18 percent rate when the prime rate is 13 percent or lower and a variable rate, equal to the floating prime rate plus 5 percent, when the floating prime is higher than 13 percent.  This formula creates dramatic disparities in the margin above the floating prime that will be recovered to address a potential breach.  As with the Construction Loan, the use of this formula shows that OneUnited decided that a margin of five percent above prime would suffice to cover both those damages that vary with prime and those others that do not, and it raises a question as to why a floor of 18 percent was necessary or justified for situations where prime is below 13 percent.  As with the Construction Loan, OneUnited offered no evidence to show that the 18 percent floor was integral to a reasonable estimation of anticipated damages.[40]  Therefore, with respect to the Church Loan, too, the evidence indicates the default rate, as applied when prime is below 13 percent, is an unenforceable penalty.

---

[39] In so holding, I do not conclude that liquidated damages can never be variable.  Indeed here it is not the variability of the formula but its fixedness over a certain part of the range that offends.  Where the time value of money is a principal factor in determining damages and that value varies, the use of a floating number is appropriate.

[40] In her testimony concerning the costs of collection and other damages that might arise, Ms. Williams' did not distinguish between the two loans.

(iii)    **Remedy**

Having found the default interest rates charged by OneUnited on both the Church and

Construction Loans are unenforceable under Massachusetts law, I must fashion a remedy.  Where actual

damages are ascertainable and proven, the court may, in lieu of default interest, award the aggrieved

party no more than its actual damages.  *See NPS*, 451 Mass. at 420.  Here, however, OneUnited has not

proven or even attempted to prove its actual damages.

Massachusetts courts also have discretion to void what is determined to be a penalty clause and

uphold the remainder of the contract.  *See 201 Forest Street*, 409 B.R. at 568.  CSAME contends that this

is the appropriate remedy on the Church Loan, and that the consequence of doing this is to substitute

the nondefault rate of interest for the default rate.  The language of the default interest clause in the

Church Loan states that, upon maturity or an earlier event of default, the interest rate will "increase to"

the default rate.  Therefore, CSAME reasons, the natural consequence of voiding the default clause is

only to prevent an increase in the otherwise applicable interest rate; the nondefault rate would

continue to apply even after maturity and in periods of default.  OneUnited offers no argument against

this conclusion, and the Court agrees that it is appropriate.  Therefore, on the Church Loan, interest for

the default/postmaturity period shall be allowed at and limited to the nondefault rate.

With respect to the Construction Loan, too, CSAME argues that the Court should void the

default interest clause and uphold the remainder of the contract.  In this instance, however, CSAME

argues that, because the Construction Loan employs different language—it does not use the words

"increase to"—the court should simply conclude that the promissory note requires no interest at all for

the default/postmaturity period.

OneUnited did not answer this argument (it was first articulated only at the hearing) but I

nonetheless find it strained.  The language of the Construction Loan is that "from and after any Event of

Default, the unpaid principal balance of all advances shall, at the Bank's option, bear interest at" the

default rate.  These are indeed different words from those in the Church Loan, but it is a difference

without significance.  If no special rate applies in the default period, then nothing displaces the general,

nondefault rate, which continues to apply.  It would be strange indeed to construe a commercial loan

agreement as requiring no interest at all during some period before repayment, especially in a period of

default.  Therefore, on the Construction Loan, too, interest for the default/postmaturity period shall be

allowed at and limited to the nondefault rate.


**B.    OneUnited's Entitlement to Postpetition Interest on its Claim**

In its proof of claim, OneUnited asserts that, as part of its secured claim, it is entitled under 11

U.S.C. § 506(b) to postpetition interest.  Charles Street argues that, if there is sufficient value in

OneUnited's collateral to permit allowance of any postpetition interest under § 506(b),  then § 506(b)

requires that such interest  be limited to the nondefault rate for both loans.

As a general rule, a creditor is not entitled to postpetition interest on its claim.  *See* 11 U.S.C. §

502(b)(2).  Section 506(b) provides an exception.  It states:

> To the extent that an allowed secured claim is secured by property the
> value of which . . . is greater than the amount of such claim, there shall
> be allowed to the holder of such claim, interest on such claim, and any
> reasonable fees, costs, or charges provided for under the agreement or
> State statute under which such claim arose.

A secured creditor qualifying for postpetition interest under § 506(b) is entitled to such interest from the

petition date through the date of confirmation of any plan.  *See In re SW Hotel Venture, LLC*, 460 B.R. 4,

24 (Bankr. D. Mass. 2011).  The burden lies with the secured creditor to prove, by a preponderance of

the evidence, that it is oversecured "to what extent, and for what period of time."  *See id.* (citations

omitted).

As a threshold matter, I note that the parties appear to be in agreement that, since the petition

date, OneUnited has been undersecured with respect to the Construction Loan.  Therefore, OneUnited's

18

claim for § 506(b) interest as to that loan is moot, as is CSAME's objection to it, and the Court need only

determine OneUnited's entitlement to § 506(b) interest under the Church Loan.  With respect to that

loan, the extent to which the value of OneUnited's collateral is sufficient to fund postpetition accretions

to its secured claim under § 506(b) is unclear.  Moreover, CSAME's present objection does not put the

value of OneUnited's interest in the collateral in issue.  Whatever that value, this objection presents a

live controversy because, regardless of the value of OneUnited's interest in the collateral, CSAME's

current plan, as modified, proposes to treat OneUnited's secured claim as fully funded through the date

of confirmation.

CSAME's argument is that, under § 506(b), postpetition interest (i) may not exceed what the

creditor is entitled to under state law and (ii) must be reasonable, but the default interest rate on the

Church Loan is both an unenforceable penalty under state law and not reasonably related to the

lender's actual damages.  Although OneUnited argues that its default rate of interest should be

permitted under state law and under § 506(b), it does not disagree that, if the default interest is a

penalty, it is not entitled to enforcement under § 506(b).

Where a default interest clause is unenforceable under state law, § 506(b) does not make it any

more enforceable in bankruptcy.  Subsection 506(b) presumes the existence of "an allowed secured

claim."  11 U.S.C. § 506(b) ("To the extent that *an allowed secured claim* is secured by . . .").  Moreover,

it is undisputed that where an otherwise enforceable default interest clause constitutes a penalty,

courts reviewing those clauses under § 506(b) are not reluctant to modify the parties' private

contractual arrangements.  *See SW Hotel*, 460 B.R. at 35 *quoting In re General Growth Props., Inc.*, 2011

WL 2974305 at *4 (Bankr. S.D.N.Y. July 20, 2011) (courts are reluctant to modify contractual default

interest rates except in limited circumstances, including where they constitutes a penalty).  Here, for the

reasons articulated above, the default interest clauses are (i) unenforceable under Massachusetts law

and (ii) penalties.  For both reasons, OneUnited is entitled to no more than interest at the nondefault rate for the postpetition period.


**III.**      **CONCLUSION**

For the reasons set forth above, a separate order will enter sustaining CSAME's objection to the default interest provisions on the Loans for the prepetition period and as to the Church Loan for the postpetition period.  The objection is moot as to postpetition interest on the Construction Loan.


Date:  September 18, 2012

_____
Frank J. Bailey
United States Bankruptcy Judge