**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| **In re**<br><br>**CHARLES STREET AFRICAN METHODIST EPISCOPAL CHURCH OF BOSTON,**<br><br>**Debtor** | **Chapter 11**<br>**Case No. 12-12292-FJB** |

**MEMORANDUM OF DECISION ON**
**SUBORDINATION OF CLAIM OF ONEUNITED AND**
**DEBTOR'S MOTION FOR FEES**

By the motion before the court, the debtor and debtor-in-possession, Charles Street African Methodist Episcopal Church of Boston ("CSAME"), seeks an award of attorney's fees against OneUnited Bank ("OneUnited") and, on the basis of the same conduct as gives rise to the claim for fees, makes an argument in support of the proposed subordination, through a separately filed plan of reorganization, of the claims of OneUnited. As the basis of its requests for subordination and fees, CSAME contends that in violation of the CSAME's exclusivity rights, OneUnited prematurely filed and circulated a plan of its own and thereby solicited votes against CSAME's plan. OneUnited opposes both subordination and fees.

**FACTS and PROCEDURAL HISTORY**

1. On March 20, 2012, CSAME filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). That same day, CSAME also filed a Plan of Reorganization (as amended, the "Church Plan") that proposed to pay OneUnited in full over time, to give no recovery to unsecured nonpriority creditors, and to give various recoveries to Tremont Credit Union ("Tremont") and Thomas Construction Company ("Thomas Construction").

2. On April 9, 2012, less than three weeks after the Petition Date, OneUnited filed a motion to terminate the Debtor's exclusive period to file a chapter 11 plan (the "Exclusivity Motion"). As filed, the Exclusivity Motion included, as an attachment, OneUnited's proposed plan of reorganization (the "Bank Plan"), entitled "Plan of Reorganization for Charles Street African Methodist Episcopal Church of Boston Proposed by OneUnited Bank." The Bank Plan was marked "DRAFT 4/9/12" on each page and was unsigned.

3. The official docket maintained in this case nowhere identifies the Bank Plan or reflects that it was filed, but it reflects the filing of the Exclusivity Motion and, by hyperlink from its docket entry, permits immediate electronic viewing of the Exclusivity Motion and its attachments, including the Bank Plan.

4. Among other things, the Bank Plan proposed to pay each creditor except Tremont the full amount of its allowed claim; the Tremont secured claim would be cured on the effective date and be otherwise unimpaired. The Bank Plan proposed to fund this distribution not from its own funds but by requiring the First Episcopal District of the African Methodist Church ("FEDAME"), who is not a debtor in this case, to supply the funds.[1]

5. The Bank Plan, dependent as it was on an unwilling third party's voluntary payment of all creditors with its own funds, could not possibly have been confirmed. OneUnited could plausibly have contended that FEDAME had an obligation under a guaranty from FEDAME to fund the repayment of CSAME's debt to OneUnited, but this obligation is contested; and even if the obligation were ultimately established by litigation, it is unclear that FEDAME could or would honor it. There is no evident basis for any obligation by FEDAME to pay CSAME's other debt. OneUnited would not even have had standing to prosecute a claim for the latter. And these rights of repayment are not assets of

[1] With respect to the identity of FEDAME and its relation to CSAME and this case, and as general background, I incorporate by reference the findings of fact set forth in the separate memorandum of decision issued today on confirmation and dismissal.

the bankruptcy estate. OneUnited would be free to contribute its right of repayment to the plan, but it could not contribute the rights of the other creditors. Given the Bank Plan's obvious infirmity, and that it was filed by counsel who I am certain understood its infirmity, I cannot conclude that OneUnited filed the Bank Plan, and the Exclusivity Motion, for any purpose other than to sway the votes of unsecured creditors with a false hope of payment in full from FEDAME.

6. The Exclusivity Motion referred to the Bank Plan as "OneUnited's Proposed Plan" and suggested that allowance of the Exclusivity Motion would "[a]llow consideration of OneUnited's Proposed Plan for confirmation." The Exclusivity Motion included a description of the Bank Plan and specified that it "pays unsecured creditors one hundred percent (100%) of their allowed claims."

7. Counsel for Tremont and FEDAME each received from the Court a notice of electronic filing indicating that the Exclusivity Motion had been filed electronically. Pursuant to the Court's local rules governing electronic filing, MLRB App. 8, Rule 9(a), Tremont and FEDAME thus were served with the Exclusivity Motion. Once the Exclusivity Motion and Bank Plan were electronically filed, they became available to the public, including to all creditors. No evidence has been adduced as to whether the creditors of CSAME viewed the motion or the plan through the public docket.

