UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

EASTERN DIVISION

| | |
|---|---|
| In re<br><br>**CHARLES STREET AFRICAN METHODIST EPISCOPAL CHURCH OF BOSTON,**<br><br>Debtor | Chapter 11<br>Case No. 12-12292-FJB |

**MEMORANDUM OF DECISION ON**
**BIDDING PROCEDURES, BREAK-UP FEE, TIMING OF SALE, AND CONFLICTS**

The debtor and debtor-in-possession, Charles Street African Methodist Episcopal Church of Boston ("CSAME"), has moved for authority to sell two contiguous parcels, known as the Storefronts and the RRC Property[1] (collectively, the "Assets"), in a private sale and, before a final hearing on the sale, to approve bidding procedures and a break-up fee and to prohibit OneUnited Bank ("OneUnited"), which holds mortgages on the properties in question, from credit bidding at the sale. The motion is before the Court on the bidding procedures/break-up fee/credit bid portion of the sale motion. Three parties have objected. Horizons for Homeless Children, Inc. ("Horizons"), a prospective purchaser who is not the stalking-horse but wishes it were, objects to the break-up fee. OneUnited and the United States Trustee object on the basis that the property has not been adequately marketed, that the sale process is tainted by an appearance of impropriety that needs to be addressed, and that CSAME has not met its burden of demonstrating cause to preclude credit bidding. This memorandum addresses the bidding procedures, break-up fee, timing of sale, and conflict issues; the court will address credit bidding separately.

---

[1] For consistency, I refer to the properties as they are described in the court's Memorandum of Decision on Confirmation of CSAME's Seventh Modified First Amended Plan of Reorganization [doc. #667]. The RRC Property includes a parking lot that is part of the sale. The parking lot in question is located on Warren Avenue; it is *not* the parcel identified in the earlier Memorandum of Decision as the "Parking Lot," which is located on Elm Hill Avenue.

  a.  **Break-Up Fee**

  The relevant facts are not in dispute. Horizon is interested in purchasing the properties and conducted its due diligence over a period of months without any reliance on the efforts of the entity whom CSAME selected as its stalking-horse bidder, Action for Boston Community Development, Inc., "ABCD"). In order to get one of these entities to make a binding offer and to maximize the stalking-horse bid, CSAME gave both Horizons, which had previously offered $1.6 million, and ABCD, which had previously offered $1.75 million, a chance to make a bid (subject to later counteroffers), in exchange for which the high bidder would serve as the stalking horse bidder and receive a commitment from CSAME to pay a break-up fee of $50,000. ABCD made the higher bid, for $2,000,000, and thereby became the stalking horse bidder in the present sale motion.

  Horizons now says that it is willing to match ABCD's offer and, having come to the process independently of any effort by ABCD, should not be disadvantaged in it by a break-up fee. It also argues that the break-up fee in this instance did not serve to create competitive bidding: Horizons was in fact the first bidder. CSAME responds that the promise of a $50,000 break-up fee was instrumental in obtaining an offer that is both binding and $250,000 richer than the highest earlier bid. OneUnited, which is by far the single most interested creditor, has not objected to the break-up fee; nor has the United States Trustee or any creditor.

  The Court will overrule Horizon's objection to the break-up fee on two grounds. First, Horizons offers no basis for standing to object. It has no contractual right to be free of the disadvantage posed by the break-up fee. And, whatever the consequences of the break-up fee for the estate, Horizons is not a creditor and therefore lacks standing to argue that the break-up fee is contrary to the estate's interests. Second, as a bidding incentive, the break-up fee is a defensible exercise of the debtor's business judgment. It is true that the break-up fee did not in this instance serve to bring the initial offeror to the table. At best, it may have incentivized both ABCD and Horizons to maximize their proposed stalking-

horse bids. Given that the bids made by both ABCD and New Horizons in their competition for stalking horse status were, in a real sense, only interim offers, subject to a later final round of bidding, it is not clear that the break-up fee generated any benefit at all that would not be realized in the final round. More importantly, however, it is also not clear that the break-up fee will *not* improve the final outcome, both by its effects to date and by its effect on the final round of bidding. In short, I do not have the evidence and confidence necessary to disturb the debtor's business judgment on the subject. Especially where OneUnited has not objected to the break-up fee—one of precious few moves by CSAME of which that is true—I am loathe to disturb it. Accordingly, the Court will approve the break-up fee.