8. OneUnited served the Exclusivity Motion by mail or email on some seventeen additional creditors of CSAME, including Thomas Construction. As to these seventeen, service included only the Exclusivity Motion, without the Bank Plan or any other attachment, but with a note that attachments would be provided upon request. OneUnited contends that no creditor served by U.S. mail or email has requested the attachments, and I have no evidence to the contrary.

9. The creditors served with the Exclusivity Motion constituted more than half of CSAME's creditors by number. It is not clear whether they also held more than two-thirds of the claims against

CSAME (excluding the claims of OneUnited) by amount. As the vote on the present plan demonstrates,[2] they were sufficient in number and total debt to affect the outcome of a vote of a class of unsecured creditors.

10. CSAME, Tremont, and Thomas Construction opposed the Exclusivity Motion, and the Court denied it.

11. In response to OneUnited's filing and distributing the Exclusivity Motion and Bank Plan, on April 30, 2012 the Debtor filed its First Amended Plan. The First Amended Plan, as modified, proposed in the first instance to pay Tremont, Thomas Construction, and unsecured creditors in full by subordinating OneUnited's claims to the claims of Tremont, which is the sole claim in Class 3, and the general unsecured creditors, whose claims collectively comprise Class 5. The First Amended Plan also provided that if the requested subordination were disallowed, then Class 5 creditors would receive no distribution, and the treatment of Tremont would not change but would be funded by different means.

12. Arguing that OneUnited had, through the filing of the Exclusivity Motion, violated CSAME's rights of exclusivity by publishing a competing plan, CSAME further responded by filing a motion for (i) designation under § 1126(e) of the votes of OneUnited Bank and (ii) costs and attorney's fees and, in the same document, a statement in support of the equitable subordination of the claims of OneUnited Bank to those of Tremont and unsecured creditors (the "Designation, Subordination, and Fee Motion"), the motion presently under consideration.[3] By order of September 11, 2012, the Court denied so much of this motion as sought designation of the votes of OneUnited. In the memorandum of decision issued in support of that order, the Court indicated that it would address costs and attorney's fees separately, "when it addresses the issue of subordination in conjunction with confirmation of the

[2] See ¶ 13 below.

[3] To be clear, the motion does not itself request subordination but merely sets forth the argument for subordination that would be effected through the plan under consideration. Insofar as the basis for subordination is the same conduct as constitutes the basis for the relief that the motion did request, the issue was briefed in the context of that motion and is being addressed there.

plan." As set forth below, the plan presently under consideration, the Seventh Modified First Amended Plan, would, if the Court agrees that the acts in question warrant equitable subordination, subordinate the claims of OneUnited to the claims in Classes 3 and 5.

13. Tremont, as the sole Class 3 claimant, voted to accept the plan. The class of general unsecured creditors, Class 5, voted unanimously—that is, six affirmative votes out of six votes cast, representing aggregate debt of $23,135.18—to accept the plan. Thomas Construction also supports the plan, which would consensually effect the assumption of Thomas Construction's prepetition construction agreement, as amended postpetition, with CSAME; under that agreement, Thomas Construction would be deemed to hold a $700,000 unsecured claim.

14. For reasons set forth in a separate memorandum of decision issued today, and in the present memorandum regarding the subordination feature of the plan, confirmation of the plan must be denied. The Court indicated in the confirmation memorandum that it would address the subordination issue in conjunction with the fee portion of the Designation, Subordination, and Fee Motion. The present memorandum constitutes the Court's findings and conclusions as to (i) the proposed subordination of OneUnited's claims to those of Class 3 and 5 creditors through the Seventh Modified First Amended Plan and (ii) the fee portion of the Designation, Subordination, and Fee Motion.

**ARGUMENTS OF THE PARTIES**

CSAME argues that by filing and distributing the Bank Plan, OneUnited violated (i) CSAME's exclusivity right—its right under § 1121(b) to be the only party who may file a plan during the first 120 days of a case (and longer if and as extended)—and (ii) violated § 1125(b) by soliciting votes against CSAME's plan and in favor of its own without authorization. CSAME further argues that a debtor's right of exclusivity is of such importance in chapter 11 that an appropriate remedy must include equitable subordination of the claim of OneUnited to those claims that the Bank Plan proposed to pay in full. And

CSAME further argues that the remedy should include an award of attorney's fees. For each of these propositions, CSAME relies heavily on *In re Clamp-All Corp.*, 233 B.R. 198 (Bankr. D. Mass. 1999).