b.    **Timing of Sale**

CSAME initially sought to complete the sale process by the end of May, 2014. OneUnited and the U. S. Trustee objected to the timeline as too abbreviated to allow sufficient marketing of the Assets, which both contend has thus far been inadequate; both maintain that the deadline of May 30, which is built into the CSAME's stalking horse agreement with ABCD at the latter's insistence, is artificial and not driven by any real need. OneUnited also argues that CSAME should be compelled to investigate, by test marketing, the value that might be obtained for the Assets if they were sold together with a contiguous third parcel, the "Church Building," so called because it is occupied by the church building itself, CSAME's central and most important asset; OneUnited reasons that the Church Building may have to be sold eventually, and the three parcels may be more valuable as a group than they would be separately.

CSAME responded by moving to obtain a broker and obtaining the consent of ABCD to extend the deadline for closing the sale by a month, to the end of June. No further extension is required, CSAME maintains, because at least two parties are interested in purchasing the Assets, and a delay beyond the end of June risks losing one or both of them; and with the loss of even one, the estate would lose a prospect for competitive bidding that it might not enjoy again in any reasonable time. The two existing bidders confirm, credibly, that their interest is time-sensitive. The objecting parties, on the

3

other hand, offer no alternative timeline that comes close to meeting the needs of the present bidders. CSAME also opposes any suggestion that it should research the value of a sale involving the Church Building

For the following reasons, I will approve CSAME's proposal to complete the sale by June 30. First, at present there exist both interest in the Assets and a prospect for competitive bidding. There is no assurance that these conditions will be achieved again in the reasonably near future.

Second, the stalking horse bid is itself within the range of values for the Assets that the Court found in its findings and rulings on confirmation of CSAME's then-pending plan in October 2013. To be sure, those values were based in significant part on values that were stipulated to only for purposes of that confirmation process, but the findings were not based exclusively on the stipulated values. OneUnited contends that values in Boston have increased in the intervening months, but even if this is generally true, it remains wholly speculative to contend that *these particular properties* have increased in value, and it is quite possible—again on the basis of findings made at confirmation—that at least one of these properties is decreasing in value. OneUnited can offer nothing at this juncture to say that the proffered value—which remains subject to a further round of bidding—is inadequate or cause for concern. Although it has urged CSAME to sell these assets, and opposed confirmation of the debtor's first plan because the plan involved retention of these properties, it can offer nothing but belief and speculation that the properties should fetch more than they are likely to in this process—a number it cannot know.

Third, there has been little active marketing to date, but the Assets have enjoyed the benefit of free publicity from press coverage of this bankruptcy case, which brought both ABCD and Horizons to the table. Some further marketing is warranted, and CSAME has agreed to this by agreeing to hire a broker and to extend the sale deadline by a month; but it is likely that the kinds of purchasers whom

OneUnited would hope to reach have already noted the availability of these Assets—or would have had they been interested.

Fourth, as OneUnited argued strenuously in the confirmation process and in support of its second motion to dismiss, CSAME and its estate can ill afford the continuing cost of insuring and retaining the Assets.  It's high time these Assets were sold.

Fifth, the Court will not compel CSAME to test market the Assets in combination with the Church Building.  OneUnited is free to investigate and offer evidence on the subject as cause, in the final analysis, to disallow the sale[2]; I make no ruling on the merits of this defense.  In any event, the debtor is free to propose its strategy for reorganization.  The Court's role is limited to approving or disapproving, not imposing alternatives.  It is certainly not CSAME's obligation in the first instance to delay its sale in order to explore an option that is inconsistent with its purposes in the case, which understandably includes retention of its home and place of worship.

### c. Conflict of Interest

In connection with the sale motion, CSAME's counsel in this case, the firm of Ropes & Gray LLP ("R&G"), disclosed certain significant connections it has to the bidders, both ABCD and Horizons (the "Potential Buyers"):

- R&G represents ABCD in ongoing matters unrelated to CSAME and this chapter 11 case; and R&G also regularly participates as a major donor at certain functions that benefit ABCD.  ABCD has agreed to waive any conflict involved in the firm's representation of CSAME in this case with respect to ABCD.