OneUnited responds that it did not actually "file" its plan within the meaning of § 1121(b), and, in any event, a debtor's exclusivity right under that section is neither fundamental nor sufficiently important to warrant the remedies requested. OneUnited further argues that the filing of a plan cannot be "solicitation" within the meaning of § 1125(b) because (i) inability to consider competing plans would unduly limit meaningful creditor participation and negotiations and (ii) if the mere filing of a plan constituted solicitation, no debtor could ever file a plan—leave to solicit always follows approval of a disclosure statement, which itself follows the filing of the plan to which it pertains—and even CSAME's own early negotiations with creditors would violate § 1125(b). OneUnited urges the Court to follow those cases that define "solicit" narrowly to apply only to a specific request for an official vote, something that did not occur here. OneUnited further argues that *Clamp-All*—which addressed these same issues and the remedies for violation of exclusivity—is distinguishable, based in essential part on abrogated precedent, wrongly decided, unpersuasive, a departure from established principles of equitable subordination, and not binding. OneUnited further emphasizes that it actually served the Bank Plan on only two creditors, neither of whom was affected by it, and that a further plan has in any event been filed, such that the filing of the Bank Plan has been of no consequence.

**DISCUSSION**

**a. Mootness**

Preliminarily, OneUnited also argues that the fee and subordination issues have been rendered moot by CSAME's filing of a plan that replaced the one whose confirmation process was allegedly tainted by improper solicitation. The Court disagrees. This argument confuses harmlessness of the underlying conduct with mootness of the demands for redress. Mootness asks only whether the controversy is or remains consequential. Rightly or wrongly, CSAME continues to seek fees on account

of the misconduct. CSAME may or may not be entitled to this relief, and in determining that issue, the Court will consider whether the conduct complained of was, or became, harmless[4] (and whether this matters), but the motion for fees remains of consequence: if granted, an order will enter requiring the payment of fees. Moreover, the present plan would subordinate OneUnited's claims on the basis of the alleged misconduct—as, likely, will future iterations of the plan. Both the fee request and the subordination issue remain live controversies. Neither is moot.

**b. Exclusivity and Solicitation**

The first issues presented are whether OneUnited, by filing and circulating the Bank Plan in the manner it did, violated either (or both) CSAME's right of exclusivity in § 1121(b) or the prohibition of unauthorized solicitation in § 1125(b). On virtually identical facts, Judge Boroff of this district held in *Clamp-All* , 233 B.R. at 208-09, that creditors who had filed and circulated a plan and disclosure statement during the exclusivity period had both violated the debtor's right of exclusivity and improperly solicited votes against the debtor's plan. *Clamp-All* is not binding on me, but its conclusions on both issues are carefully considered, well-supported, and persuasive. I adopt its reasoning and discussion of the applicable law.

OneUnited's contention that *Clamp-All* rests in essential part on abrogated precedent, specifically *In re Temple Retirement Comm.*, *Inc.*, 80 B.R. 367 (Bankr. W.D. Tex. 1987), is false; another bankruptcy court in Texas has declined to follow *Temple Run* (and was not obligated to follow it), but the judge that issued *Temple Run* has not repudiated it. It is true that he relied on a decision that was reversed on appeal in *Century Glove v. First Am. Bank of New York*, 860 F.2d 94, 101 (3d Cir. 1988), but the decision he relied on was from outside his circuit, the Fifth, and was relied upon because it was persuasive. Its reversal on appeal by a decision of the Court of Appeals for the *Third* Circuit does not

[4] Harmlessness is not undisputed. CSAME argues that OneUnited's misconduct has irrevocably affected CSAME's options in the case, every plan that might be filed.

abrogate the holding of a Fifth Circuit court. Moreover, in *Clamp-All*, Judge Boroff was aware of the Third Circuit's decision in *Century Glove* and addressed it. In any event, even *Century Glove* does not permit a third party to *file a plan during the exclusivity period,* which is what happened here and in *Clamp-All*. However difficult it may be to define solicitation, I know of no case in which the filing of a plan during the exclusivity period was excused because it did not amount to solicitation as narrowly defined in *Century Glove* and the case it followed, *In re Snyder*, 51 B.R. 432, 437 (Bankr. D. Utah 1985). *Clamp-All* alone addressed those facts. Had OneUnited not filed its plan and instead merely circulated it, the issue presented would be more difficult, but that is not this case. Section 1121(b) creates not only a bright line but a "third rail": don't file a plan during the exclusivity period. The right of exclusivity was violated by the filing of a plan and needs to be vindicated. Whether this unauthorized filing, together with the notice of it that was given through the Exclusivity Motion, also effected an unauthorized solicitation, is merely academic.