---

[2] There has been plenty of time for this to date, but the possibility of selling of three properties as a unit was not even broached as a valuation concern in the confirmation process.

- R&G represents, or has in the last five years represented, certain members of the boards of directors of both Potential Buyers and entities affiliated with certain members of the boards of directors of both Potential Buyers.

- A partner at R&G is a former chairman of ABCD's board of directors, and ABCD's current corporate clerk and a member of ABCD's board of directors.  He will not represent the Debtor in this chapter 11 case; and the firm will establish an ethical wall to keep CSAME's information in its files confidential from the partner.

- A partner at R&G is an honorary board member of Horizons.  She will not represent CSAME in this chapter 11 case; and the firm will establish an ethical wall to keep CSAME's information in its files confidential from the partner.

R&G maintains, and no one disputes, that these connections to the Potential Buyers had nothing to do with bringing them to this transaction; and no one has alleged that R&G has acted in bad faith or otherwise not in compliance with the Bankruptcy Code.  Nonetheless, in order to avoid the appearance and possibility of impropriety, OneUnited urges the following steps—or one or more of them—as necessary to neutralize potential conflicts of interest for the benefit of the estate:  an order requiring CSAME to retain special counsel to represent it in conjunction with the sale prohibiting R&G from advising CSAME about the sale; retention of an independent broker or investment banker to market the assets; or expansion of the duties of the already-appointed examiner to include oversight and decision-making duties regarding the sale.  The U.S. Trustee asks that R&G be required to make fuller disclosure of its connections to the bidders—especially whether in the aggregate these clients represent more than 1 percent of total firm revenues—and, if necessary, withdraw from the sale transaction.

I address these measures in no particular order.  The U.S. Trustee's request for further disclosure was warranted when made but, in view of thorough vetting of these issues at the hearing, at which all the relevant parties were represented, no further disclosure is necessary.  The request to bring

6

in a broker has been accepted by CSAME, which has already applied to employ one; an investment banker would surely be overkill in a case of this magnitude. The request to expand the examiner's duties is denied insofar as it essentially seeks to vest the examiner with a limited subset of the responsibilities of a trustee. As OneUnited and CSAME earlier agreed, the appointment of a trustee or its equivalent would be inappropriate in this case. It is also unnecessary, where the matter in issue is a simple sale of two parcels for which there is ample oversight by an active secured creditor and the U.S. Trustee. In a perfect world, the hiring of special conflicts counsel to handle the sale as a discreet matter would be appealing, but it is not practical here. R&G is handling this case *pro bono*; the estate cannot afford to hire additional counsel.[3] Also, advice on the sale is not easily separable from advice on CSAME's reorganization as a whole, and the history is long and complexities numerous. Conflicts counsel would face a steep learning curve for a relatively simple issue. The dance of coordination and separation between two sets of counsel would be difficult, the choreography more trouble than this issue is worth. R&G is not representing either bidder in this case and is establishing ethical walls to prevent its connections from influencing this process. Lastly, the "appearance" of impropriety is considerably muted by that fact that Ropes has connections not to a single bidder but to *two competing* bidders, which, if these connections had any influence on the process at all—I find they have not and trust they will not—would be inconsistent with the interests of either bidder but consistent with the maximization of value and the interests of CSAME, the estate, and OneUnited. I see no need for further correctives than those R&G has already undertaken.

---

[3] Generally, while cost does not merit consideration when evaluating a professional conflict, it is one factor that bears on the totality of the circumstances.

  d.  **Other Bidding Procedures**

  CSAME also seeks approval of a host of other bidding procedures to which no objection has been asserted.  The Court takes no issue with these and now approves them.  The Court reserves only the credit bidding issue and will address it in a separate memorandum.

  e.  **Conclusion**

  On or before Monday, May12, 2014, CSAME shall submit a proposed Bidding Procedures Order consistent with the above rulings, reserving only the credit bidding issue.

Date:  May 9, 2014             _____
                        Frank J. Bailey
                        United States Bankruptcy Judge