OneUnited would distinguish *Clamp-All* on the basis that, in *Clamp-All*, the creditors' plan was sent with a disclosure statement directly to all creditors, while here the Bank Plan was actually sent to only two creditors. This is a distinction without a difference. The filing of a document puts it on the public record, 11 U.S.C. § 107(a), supplying actual notice to any who care to look at it. Creditors may or may not have viewed the filed Bank Plan, but the burden of proving that they did not, to the extent that it matters at all, is on the party that violated the exclusivity statute, a rule against *filing*. OneUnited has not addressed that burden. OneUnited's argument is of the "harmless error" variety. I know of no law that applies that doctrine in circumstances such as these, and I am not inclined to apply it here. Moreover, the Exclusivity Motion was served on numerous parties, and it put them on notice that the Bank Plan was filed and of what it said. The possibilities for mischief here are large, and the precise limits of that mischief are hard to know and perhaps not even fully played out. The burden cannot fall

on a debtor to prove that ill effects have occurred or will occur. The burden of uncertainty is on the party that created it by doing what the statute prohibits. I am satisfied that *Clamp-All* is on point.

Nor can it be said that the filing of a superseding plan, and even its acceptance by all voting classes other than OneUnited's, means there can be no ill effect from the filing of the Bank Plan. The superseding plan was different precisely in that it included the subordination now at issue, which subordination is justified (if at all) precisely by OneUnited's violation of exclusivity. And the acceptance of the plan by the class of general unsecured creditors can only have been based on the possibility it offered that, by virtue of subordination, their claims would be paid prior to OneUnited's; otherwise, they would receive nothing. If the option of subordination is denied, then a subsequent plan may look to the unsecured creditors quite a lot like the plan that was in play when OneUnited violated exclusivity. Unsecured creditors are unlikely to forget that another plan offered payment in full. *Clamp-All*, 233 B.R. at 210.

**c. Remedies**

This leaves the question of remedies. In *Clamp-All*, Judge Boroff settled on a combination of attorney's fees and subordination of the offending parties' claims to the claims of the unsecured creditors to whom the errant plan had offered payment in full. He reasoned that the latter was the most effective means of undoing the harm caused by the violation and deprivation of exclusivity.

While I endorse the goal of undoing the harm, subordination would in this instance be disproportionate to the harm—unsecured claims could conceivably approach $2 million. Here, the harm can be undone in a different way. CSAME's lost exclusivity would in effect be restored by prohibiting OneUnited from filing a plan in this case, and I will enter an order to that effect. Had the Bank Plan offered a real possibility of payment to creditors, this remedy would be inappropriate, a sanction effectively against the unsecured creditors. Here, however, the Bank Plan offered no real hope of

confirmation or recovery; and OneUnited is unlikely, through any other plan it might file, to fund *other* creditors' recoveries with monies of its own.

As in *Clamp-All*, the remedy should also include an award of fees. It shall include the fees and expenses for the work of CSAME's counsel, Ropes & Gray LLP, at its normal hourly rates—notwithstanding that they have represented CSAME *pro bono*—for prosecuting the Designation, Subordination, and Fee Motion. The Court will further deny to OneUnited the fees it expended in prosecuting the Exclusivity Motion and defending the present motion.

Though subordination would be a disproportionate remedy, the above remedies are by themselves inadequate to the offense. OneUnited filed its Exclusivity Motion for no purpose other than to do precisely what § 1121(b) prohibits. This was a knowing and deliberate violation of the right of exclusivity, executed precisely to sway the votes of unsecured creditors with a hope of payment in full, made only the more egregious by the falsity of the hope and pretense of the ploy. Therefore, I will add to the above sanctions the further requirement that OneUnited shall fund the cost of the examiner to be appointed in the case. The examiner's fees shall be funded from the first dollars that would otherwise be paid to OneUnited on its secured claims, either from sale of OneUnited's collateral or payments on its claim under a confirmed plan. The fees so payable shall be capped at $50,000.[5]

**d. Conclusion**

For the reasons set forth above, the Court will enter separate orders (i) denying subordination of the debt of OneUnited to the claims of Tremont and the class of general unsecured creditors, (ii) prohibiting OneUnited from filing a plan in this case, (iii) denying to OneUnited any recovery from CSAME for the fees it incurred in prosecuting the Exclusivity Motion and defending against the Designation, Subordination, and Fee Motion, (iv) establishing a procedure to quantify the attorney's fees and expenses of CSAME's counsel for prosecuting the Designation, Subordination, and Fee Motion,

[5] To be clear, this is a limit not on the amount of the examiner's fee but on the portion payable by OneUnited.

(v) upon quantification, requiring that OneUnited pay the same to CSAME's counsel, and (vi) requiring that OneUnited shall, upon completion of the examiner's duties and allowance of his or her fees, fund the fees and expenses of the examiner to be appointed in the case.

Date: October 2, 2013

Frank J. Bailey
United States Bankruptcy Judge