# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re** | **Chapter 11** |
| **CHARLES STREET AFRICAN METHODIST EPISCOPAL CHURCH OF BOSTON,** | **Case No. 12-12292-FJB** |
| **Debtor** | |

### MEMORANDUM OF DECISION ON CONFIRMATION OF
### DEBTOR'S SECOND MODIFIED SECOND AMENDED THIRD PLAN OF REORGANIZATION

The matter before the court is the proposed confirmation of the Second Modified Second

Amended Third Plan of Reorganization [Doc. # 1214] of debtor Charles Street African Methodist

Episcopal Church of Boston ("the Church"), to which creditor OneUnited Bank ("OneUnited") has

objected.  For the reasons set forth below, the Court will confirm the plan.

**PROCEDURAL HISTORY**

**a.   The Petition and Case to Date**

The Church is an incorporated congregation of the African Methodist Episcopal Church.

OneUnited is the Church's largest creditor, having extended to it two loans that, as of January 2012,

were in default.  On March 20, 2012, facing foreclosure on its church building and two other properties,

the Church filed a petition for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").

The ensuing history of this bankruptcy case is lengthy, but for present purposes, the short form

should suffice.  Though the plan presently under consideration is entitled the Church's Third, in fact only

one other has been presented for confirmation.  The Church presented a plan of reorganization for

confirmation in the summer of 2013.  After an evidentiary hearing, the Court sustained OneUnited's

objection to it confirmation.  At the same time the Court denied a motion by OneUnited to dismiss this

case and ordered the appointment of an examiner in the case for limited purposes.  After these events,

the Church turned its attention to prosecuting two counterclaims against OneUnited, which it asserted

primarily as defenses, in the nature of setoff, against the OneUnited's claims in this case.  After another

evidentiary hearing, the Court dismissed the counterclaims and accordingly overruled the Church's

objections to the OneUnited's claim.  On appeal, the District Court vacated that judgment in part and

remanded one count for the limited purpose of explaining the relationship of the Court's findings to one

of two theories underlying one of the Church's counts.  In July of this year, the Court did so and again

entered judgment for OneUnited on the remanded count. As of this writing, there is pending a motion

by the Church for the Court to alter or amend its findings and/or judgment.

> **b.  Claims of OneUnited and other Secured Creditors**

In this bankruptcy case, OneUnited holds the vast majority of the secured debt.  It has filed a

proof of claim, now thrice amended, by which it asserts in total three claims—two secured and one

unsecured—based on two loans made by OneUnited to CSAME on October 3, 2006.  The first, the

"Church Loan," involved a borrowing of $1,115,000, with principal and unpaid interest due in full on

December 1, 2011.  The second, known as the "RRC Loan" (together with the Church Loan, "the Loans"),

was an 18-month non-revolving line of credit of up to $3,652,000 for the purpose of constructing a

community center, the Roxbury Renaissance Center (the "RRC Building").

The Loans were secured by mortgages on Church-owned real property, six parcels in all.  The

Church Loan was secured by mortgages on the house of worship, located at 545-551 Warren Street,

Roxbury, Massachusetts (the "Church Building"), on the adjacent property at 553-565 Warren Street

(the "Storefronts"), consisting of storefronts that the Church was renting out as office space, and on a

single-family residence at 70 Sumner Street in Milton, Massachusetts (the "Milton Property" or "Milton

Parsonage").  The Construction Loan was secured by mortgages on 567-575 Warren Street (the "RRC

Building"), which was the site of the RRC, on 5 Elm Hill Avenue, Roxbury, ("5 Elm Hill" or "the Old

Parsonage"), and on an adjoining parking lot at 15 Elm Hill Avenue (the "Church Parking Lot").

In 2014, the Church, by exercise of its powers as a debtor-in-possession under the Bankruptcy

Code, sold the RRC Building and the neighboring Storefronts together as a unit at auction for $2.9

million, of which $350,000 was allocated to the Storefronts and the balance to the RRC Building.  And, in

a separate sale in 2014, again by exercise of its powers as a debtor-in-possession under the Bankruptcy

Code, the Church sold the Milton Property for approximately $385,000.  Each sale was free and clear of

OneUnited's mortgage on the property in question, with that mortgage attaching instead to the

proceeds of the sale, with the same priority and validity and to the same extent as its mortgage on the

property had enjoyed.

The proceeds securing the Church Loan are subject only to OneUnited's mortgages and no other

encumbrance.  The proceeds securing the RRC Loan are subject to one other lien, a real estate tax lien in

favor of the City of Boston which, it is undisputed, has priority over OneUnited's mortgage.  In its

disclosure statement for the present plan, the Church estimates the City's lien to be in the amount of

$88,212.00.

Aside from the liens already mentioned, only one other has been asserted against and presently

encumbers the Church's properties (or the proceeds thereof), that one being a junior mortgage on the

Church Building in favor of creditor Tremont Credit Union ("Tremont"), securing an asserted claim of

$493,274.05.

The sale proceeds from the three sold properties were placed in escrow, to be disbursed only

upon order of the Court. To date, the Court has authorized three distributions from escrow, one to the

Church to reimburse it under 11 U.S.C. § 506(c) for costs of preserving the mortgaged properties, and

two to OneUnited in partial abatement, on a dollar-for-dollar basis, of its secured claims.[1]  The escrow

account continues to hold $1,694,280.64.

In an amendment to its proof of claim, OneUnited asserted that its Church Secured Claim

should, under 11 U.S.C. § 506(b), include attorney's fees approaching $4 million, and the Church

objected to this § 506(b) claim, arguing that the fee component of this claim should be disallowed in its

entirety. The controversy has been resolved by a stipulation that the Court has approved.

Consequently, for purposes of the present confirmation proceedings, the Church and OneUnited have

stipulated to the following, resolving virtually all issues pertaining to quantification of OneUnited's

claims:

    i.    Valuation of Unliquidated Properties:  The value of the Church Building is

$1,350,000, the value of 5 Elm Hill is $385,000, and the value of the Church Parking Lot

is $400,000.

    ii.    OneUnited Church Loan 506(b) Fee Claim:  OneUnited shall have an allowed

claim with respect to its postpetition fees and costs under § 506(b) of the Bankruptcy

Code in the amount of $340,000.00 (the "OneUnited Church Loan 506(b) Fee Claim").

The OneUnited Church Loan 506(b) Fee Claim shall be treated as part of the OneUnited

Church Secured Claim under the Third Plan. Other than the OneUnited Church Loan

506(b) Fee Claim, the Bank shall have no allowed claim against the Church for any

postpetition fees or costs with respect to the OneUnited Church Note or the OneUnited

RRC Note.

    iii.    OneUnited Church Secured Claim:  The OneUnited Church Secured Claim shall

equal the sum of (i) the prepetition claim amount of $1,155,471.23, (ii) post-petition

---

[1] One of the distributions to OneUnited was made, by agreement between OneUnited and the law firm of Choate,
Hall & Stewart LLP ("Choate"), in satisfaction of an attorney's lien then being asserted by Choate against
OneUnited's recovery in this case, for unpaid services rendered by Choate to OneUnited in the case.

interest through October 31, 2017 of $469,556.67, (iii) $232.34 per diem post-petition

interest from November 1, 2017 to the effective date of a chapter 11 plan, if confirmed,

and (iv) the OneUnited Church Loan 506(b) Fee Claim of $340,000.00.

iv.     OneUnited RRC Secured Claim: As the OneUnited RRC Note is undersecured, the

amount of the OneUnited RRC Secured Claim shall equal the value of the collateral

securing the OneUnited Note, which equals the sum of (i) the RRC Proceeds in the

amount of $2,387,839.82, plus accrued interest thereon, (ii) the stipulated value of 5

Elm Hill, $385,000.00, and (iii) the stipulated value of the Church Parking Lot,

$400,000.00.

v.     OneUnited Unsecured Claim: The OneUnited Unsecured Claim shall equal the

difference between (i) the prepetition OneUnited RRC Claim amount of $3,436,629.13,

and (ii) the OneUnited RRC Secured Claim.

The Church maintains, and Tremont does not dispute, that Tremont's mortgage on the Church

Building is junior to OneUnited's and that by virtue of that priority and the limited value remaining in the

Church Building after subtraction of OneUnited's secured claim, Tremont's $493,274.05 claim is, for

purposes of the present plan, a secured claim to the extent of approximately $70,000 and an unsecured

claim for the balance.

**c.   The Present Plan**

The Church now presents a second plan for confirmation, its Second Modified Second Amended

Third Plan of Reorganization [Docket No. 1214], the result of two amendments and three modifications

to the Church's Third Plan.  The Third Plan was filed in this case on March 27, 2017.  On June 28 and July

5, 2017, the Church filed its first and second amended Third Plans.  On July 10, 2017, the Court approved

the Church's disclosure statement as to the Second Amended Third Plan of Reorganization (the

"Disclosure Statement").  The Church then transmitted the Disclosure Statement to creditors and

solicited their votes with respect to confirmation of the Second Amended Third Plan. Upon completion

of plan voting, the Church's counsel filed a declaration certifying (i) the methodology for the tabulation

of votes on the plan and (ii) the results of the voting.  The report indicates that of the seven classes

entitled to vote, three (Classes 3, 8, and 9) have accepted the plan and four (Classes 2, 4, 6, and 7) have

rejected it. No creditor disputes, and I find, that the results so declared constitute a fair and accurate

account of the plan voting and its results.

       After approval of the Disclosure Statement but prior to the confirmation hearing, the Church

twice moved to approve modifications of its Second Amended Third Plan without further disclosure or

need to resolicit votes.  The Court permitted the modifications (subject to the right of any party to

object to the plan as so modified) and determined that in neither instance did the proposed

modifications warrant further disclosure or resolicitation of votes.  After the confirmation hearing, the

Church filed a further modification of its Second Amended Third Plan, this version of the plan appearing

on the docket as No. 1214 (and notwithstanding that it constitutes the Church's *third* modified Second

Amended Third Plan, is entitled  Second Modified Second Amended Third Plan).  After a hearing on this

further proposed modification, on notice to all creditors, the Court determined that the modification

required no further disclosure and no resolicitation of votes and that it gave rise to no new or further

objection to discharge.

       Accordingly, the plan presently before the Court for confirmation is Docket No. 1214 ("the

Plan"). In it the Church proposes to distribute the remaining proceeds from its three sales of estate

properties in partial satisfaction of the secured claims they secure, retain its three remaining properties,

give its remaining secured creditors promissory notes and mortgages for the balances owing on their

secured claims, and pay non-priority unsecured creditors from a designated pool of funds, in which they

will share pro rata, effecting an estimated distribution in the neighborhood of 5.5 percent of such

claims.

The Plan classifies claims into nine classes as follows:

| Class | Name | Description | Impairment |
|---|---|---|---|
| Class 1 | Other Priority Claims | All priority claims (if any) that are not administrative claims or priority tax claims. | Unimpaired |
| Class 2 | OneUnited Church Secured Claim | The OneUnited Church Secured Claim | Impaired |
| Class 3 | Tremont Secured Claim | The Tremont Secured Claim | Impaired |
| Class 4 | OneUnited RRC Secured Claim | The OneUnited RRC Secured Claim | Impaired |
| Class 5 | Other Secured Claims | [This class is provisional and contains no known claims.] | Unimpaired |
| Class 6 | City of Boston Tax Claim | | Impaired |
| Class 7 | OneUnited Deficiency Claim | The OneUnited Unsecured Claim | Impaired |
| Class 8 | Tremont Deficiency Claim | The Tremont Unsecured Claim | Impaired |
| Class 9 | General Unsecured Claims | The claims of nonpriority unsecured creditors. | Impaired |

Classes 1 and 5 are unimpaired, and accordingly their members were not permitted to vote. Each holder of a Class 1 claim will receive cash equal to the unpaid amount of its claim (except to the extent that it agrees to less favorable treatment) on or as soon as practicable after the latest of (x) the Plan's effective date, (y) the date on which the claim becomes allowed, and (z) such other date as the holder and the Church may agree. Each Holder of a Class 5 secured claim will have its agreement with the Church reinstated.

All other classes are impaired and were entitled to vote. The holder of the Class 6 claim, the City of Boston Tax Claim, which is secured by the first-priority lien on the remaining proceeds from sale of the RRC, will receive a distribution of proceeds from that sale for the full amount of its secured claim.[2]

---

[2] The Plan further provides that, in the alternative, the City of Boston could, by agreement with the Church, receive deferred payments, the promise of which would be secured by a new first-priority mortgage on 5 Elm Hill (a/k/a the New Parsonage) and the Church Parking Lot. At closing arguments, the Church clarified that it had decided against this alternative treatment. I therefore treat the Plan as providing only the first option.

The holder of the Class 6 claim has not objected to confirmation of the Plan; nor did it cast a vote one way or the other, and the class is accordingly deemed to have rejected the plan.

Class 4 is comprised of the OneUnited RRC Secured Claim.  As holder of this claim, OneUnited voted to reject the Plan and objects to the Plan's treatment of this claim. Under the Plan, the holder of this claim will receive, in full satisfaction and discharge thereof, a distribution of the RRC Proceeds, less any amounts paid to satisfy the City of Boston Tax Claim, and two new promissory notes, the New Parsonage Note, in the principal amount of $385,000, and the New Parking Lot Note, in the principal amount of $400,000, which Notes shall be secured by the New Parsonage Mortgage and the New Parking Lot Mortgage, respectively. These new mortgages shall be first in priority.

Class 2 is comprised of the OneUnited Church Secured Claim. As holder of this claim, too, OneUnited voted to reject the Plan and objects to the Plan's treatment of this claim.  Under the Plan, the holder of this claim will receive, in full satisfaction and discharge thereof, distribution of the proceeds from sale of the Milton Property and the Storefronts, plus accrued interest, and another new promissory note, the New Church Note, which shall be secured by a new first-priority mortgage on the Church Building, the New OneUnited Church Mortgage. The principal amount of the New Church Note shall be $1,155,471.23 minus the amount of the Milton Proceeds, minus the amount of the Storefront Proceeds, plus $469,556.67 of accrued interest through October 31, 2017, plus $232.34 per diem of accrued interest from November 1, 2017 to the Effective Date, plus the amount of the OneUnited Church Loan 506(b) Fee Claim, now agreed to be $340,000.

OneUnited objects to confirmation in part on the basis of the terms of the new notes and mortgages it would receive in satisfaction of its Class 2 and 4 claims.  The relevant provisions are as follows. The Plan provides that each new promissory note—the New Church Note, the New Parsonage Note, and the New Parking Lot Note—shall be payable with equal quarterly payments and an option for the Church, as reorganized debtor, to cure any missed payment within 30 days following written notice,

a 20-year term with 30-year amortization, and an interest rate equal to 6.3% per annum (non-compounding). Each new promissory note would include the following provisions: (i) "Payments shall be made on January 31, April 30, July 31 and October 31 of each year, commencing with the first such date that is at least three months after the Effective Date[;]" and "[i]f any amount due shall not be paid within 30 days after written notice from the Bank to the Church of failure to pay, the Bank may by written notice declare all amounts to be immediately due and payable; provided, however, that no acceleration or other remedy shall be available unless defaults under this Note or the New OneUnited Church Mortgage have occurred and are continuing and have not been cured."  The new mortgages would, by their terms, be governed by Massachusetts law.  Each new mortgage would contain the following covenants and no others:

2.1    This Mortgage is upon the STATUTORY CONDITION; provided, that any provision of the STATUTORY CONDITION that is subject to the Mortgagee's approval shall be subject solely to the Mortgagee's reasonable approval.

2.2    The Mortgagor shall deliver to the Mortgagee the following:

(a)    within 120 days after the end of each fiscal year, an annual financial statement of the Mortgagor compiled (without requirement of a review or audit) by an independent accountant; and

(b)    within 45 days after the end of each of the first three quarters of each fiscal year, an unaudited quarterly financial statement in the form used by the Mortgagor for its internal purposes.

2.3    The Mortgagee shall have the right, on not less than 5 business days' written notice, to inspect any of the Mortgaged Properties at a time reasonably agreed by the Mortgagor and Mortgagee and so as not to disrupt any events or functions of the Mortgagor; provided that the Mortgagee may conduct only two inspections of each Mortgaged Property in each calendar year.

Concerning defaults and remedies, each new mortgage would contain the following provisions and no others:

  3.1  Events of Default. Event of Default shall mean the failure of the Mortgagor to make payment under the Note within 10 days after written receipt of notice of acceleration of the Note.

  3.2  Remedies.

    (a)  On the occurrence of any Event of Default the Mortgagee may, at any time thereafter, at its option and, to the extent permitted by applicable law, exercise the STATUTORY POWER OF SALE with respect to the Mortgaged Premises and remedies under Article 9 of the Uniform Commercial Code with respect to the other Property.

    (b)  The Mortgagor agrees that the covenants set forth in Section 2 are and shall be specifically enforceable by the Mortgagee.

    (c)  Specific performance shall be the Mortgagee's sole remedy for the violation of the covenants set forth in Section 2.

    (d)  For the avoidance of doubt, no breach of section 2, or order of specific performance arising therefrom, shall give rise to any right of acceleration of the Note, right to foreclose this Mortgage, or right to exercise the STATUTORY POWER OF SALE.

Class 3 is comprised of the Tremont Secured Claim, which is secured by a second-priority lien (junior to OneUnited's Church Loan mortgage) on the Church Building. As holder of this claim, Tremont voted to accept the Plan and has not objected to the Plan's confirmation.  Under the Plan, the holder of this claim would receive, in full satisfaction and discharge thereof, a new promissory note, the New Tremont Note, to be secured by a new second-priority mortgage (junior to OneUnited's New Church Mortgage), the New Tremont Mortgage.  The Plan specifies that the New Tremont Note shall have the following terms:  equal quarterly debt service payments of principal and interest, a 15-year term with 15-year amortization, an interest rate of 6.25% per annum, and an original principal amount equal to the value of the Church Building (stipulated as $1,350,000.00) minus the amount of OneUnited's New Church Note. The New Tremont Mortgage would have the same covenants and provisions governing defaults and remedies as the new OneUnited mortgages and no others.  Tremont has decided irrevocably not to make an election under 11 U.S.C. § 1111(b) as to its claim.

The three remaining classes are comprised wholly of non-priority unsecured claims: in Class 7, the OneUnited Unsecured Claim; in Class 8, Tremont's unsecured deficiency claim; and in Class 9, all other non-priority unsecured claims. By far the largest claim in Class 9 is that of Thomas Construction Company, Inc. ("Thomas"), as general contractor on the RRC construction project; by agreement, Thomas's claim is wholly unsecured and quantified at $913,619.56.[3] The Plan treats the holders of claims in each of these classes the same: each shall receive, in full satisfaction and discharge of its claim, its pro rata share of a Plan-created fund, the Unsecured Recovery Pool, on or as soon as practicable after the latest of (x) the Effective Date, (y) the date on which the OneUnited Deficiency Claim becomes Allowed, and (z) such other date as mutually may be agreed to by and among such Holder and the Debtor. At § 4.1, the Plan provides that the Unsecured Recovery Pool shall be funded from three sources: on the effective date of the Plan, (i) the Church shall contribute $50,000 to this fund; (ii) Ropes & Gray LLP shall be deemed to contribute to the Estate its claim against OneUnited for fees and expenses pursuant to an October 2013 Exclusivity Sanctions Decision, for the benefit of the Unsecured Recovery Pool (currently estimated up to $60,000); and (iii) FTI Consulting, Inc. shall be deemed to contribute to the bankruptcy estate its claim for fees and expenses pursuant to a sanction order against OneUnited, entered in this case on August 20, 2012. The Church estimates that the funds that the Plan either commits or expects to be donated to this Pool will total $160,000.

As sole holder of a Class 7 claim, OneUnited voted to reject the Plan. As sole holder of a Class 8 claim, Tremont voted to accept the Plan. Three claimants, their claims aggregating $923,499.56, voted in Class 9, all to accept the Plan. Accordingly, the Plan has been rejected by Class 7 and accepted by Classes 8 and 9.

---

[3] Under the plan and pursuant to the same agreement, the Church would also reject its executory construction agreements with Thomas, and the unsecured claim so quantified would include any damages arising from such rejection.

In addition to the foregoing, the Plan includes two further provisions of note. First, to effectuate and support the Plan, "[u]pon the Effective Date, an anonymous donor (and/or persons selected by him) not affiliated with the Church, shall donate $50,000 to the Church, to be used solely for the ordinary operating expenses of the Church from and after the Effective Date, and under no circumstances to be used to pay amounts due to the OneUnited. The Church shall otherwise have discretion as to when such funds shall be used, and on what operating expenses." Plan § 4.4. Second, "[p]ursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims and causes of action of any nature whatsoever arising on or before the Effective Date." Plan § 9.2.

**d.    Objections to and Hearing on Confirmation**

The Court established August 29, 2017, as the deadline for filing objections to confirmation. Only OneUnited objected to confirmation.  It did so on the basis that the Plan fails to satisfy nine distinct statutory requirements for confirmation in 11 U.S.C. § 1129(a) and (b), some for multiple reasons, with each such failure constituting an independent basis to deny confirmation. Several have since been withdrawn,[4] leaving only the following (in the order raised by OneUnited):

(i)    that the Plan does not satisfy the so-called "feasibility requirement" in § 1129(a)(11), the Church having barely broken even during the five years in which it has operated under the protection of the Bankruptcy Code without debt service obligations;

---

[4] As part of the Stipulation between the Church and OneUnited Resolving Amount of Section 506(b) Claim for Fees and Expenses, OneUnited agreed to "withdraw its objection to confirmation of the Third Plan based on the classification of claims under the Third Plan." [Doc. #1205, ¶ 7]  At closing arguments, OneUnited confirmed that it had withdrawn its objection under § 1129(a)(1) (that the Plan does not comply with the applicable provisions of Title 11 because it impermissibly and unjustifiably separately classifies claims of the same legal character) and also that it had withdrawn the Plan's separate classification of claims of the same legal character as a basis of its objection under § 1129(a)(3). At closing arguments, OneUnited further clarified that it was no longer pressing its objections under § 1129(a)(5), (a)(7), and (a)(10).

(ii)     that the Plan has not "been proposed in good faith and not by means forbidden by law," as required in § 1129(a)(3), because

    a.   it is supported in part by a $50,000 donation whose donor wishes to remain anonymous and the Church has not identified;

    b.   it proposes to give a junior mortgage on the Church Building to Tremont, in violation of a covenant in OneUnited's existing mortgage on that property;

    c.   the terms of the New Church Note that the Church would give to OneUnited are unreasonable; and

    d.   in previous iterations of the Plan, the proposed new promissory notes included language that made them unnecessarily non-negotiable;

(iii)    that the Plan does not satisfy the requirement in § 1129(a)(2) that its proponent comply with the provisions of the Bankruptcy Code because

    a.   the Church, as a debtor-in-possession, entered into a joint defense agreement with affiliated entities of the AME Church without court authority, in violation of §§ 1107 and 1108 of the Bankruptcy Code; and

    b.   the Church, as a debtor-in-possession and consequently the estate fiduciary, has used its time in bankruptcy principally for the benefit of its parent entity, the First Episcopal District of the AME Church, by efforts to obtain release or elimination of the District's obligation to OneUnited under the District's guarantee of the RRC Loan, in violation of § 1107; and

(iv)    that, with respect to OneUnited's two classes of secured claims, both of which are impaired and have not accepted the Plan, the Plan does not satisfy the requirement of § 1129(b)(1) and (2)(A)(i)(II) and (2)(A)(iii) that the Plan be fair and equitable because the interest rate of the promissory notes that OneUnited would receive, 6.3 percent per

annum (non-compounding) is inadequate to compensate OneUnited for the risk of non-payment over the notes' twenty year term and therefore to give OneUnited the indubitable equivalent of the value, as of the date of confirmation, of its secured claims.

The Church filed a response to the Bank's objection to confirmation (the "Objection") and a separate memorandum in support of confirmation. In anticipation of the evidentiary hearing on confirmation, the Church and OneUnited, in a joint pretrial memorandum, identified a small set of facts on which they agreed, virtually all bearing on issues pertaining to quantification of OneUnited's Church Secured Claim; but the facts itemized there have largely been rendered irrelevant by a subsequent stipulation between the Church and OneUnited resolving the amounts of OneUnited's claims in this case [Doc. #1205]. The stipulation was announced at the commencement of the confirmation hearing and, after notice to all creditors, has since been approved.

The Court held a four-day evidentiary hearing on confirmation, at which it heard testimony from fact witnesses Gregory G. Groover, Jr., Rolanda Dudley-Cowans, and Eric Danner for the Church and Kevin Cohee for OneUnited, and expert witness Jeffrey Kopa for the Church. The parties then filed proposed findings and conclusions and OneUnited also filed a memorandum of law, after which the Court heard their closing arguments.  In its memorandum of law, OneUnited asserted for the first time two new bases for its § 1129(a)(3) objection to confirmation: (i) that a previous iteration of the Plan included an offer of compromise that the Plan left open for an unnecessarily short time, tantamount to bad faith, and (ii) that prior to the hearing on confirmation, Rev. Groover had not seen and was not familiar with the terms of the Plan, notwithstanding that he signed it on behalf of the Church. At closing arguments, OneUnited conceded that it had not raised the first of these bases for its § 1129(a)(3) objection before the confirmation hearing; the factual support for the latter was discovered at deposition just days before the confirmation hearing.

14

**FINDINGS OF FACT**

a.     **The Church**

1.      In 1818, a group of free African Americans in the Beacon Hill area of Boston began

worshipping together and sought affiliation with the African Methodist Episcopal Church (the "A.M.E.

Church"), which had formed just two years earlier. The Massachusetts State Legislature granted a

charter to the Church as the First African Methodist Episcopal Society of Boston in 1839.  It relocated to

the corner of Charles Street and Mt. Vernon in 1876, whereupon it started being known by its current

name.  The Church moved to Warren Street in Roxbury in 1939, where it remains.

2.      The A.M.E. Church is, in its own nomenclature, a "connectional" church, meaning that

the various local churches, such as the Church, are joined through a series of widening levels of

governance, with some decision making authority at each level, but ultimate authority always remaining

at the highest level.  Thus the Church belongs, in ascending hierarchical order, to a presiding elder

district, then an annual conference, an episcopal district, and finally the global connectional A.M.E.

Church. The Church is part of the First Episcopal District, which is presided over by a bishop, whose

duties include the assignment of pastors to local congregations.

3.      Since 1994, the Church's pastor has been Rev. Gregory Groover.  In accordance with

A.M.E. Church polity, Rev. Groover became pastor by virtue of appointment by the bishop of the First

Episcopal District, the appointments being always of a year's duration, subject to renewal.  By virtue of

his position as pastor, he is chair of each of the Church's several governing boards and committees.

4.      Today the Church has just under 1200 members on its rolls, not all "active," meaning

seen at or in contact with the church at least once a month. A little over 800, including children and

teenagers, are active.  About 400, sometimes 450, attend services on any given Sunday.  Attendance at

Sunday services fluctuates, affected by weather, especially winter storms, and vacation schedules.

5.      Member tithes and donations, usually (but not exclusively) given at Sunday worship

services, are the Church's principal source of revenue.  Sunday giving correlates with and is affected by

attendance at Sunday service. The Church does not ask for or receive member pledges or dues.

6.      Community service has been and remains central to the Church's mission. The Church

strives to address the needs of the residents of its community as well as systemic social issues. To that

end, the Church operates a number of ministries, especially for youth and seniors.  It was for the

expansion of these ministries that the Church undertook the development and construction of the RRC.

The Church's membership, through donations approaching $2 million to support the development of the

RRC, invested heavily in this mission.

**b.      Events Preceding the Bankruptcy Filing**.

7.      On October 3, 2006, OneUnited made two loans to the Church.  The first, the Church

Loan, involved a borrowing of $1,115,000, with principal and unpaid interest due in full on December 1,

2011.  The second, the "RRC Loan", was an 18-month non-revolving line of credit of up to $3,652,000 for

the purpose of constructing a community center, the Roxbury Renaissance Center (the "RRC Building").

The Church's obligations under the Construction Loan were guaranteed by the First Episcopal District.

8.      After several modifications and extensions, the Construction Loan matured in December

2009 with an outstanding balance of approximately $2.8 million.  Construction of the RRC had stalled, a

victim of unforeseen costs, attendant delays, and a deep national recession that made further fund-

raising more difficult than either the Church or OneUnited had anticipated. OneUnited demanded

payment in full of the Construction Loan in August 2010 and initiated a state court collection action

against Charles Street and the First Episcopal District with respect to the Construction Loan and guaranty

in early September 2010.

9.      The Church Loan matured in November 2011, when a balloon payment for the principal

amount of the loan came due. The Church was unable to pay it. Over the five-year term of the Church

16

Loan, the loan required payments of interest only each month.  The Church made 46 of the 60 payments late, but it did make them all.

10.     The Church Loan included covenants, one of which prohibited the Church, as borrower, from granting a junior mortgage on the Church Building without notice to and consent from OneUnited. Notwithstanding this covenant, and without notice to OneUnited, the Church borrowed approximately $450,000 from Tremont in 2009 and, to secure that borrowing, granted Tremont a junior mortgage on the Church Building. There is no evidence that, when it took these actions, the Church was aware of the covenant in question or disregarded it knowingly. The Church used the proceeds of this loan in part to make needed repairs to the roof of the Church Building, and thereby honored another covenant of the same loan, requiring that the Church keep OneUnited's collateral in good repair.

11.     Upon maturity of the Church Loan, OneUnited sent default and acceleration notices. Without notice to Reverend Groover or any other representative of the Church, OneUnited scheduled a foreclosure auction of the three properties securing the Church Loan—the Church Building, the Storefronts, and the Milton Property—for March 22, 2012.  Reverend Groover learned of the scheduled foreclosure from a member of the congregation who had happened upon a notice for the auction on the internet. The Church attempted to negotiate a resolution, but OneUnited was unreceptive.

12.     The Church's default on the two Loans, and the prospect of foreclosure on the Church Building and other properties, placed its members' donations/investment in the Church's ministry in jeopardy and threatened both the mission and the continued existence of the Church as a community.

13.     On March 20, 2012 (the "Petition Date"), the Church filed a petition in this Court for relief under chapter 11 of the Bankruptcy Code. It did so in order to stay the foreclosure auction, especially of the Church Building, reorganize its finances, and preserve its assets for the benefit of its members and the community it serves.

c.      **Events During the Bankruptcy Case**

(i)      **The First Plan**

14.      On the Petition Date, the Church filed the Plan of Reorganization of Charles Street African Methodist Episcopal Church of Boston (as amended or modified from time to time, the "First Plan"). Under the First Plan, the Church would have, among other things, (i) retained five of the six properties it owned at the time and given the Milton Property to OneUnited in partial satisfaction of its Church Loan secured claim, (ii) with a donation of $1.5 million from the First Episcopal District, completed construction of the RRC, (iii) repaid the claims of OneUnited on both the Construction Loan and the Church Loan in full over twenty years at a thirty-year amortization rate (including a balloon payment on maturity), (iv) in initial iterations of the First Plan, released the First Episcopal District's obligation to OneUnited on its guaranty of the RRC Loan, and (v), in the First Plan's final iteration, replaced the District's guaranty of the RRC Loan with a more limited guaranty by the District of the same loan (the original version included no guaranty at all). OneUnited opposed confirmation of this plan on numerous grounds.

15.      On October 3, 2013, the Court denied confirmation of the First Plan. The order was based on findings and rulings that the Court had set forth in a memorandum of decision issued the day before (Docket No. 673, the "First Confirmation Opinion," admitted as Exhibit 32 in the present proceeding). The Court denied confirmation on two grounds: that the First Plan would have released a third-party guaranty without justification, and that it did not satisfy the feasibility requirement in § 1129(a)(11). Regarding feasibility, the Court found that confirmation of a plan of reorganization would likely enable giving by the Church's membership to return to substantially higher levels than CSAME was then achieving, but also that this was outweighed by (in relevant part) concerns about the Plan's high level of debt service, the extraordinary demands this would make on congregational giving for twenty years, and the Church's lack of working capital reserves.

16.      Regarding other grounds on which OneUnited objected to confirmation of the First Plan,

the Court made the following findings and rulings.  Regarding the proposed release of the District's

guaranty, the Court further ruled that, notwithstanding the impermissibility of the release, it was not

bad faith within the meaning of § 1129(a)(3) for the Church to have proposed plans plan that included

the release. With respect to OneUnited's objection to confirmation on the basis that the paucity of

covenants in the new notes and mortgages that the First Plan proposed to give to OneUnited rendered

that plan less than fair and equitable under § 1129(b)(1) and (b)(2)(A), the Court ruled:

> The Court agrees with CSAME that, in view of OneUnited's conduct in this case
> and since its declaration of default, it should be expected that OneUnited would
> use standard covenants for maximum leverage, beyond their intended purpose.
> The Court would insist that collateral be insured (with due regard for the fact that
> three of the six properties have virtually no value beyond that of their land) and
> that nonpayment be an event of default after a suitable grace period.  Beyond
> that, the Court will consider other covenants provided they are fashioned in a
> manner acceptable to CSAME [the Church] or to otherwise allay CSAME's valid
> concern.

The Church's valid concern was—and remains—that at the first technical breach of even the most

minor covenant, OneUnited would accelerate the loan and thus cause the Plan to fail.

17.      The Court also made findings regarding what is known as the Church's Pastoral

Residency Program ("PRP").  I incorporate by reference Findings Paragraphs 32 through 38 (at pp. 26-29

of the First Confirmation Opinion) and reiterate only that in the first half of 2013, the Church committed

itself to restoring to the PRP certain restricted funds, totaling $875,000, that it had diverted from that

program; that the Church planned to restore the funds by funding the PRP from its own resources until

the diverted monies were restored in full; that this restoration began in 2010; and that, as of June 28,

2013, by payment from CSAME's own resources of expenses that would otherwise have been funded

from the grants, some $288,000 of the diverted total had already been restored. That left $587,000 to

be restored from and after June 28, 2013.

**(ii)    Appointment of Examiner**

18.    At the same time as the Court denied confirmation of the First Plan, the Court also

denied a then-pending motion by OneUnited to dismiss the bankruptcy case.  In ruling upon the motion

to dismiss, the Court found that two reasons existed to appoint an examiner under 11 U.S.C. § 1104(c):

that the Church had apparently allowed insurance coverage to lapse on three of its properties and that

its accounting standards and practices were not adequate to the needs of this case.   Accordingly, the

Court ordered the United States Trustee to appoint an examiner (i) to monitor the existence and

continuance going forward of insurance coverage as to all the Church's real property and to file a report

in the event of a discovery of a lapse in coverage and (ii) to review the Church's Monthly Operating

Reports (MORs) going forward for accuracy and to file reports only where significant errors or

discrepancies appear.  The Court further ordered: "The examiner may review the MORs after they are

generated and filed or, if both CSAME and the examiner prefer, may work with CSAME in the generation

of the MORs to ensure that they are completed correctly and accurately in the first instance. The

examiners duties shall be limited to these."

19.    On October 9, 2013, the United States Trustee appointed David S. Williams, a partner at

Deloitte Financial Advising Services, LLC ("Deloitte"), to serve as examiner (the "Examiner"), and, on

October 21, 2013, the Court approved the appointment. He has served continuously as examiner to

date.  He immediately assembled a team of professionals from within Deloitte (the "Examiner Team") to

carry out his charge. The Examiner Team has at all times been led by Eric Danner, then a managing

director at Deloitte with over 20 years of restructuring experience, including experience in chapter 11

matters.

20.    In October 2013, when the Examiner Team began working with the Church, they

considered the Church's financial books and records to be in a "challenged state." The Team worked

with the Church to establish best practices for bookkeeping and accounting, including switching to an

accrual basis of accounting, which allows it to more-easily evaluate its cash position. The Examiner Team

has continued to provide ongoing support and guidance to the Church in the areas of bookkeeping and

accounting throughout the bankruptcy case.   As a result of these efforts, to which Church personnel

were receptive, the Church's books and records today are significantly improved and, for purposes of

understanding the Church's financial performance since October 2013, reliable.

21.     The Examiner Team also assisted in the generation of the MORs submitted since

October 2013, finding it more efficient to effectuate change by working side-by-side with the Church

than by just reviewing the MORs.   As the Church's books and records have improved, the Examiner

Team's feedback to the Church on each MORs has correspondingly decreased.   During the preparation

of the first MOR in October 2013, members of the Examiner Team spent almost an entire week working

side-by-side with Church staff on reconciling the Church's books and records and preparing the MOR. In

recent months, the Examiner Team spends less than an hour on the phone in order to provide feedback

on the MORs.

22.     In the first month or so after the Examiner's appointment, the Examiner Team reviewed

the church's prior-filed MORs (for March 2012 through September 2013) and spent considerable time

on site at the Church, working with its bookkeeping staff to try to ensure that it understood the financial

record that had been set forth to the court prior to its appointment, as well as how that dovetailed with

the current period at issue, October 2013.

23.     The Examiner Team determined, as reflected in the October 2013 MOR, that (i)

unrestricted cash on hand at the end of that month was $21,894.63, down approximately $2,800 from

the amount that had been on hand on the Petition Date, and (ii) restricted cash was down to just

$12,366.15, from $409,252.54 on the Petition Date.   The Examiner Team further determined that, as of

the end of October 2013, the Church's net profit or loss from the Petition Date was a loss of $134,000,

and the Church owed post-petition accounts payable aggregating $87,394.59, including taxes of

$46,502.40.

> **(iii)     Establishment of Commission on Stewardship and Finance**

24.     Since long before the commencement of the bankruptcy case, attendance to the

Church's "temporal concerns"—meaning its real estate and other property—has been in the charge of

the Church's Trustee Board, comprised of members of the Church and chaired by Rev. Groover. To

supplement the work of the Trustee Board with respect to the Church's financial affairs, the Church

established, in 2013, what is now known as its Commission on Stewardship and Finance (the "CSF"), of

which Rev Groover is chairperson *ex officio* and Rowena Dudley-Cowans is vice-chairperson. Members of

the CSF have varied backgrounds, including law degrees and advanced degrees in business and

accounting. The CSF tracks revenue and expenditures, conducts historical analysis of the Church's

finances, creates projections, ensures the Church has policies that promote financial controls, and

creates documentation for revenue and expenses for audit purposes.

25.     Since 2013, the CSF has instituted and implemented a number of financial policies and

controls.  Among other things, it reviews all of the Church's expenses, must approve an expense before

it can be paid, and requires that payments be made by check signed by two authorized signatories,

rather than cash, in order to create an audit trail. The CSF also implemented policies in order to increase

financial transparency and allow congregants to raise financial questions or concerns. Quarterly, the CSF

presents financial information to the Church's official board and shares a high-level summary of the

Church's revenue and expenses with the congregation in the Church's bulletin at Sunday services.

> **(iv)     Reduction of Expenses**

26.     During the Chapter 11 Case, the Church significantly cut its expenses in multiple ways.

First, it reduced salary expenses. Early in the Chapter 11 Case, the Church cut the salaries of all staff by

ten percent, at which level they have remained frozen.  In addition, Rev. Groover voluntarily further

reduced his compensation by eliminating pastoral stipends for local travel and other expenses.

Additionally, certain staff members took furloughs during the bankruptcy case, and several positions

were eliminated, such as staff in the music ministry.  Also, the PRP, though it has continued, has been

reduced in numbers from, at its height, three residents and a program coordinator to, at present, a

single resident.

27.    Second, Charles Street was able to achieve significant savings in property upkeep

expenses.  Heeding suggestions in the First Confirmation Opinion, the Church retained only the

properties that were essential to its operations—the Church Building, 5 Elm Hill, and the Church Parking

Lot—and, in 2014, sold the other three. These sales significantly reduced the Church's expenses,

including for utilities and insurance premiums.

28.    Third, through sale of the RRC Building—which represented a considerable sacrifice by

the Church of aspirations for the ministry that the Church hoped to effect through it, and of the

considerable donations that members invested in those aspirations—the Church took the hard step of

narrowing and focusing its efforts and objectives in this reorganization. It has effectively unburdened

itself of the costs, complications, distractions, and financial uncertainties that would attend first

completion of RRC construction and later staffing and funding the completed RRC.

29.    Fourth, through efforts of the CSF, the Church achieved significant savings by obtaining

new insurance policies and additional coverage in 2016. After soliciting and analyzing various proposals,

the Church changed its insurance to a policy that provides more coverage at a lower cost, effecting a

savings of approximately $11,000 annually that will extend until at least November 9, 2019.

30.    Fifth, the Church was also able to reduce expenses associated with late payments by

eliminating its accounts payable. Prior to the implementation of the CSF, the Church's post-petition

accounts payable, especially for utility charges, were at times quite high.  At the recommendation of the

CSF, the Church held a fundraiser targeted at addressing the outstanding accounts payable; the money

raised was distributed to the longest overdue expenses, until all were paid in full.  By November 2016

the Church had paid off the entirety of its accounts payable (except for the City of Boston Tax Claim,

which is to be paid from the RRC Proceeds). As of August 2017, the Church's accounts payable remain at

$0.

31.    Sixth, the Church has, by continuation of the PRP at its own expense, largely satisfied its

commitment to restore from its resources some $587,000 that remained to be restored to the PRP on

June 28, 2013. The restoration will be complete at the end of October 2018, with the funding, in the

amount of $70,804, of the final twelve months of the current resident's term.  In short, the Church has,

since June 2013, paid down some $516,000 of this commitment.  And it has done so by funding at its

own expense that which formerly was funded by grants received specifically for use exclusively in the

PRP.

**d.    The Financial Projections and Plan Feasibility**

**(i)    Preparation of Financial Projections**

32.    In conjunction with the preparation of the Plan, the Church prepared projections of its

revenues and expenses for the period from January 1, 2017 through December 31, 2019 (the "Projection

Period").  These projections reflect an extensive budgeting process by the Church. The budget

committee of the CSF creates a budget for the Church annually.  In order to draft the budget, budget

committee members review the historical financial information and patterns in revenue and expenses,

and they meet with Church leaders to understand prospective budgetary needs. The draft budget is

subject to approval by the CSF, then by the official board, and ultimately by the Church Conference

(including any Church member above 18 years old). While Reverend Groover is not a voting member of

either the CSF or the Trustee Board, he reviews the budget before it is presented to the Church

Conference.

33.    The CSF is led by its vice-chair, Rolanda Dudley-Cowans, who has served in that capacity

since the CSF was established. She holds an undergraduate degree in accounting, but has never worked

as an accountant and has no professional experience related to lending. She dedicates an immense

amount of time to assist Church leadership as an uncompensated volunteer on (among other things) the

CSF and the Senior Trustee Board.  She provided credible, well-informed, and well-reasoned testimony

regarding the Church's projections, the assumptions on which they are based, and the historical financial

information that informs the projections.

34.    The projected revenue and expenses captured and presented in the Church's Disclosure

Statement were prepared by Ms. Dudley-Cowans, who reviews the Church's MORs and reconciles the

MORs with QuickBooks transaction reports provided by the Church's Associate Pastor, Reverend Opal

Adams. To prepare the projections, Ms. Dudley-Cowans and the CSF used the Church's historical data

from 2014-2016 (the "Historical Period") as a base for future projections. She also consulted with

various leaders within the Church's organizational structure so their plans for the coming years as

compared with operations from prior years could be factored into projected revenues and expenses.

35.    The projections and historical records on which they are based are relevant here to the

feasibility of the Church's making its debt service obligations under the Plan.  The Church's historical

financial performance is presented in some details in Exhibit 121, a four-year overview of the Church's

revenues and expenses from April 2013 through March 2017 (because the Church's internal accounting

corresponds to its 4/1 to 3/31 "Conference Years"); a more concise version, presented by calendar year

for 2014 through 2016, is appended to the approved disclosure statement as Exhibit B. The Church's

projections are set forth in Exhibit 119, an itemized three-year budget for the period from January 2017

through December 2019, showing projected revenue and expenses on monthly and annual bases.  The

projections assume that Plan debt service obligations will begin in August 2017; because the parties now

expect the Plan to become effective (if at all) only in late December of this year, the 2017 figures

overstate debt service.

36.    The Court denied confirmation of the First Plan in part because it required the payment

of more debt service, $316,000 per year, than the Court found the Church could comfortably service.  By

selling the RRC and the Storefronts, the Church has effectively reduced its debt service under the

present plan to $174,000 per year.

37.    In summary, the projections show the Church, in 2018 and 2019, meeting these debt

service obligations with only modest increases in revenue and a more significant reduction in expenses,

and essentially breaking even over the two-year period.  The following table places the Church's

historical figures (for 2014 to 2016) and projected figures (for 2017 through 2019) side by side.

| | HISTORICAL[5] | | | PROJECTED[6] | | |
|---|---|---|---|---|---|---|
| Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Revenue | 842,825 | 786,463 | 821,082 | 842,538 | 844,475 | 860,880 |
| *Growth %* | | -4.7% | 4.4% | 2.4% | 0.2% | 1.9% |
| Expenses | 841,082 | 785,934 | 782,013 | 695,177 | 678,496 | 684,594 |
| Net Income Before Debt Service | (16,257) | 529 | 39,070 | 147,361 | 165,979 | 176,286 |
| Debt Service | -- | -- | -- | -- | 174,000 | 174,000 |
| Net Income After Debt Service | (16,257) | 529 | 39,070 | 147,361 | (8,021) | 11,072 |

38.    The Church anticipates both a significant increase in revenue (from increased member

donations) and a significant decrease in expenses (from termination of the PRP beginning on October

31, 2018), but the projections assume that neither will occur.

---

[5] The historical numbers are taken from the Exhibit B to the approved disclosure statement, because they are presented there on a calendar year (as opposed to Conference Year) basis, permitting comparison to the projections, which are also presented there on a calendar year basis.

[6] Calendar Year 2017 was mostly still in the future when the projections were prepared.  At the time of the evidentiary hearing, in September 2017, the Church had historical figures for the first eight months of the year.

**(ii)      Revenue Projections**

39.      Ms. Dudley-Cowans testified that Church's revenue projections were derived from historical data from 2013 to present, incorporating anticipated changes in contributions from the Church's various programs as described by the leaders of those programs and a roughly 1% increase to account for expected inflation.  The Church projects its revenues on a month-by-month basis, using both the historical data and assumptions described above, as well as the number of Sundays contained in a given month to account for the fact that the number of services held is a significant factor in the Church's revenues for a given month.

40.      Over the course of the bankruptcy case, despite fluctuations in revenue and changes in the Church's membership rolls, the Church's revenue has consistently been around $800,000 to $850,000 per year, with an outlier high of $885,859.00 (for the twelve months ended March 2014) and low of $786,463 (for the twelve months ended December 2015).  Projected revenues for calendar years 2017 and 2018 fall within this range, at $842,538 and $844,475, respectively. Projected revenues for 2019 are slightly above at $860,880, but even this number is less than the Church's revenue from for the twelve months ended March 2014. These projections reflect modest anticipated year-over-year growth ranging between 0.2% and 2.4%. Ms. Dudley-Cowans and Reverend Groover both testified that the revenue projections reflect a desire to take a conservative approach to budgeting that did not reflect significant increases in income beyond present levels. Given the modest amount of the projected increases in revenue, and in light of the fact that these increases are driven by factors such as inflation or the number of Sundays in a year, rather than an expectation that giving will increase substantially once the Church has emerged from bankruptcy, the Court finds the revenue projections to be reasonable.

41.      During the period from January 1, 2017 through August 31, 2017 (the "2017 Period"), the Church's revenue lagged behind projected revenue by approximately 3 percent. While the Church's

revenue has been less than projected, the shortfall is slight, and the Church has provided satisfactory

explanations for the shortfall and why it expects to make up at least some, if not all, of the missed

revenue in the coming months. Ms. Dudley-Cowans testified that the variance in revenue is due to less-

than-expected donations for a fundraiser and a slight decrease in tithes and offerings over the period.

Additionally, the Church did not conduct its annual conference assessment fundraiser during the 2017

Period, but it plans to conduct that fundraising post-emergence, when the expectation is that it will be

more effective. The moderate shortfall in revenue during the first portion of 2017 does not materially

undermine the reasonableness of the Church's projections.

42.    Ms. Dudley-Cowans and Rev. Groover provided credible testimony that the Church has

a reasonable expectation that giving would increase after confirmation of the Plan significantly beyond

that which is reflected in the Church's projected income. Reverend Groover testified that there has been

a historical decrease in giving during the bankruptcy case, which, in combination with the precipitating

financial troubles and threat of foreclosure, has made some members anxious about the Church's

future. Ms. Dudley-Cowans also testified that the Church's expectation that giving will increase post-

bankruptcy was based on conversations she has had with a number of members of the Church. Rev.

Groover also testified that attendance at Sunday services has dropped since the beginning of the

bankruptcy case due to the uncertainty surrounding the proceedings, and that this further depressed

giving. It is reasonable to assume that the increased certainty provided by the confirmation of a plan of

reorganization would help restore attendance and increase giving to the Church.  In its findings on the

First Plan, the Court found that confirmation of a plan of reorganization would likely enable the Church

to increase its income to substantially higher levels than it had achieved in bankruptcy. The prospect for

such increased giving, beyond that reflected in the projections, provides a cushion that further confirms

the reasonableness of the projections.

43.     The Court is given further comfort in the reasonableness of the Church's projections by the fact that funds from capital campaigns and special fundraising the Church plans for the post-emergence period may enhance the Church's revenues, but are not reflected in the Church's revenue projections. During the bankruptcy case, the Church has not undertaken any capital campaigns. Prepetition, however, the Church conducted at least one capital campaign that generated substantial revenue. The capital campaign donations supplemented, did not replace, the membership's ordinary Sunday giving; funds raised from capital campaigns are above and beyond members' ordinary tithes and offerings. Though it is not reflected in the Church's projections, the Church is planning a capital campaign for the post-emergence period. The proposed "Lifestyle Stewardship Ministry Campaign" is planned to coincide with the Church's bicentennial anniversary, in 2018, with a goal of raising $2 million. The campaign's goals are threefold: to significantly reduce the Church's debt, to improve the Church's properties, and to grow the Church's ministries. No specific allocation of the raised monies among the three purposes has been decided upon, but the Church's witnesses have made clear that debt reduction is a priority for the Church, and that meeting its Plan debt service is its highest priority.

44.     The Court further finds that the Church's revenue projections are reasonable because they are based on historical data that excluded a one-time event, specifically the receipt of funds from a significant settlement with OneUnited, even though the use of such funds were included in the historical expenses. On June 30, 2014, the Church initiated an adversary proceeding against OneUnited for the recovery of the costs and expenses of preserving, or disposing of, the Construction Loan collateral during the Chapter 11 Case (the "506(c) Adversary"). On March 13, 2015, the Church and OneUnited settled the 506(c) Adversary for $96,159.06 (the "506(c) Funds"), and on March 19, 2015, the Church received the 506(c) Funds. The Church's presentation of the historical figures for 2014-2016 in Exhibit B to the Disclosure Statement does not include the 506(c) Funds as revenue. The 506(c) Funds were not logged as revenue because it would skew the trend of the Church's receipts. However, Ms. Dudley-

Cowans testified that the funds were largely used for capital maintenance projects the Church

undertook during the bankruptcy case, and that Church incorporated the expenditures associated with

those projects in the Church's historical expense data.

45.    For all these reasons, the Court finds that the Church's revenue projections are

reasonable.

**(iii)    Expense Projections**

**(A)    Formulation of the Projections**

46.    The Church projected its expenses through a process similar to that by which it

projected its revenues, relying primarily on historical data and any future plans that would cause

expenses to vary from prior years.  Ms. Dudley-Cowans testified credibly as to the reasons for

anticipated variances from prior years. The Church's witnesses explained that the overall goal of the

Church in its expenditures going forward is to keep things steady as they are now, incorporating a slight

increase in certain categories of expenses to account for inflation, but avoiding major additional

expenses beyond its current spending. In notable part, though the Church cut salaries of its employees

as part of its reorganizational efforts during the bankruptcy, the Church does not intend to restore

employee salaries to their prepetition state after emerging from bankruptcy.

47.    The Church's projected ability to make ends meet in the first years of Plan debt service

relies to a large extent on an anticipated decrease in operating expenses between 2016 and 2017 of

11%, followed by a 2% reduction in 2018. Ms. Dudley-Cowans explained these reductions by noting,

among other things, that expenses in certain categories such as professional fees and capital

maintenance have been higher recently than typical years, largely due to major one-time expenses. For

example, the Church paid professional fees totaling $25,000 for an expert witness in connection with

the Chapter 11 Case, which will not be a recurring expenditure.  Additionally, the Church undertook

various one-time large capital projects, such as repairing the Church's buttress and its heating and

cooling system, and the Church does not expect to continue expenditures in this category at that level.

Further, in November 2016, the Church changed its insurance carrier and further reduced its premiums,

at a savings of $11,000-12,000 annually as compared with 2016 levels.

### (B)    Built-in Provision for Unanticipated Contingencies

48.    The Church's projected expenses include a contingency line item of $10,000 in 2017 and

$9,500 in 2018 and 2019.

49.    In its projected expenses, the Church also makes provision for continuance of the PRP

throughout the projection period, but in fact the Church has decided to discontinue the PRP at the end

of the current resident's term, on October 31, 2018.  Reinstating the program would involve multiple

steps and levels of approval. The Church will only consider reinitiating the PRP if it has additional

revenue, above and beyond current projections, such that debt service would remain well in hand.

Ending the PRP in October 2018 will decrease the Church's expenses by $12,758 in 2018, $70,804 in

2019, and approximately $71,000 per year thereafter. This amounts to a second and more substantial

contingency item in the budget.  If necessary, it could fund nearly half of the Church's annual debt

service under the Third Plan; and, to the extent that it is not required for that purpose, it would allow

the Church to add annually to its cash reserves. For both reasons, discontinuation of the PRP greatly

enhances the feasibility of the Plan.

### (C)    Comparison of Projections to Actuals for 2017

50.    In the first eight months of 2017, the Church's projections for 2017 exceeded

projections for those months by approximately 9% percent. The variance in expenses is largely due to

expenses in four categories: (i) increased pastoral travel, (ii) increased ministry outreach, (iii) a new

assessment schedule, and (iv) unexpected professional fees. The Court finds that the Church has

provided satisfactory explanations for the overages in each category and for its belief that it will realize

lower expenses with respect to these categories in the future.

51.     **Pastoral Travel.** Ms. Dudley-Cowans testified that during 2017, Rev. Groover traveled

more than anticipated. The Church projected that Rev. Groover's travel expenses would decrease by

15% to 18% in 2017, to $21,399 for the year. Rev. Groover is required to travel regularly because he

holds various positions at each level of the A.M.E. Church.  His obligations are mandatory, not

negotiable, and the costs of travel are borne by the Church.  In 2016 and 2017, his travel obligations

have been unusually high. In 2016, the A.M.E. Church celebrated its bicentennial and held related events

that have stretched into late 2017, which required higher than anticipated pastoral travel. Additionally,

the Book of Discipline, the doctrinal book of the A.M.E. Church, was also revised during this period. Rev.

Groover serves as Chair of the Revisions Committee and in that position has required travel for

meetings. With these events largely concluded, the Church anticipates a decrease in pastoral travel for

the remainder of 2017 and on a go-forward basis. Further, though very little of Rev. Groover's travel is

discretionary, the Church has indicated that it would decrease expenditures on discretionary pastoral

travel in the future in order to pay its debt service if necessary.

52.     **Ministry Outreach.**  During 2017, Charles Street spent more funds than anticipated on

its various ministries. Specifically, the Church funded a trip for approximately 50 youth to Washington,

D.C. and received higher-than-usual benevolence requests from Church members. Ms. Dudley-Cowans

testified that this category of expense is discretionary on the Church's part and that the Church would

reduce its ministries and community outreach to pay its debt service if necessary.

53.     **Assessments.** The Church's fixed expenses include assessments it must pay to each of

four levels of A.M.E. Church governance.  In 2017, these are projected to total $87,538, in fifteen

different payments over the course of the year, with especially large assessments to the First Episcopal

District due in March and October.  During the 2017 Period, the payment schedule for connectional

assessments to the First Episcopal District changed to even monthly payments spread out throughout

the year. The total assessments have not changed, and therefore the Church reasonably explains that

the total amount of the assessments will balance out and meet projections by the end of 2017.

54.      **Professional Fees.** Although the Church has incurred certain professional fees in

connection with the bankruptcy case, the Church does not anticipate paying additional professional fees

during the Projection Period, including legal services. Though fees for an accountant to compile the

financial statements required by the New OneUnited Mortgages are not provided for in the Church's

projections, Ms. Dudley-Cowans testified that hiring an accountant for this limited purpose will not

significantly impact the Church's projections or ability to pay its debt service. In view of the substantial

contingency fund built into the Church's budget by virtue of its discontinuance of the PRP, the Court

agrees.

55.      In view of the Church's explanation of the overages through August of 2017, the Court is

satisfied that they do not demonstrate a fundamental unsoundness in the projections concerning

Church's ability to achieve expense reductions aggregating 11 percent over two years.

### (D)      Exclusion of Large Capital Improvements

56.      OneUnited seeks findings that (i) Rev. Groover, and by implication the Church, does not

know the building repairs it will need to undertake in the next three, five, or twenty years or the cost of

those repairs; (ii) that, given the age of the Church Building, necessary costly repairs are inevitable over

the next 20 years; (iii) that the Church has made no provision for such repairs in its expense projections,

and (iv) that this makes the projections unreasonable.  OneUnited's only issue is with the Church

Building; it requests finding about the age, condition, or needs of the Church's other two properties, one

a former manse that now serves as program and office space for the Church, and the other a simple

parking lot.

57.     It is true, and I find, that the Church Building is aging, having been erected in 1888.  It is

also true that the Church's projections make no provision for major repairs or improvements, other than

$3,000 per year for "capital maintenance projects."

58.     It is not true that Rev. Groover, much less the Church through its Trustee Board (as

overseer of property upkeep) and CSF (as formulator of the projections), has failed to consider the

repair needs of the Church's properties in the near, medium, and long terms.

59.      In the past three years, the Church undertook several significant capital maintenance

projects, all reflected in the Church's historical financials. These include repairing the Church's buttress,

renovating bathrooms, repairing the heating and cooling system, repairing the handicap elevator,

repairing outdoor stairs, and conducting general office and gutter improvements. These projects took

place between 2014 and 2016 and cost approximately $91,000. Ms. Dudley-Cowans testified that all of

the capital maintenance took place during the Chapter 11 Case because the Church had the funds to

undertake the projects, largely from the 506(c) Funds. Having completed these capital projects over the

last few years, the Church does not anticipate any additional significant capital maintenance projects in

the projection period, through 2019.  Following the completion of the capital maintenance projects

described above, further repairs do not appear to be strictly necessary.

60.     Two to three years ago, the Trustee Board engaged a service to determine future repairs

the Church Building may need.  Some of the items identified in the report have not been completed, and

the Trustee Board has identified repairs the Church could potentially undertake over the next five years,

such as the flooring in the lower auditorium of the Church Building. However, Ms. Dudley-Cowans

testified that while the Church has considered undertaking some of these capital projects, they are not

essential and would not be completed unless the Church fundraises specifically for the project. Post-

emergence, any necessary capital maintenance over $3,000 will be funded by special fundraisers, which

recent history suggests the congregation is responsive to (as with its special fundraising to address post-petition accounts payable).

61.     In light of the capital maintenance work the Church has already undertaken, the lack of any urgent capital projects, and the testimony concerning use of special fundraising to fund any such future projects, I find that the Church's budget with respect to major repairs and capital maintenance is reasonable.

### (iv)    Prioritization of Debt Service

62.     The Church's witnesses were unequivocal in their testimony, which I credit, that after emerging from Chapter 11, the Church's priority will be paying its Plan debt service, because payments on its debt are necessary to keep the Church's doors open and its mission thriving. This prioritization is evident not just in their testimony but also in the actions the Church has undertaken in its efforts to reorganize in Chapter 11:  its abandonment of the RRC construction project, its decision to terminate the PRP, and its creation of the CSF and implementation of its reforms. I credit Rev. Groover's testimony that the Church's decision to terminate the PRP, notwithstanding that it has been a source of pride for the Church, was driven by a desire not to undertake any nonessential expense that could possibly compromise the Church's ability to meet its Plan debt service obligations. Ms. Dudley-Cowans testified that debt service will be prioritized "because we want to keep our church so that we continue to do the work that God has called us to do." The Court finds that in the event of any shortfall in the Church's revenues, the Church intends to meet its promise to prioritize Plan debt service over discretionary expenditures.

### (v)    Improvements in Cash Position

63.      In the First Confirmation Opinion, the Court noted that its concerns about the feasibility of the First Plan—specifically about the Church's ability to meet its debt service demands—could be mitigated or allayed in part by development of cash reserves, of which the Church at that time had

virtually none.  Since 2013, the Church has increased its cash position significantly and has improved its

liquidity. At the end of October 2013, the Church had $34,260.78 in cash on hand, of which $12,366.15

was restricted, with $22,294.26 in accounts payable. By contrast, at the end of August 2017, the Church

had accrued $176,290.67 in cash, of which $31,848.84 was restricted, and (with the exception of the

City of Boston Tax Claim) had paid down its accounts payable to $0.  And the present Plan is supported

by a third-party's promised donation of an additional $50,000.[7] The Church would be embarking on the

Plan with reserves of well over a year's debt service, a factor that adds considerably to the feasibility of

the Plan.

64.    The Church's expert witness, Jeffrey Kopa, prepared an analysis of the Church's

projected unrestricted cash and, on the basis thereof, testified credibly that, at the close of December

2017, the Church's post-emergence (from bankruptcy, through confirmation of the Plan) minimum cash

balance, on October 31, 2018, would be $189,000, and that its maximum cash balance during the

projection period (assuming the PRP were not discontinued) would be $260,000, on December 31, 2019,

the very end of the period. Depending on cash-flow demands (such as quarterly debt service payments

of nearly $43,000 and irregular payments on assessments), the Church's reserves will fluctuate between

these extremes.  OneUnited failed to counter this testimony with its own expert.

65.    When the Church discontinues the PRP in October 2018, some $71,000 per year that

would otherwise have funded that program will become available to meet contingencies and, to the

extent not so consumed, will increase the Church's reserves by up to $70,000 per year. As Mr Kopa

---

[7] OneUnited originally disputed that this payment would in fact be made.  The Church then moved to deposit the
promised funds in escrow with the clerk of court, to establish beyond doubt the availability of the funds (without
compromising the anonymity of the donor). After initially opposing even this motion, OneUnited withdrew that
portion of its objection to confirmation that questioned whether this donation would in fact be made as promised,
which in turn made it unnecessary for the Church to proceed with its motion to deposit the funds in court. To be
clear, despite the anonymity of the donor, I am satisfied that the donation will be made.

showed, if the PRP funds are not expended for other purposes, the Church's cash position would be

$343,000 on December 31, 2019, and could increase by some $70,000 per year thereafter.

66.     The strong prospect of continuing and increasing cash reserves after confirmation, as

found in the foregoing paragraphs, further enhances the probability that the Church will be able to meet

its debt service obligations under the Plan.

### (vi)     Conclusion as to Feasibility of Plan Debt Service

67.     For the reasons set forth above, the Court finds and is satisfied—by a comfortable

margin, as this is not a close call—that the Church is at least reasonably likely to be able to service the

debt obligations to OneUnited and Tremont under the Plan.

### (vii)     Other Plan Obligations

68.     The Plan imposes two further sets of obligations on the Church, neither of which is (or

should be) addressed in the Plan projections.  The first consists of the payment obligations the Church

must satisfy immediately upon the Plan's becoming effective: full payment from funds in escrow of the

City of Boston Tax Claim; payments from funds in escrow on the OneUnited Church and RRC Secured

Claims; and payment of the promised distributions from the Unsecured Recovery Pool to unsecured

claims in Classes 7, 8 and 9.  OneUnited does not dispute, and I find, that each of these is feasible, as the

funds for payment thereof are already on hand in escrow.

69.     The other set of obligations is the Church's obligations to pay the balloon payments that

will come due in twenty years on each of OneUnited's three Plan promissory notes. The OneUnited

notes require quarterly payments for twenty years at a twenty-five year amortization rate, and they

permit prepayment of each note without penalty.  If the Church does not repay the notes at all before

the notes mature in twenty years, it will have to pay the balance due on each note—approximately 56

percent of the principal balance of each would then remain owing—on the twentieth anniversary.  The

Church plans a $2 million capital campaign, in part to pay down its Plan debt; over twenty years, it will

be able to conduct more than one such campaign, if necessary.  The Church has in the past successfully

raised sums on this order.  It is more than probable that, over twenty years, the Church will have raised

the funds necessary to pay the principal balance owing at that time (and if not in full, then at least in

substantial part).  And, in any event, at that juncture, with the debt to OneUnited having been reduced

by 44 percent, and the junior debt to Tremont having been fully amortized, and assuming *no*

appreciation in the value of the Church's properties over 20 years, the loan to value ratio on each of the

three properties would be such as to permit easy refinancing of the balance then due.  I conclude that

the Church has satisfied its burden as to the feasibility of its final obligations under the OneUnited Plan

promissory notes.

**e.    Whether the Plan is Fair and Equitable as to OneUnited's Secured Claims**

70.    OneUnited disputes the fairness and equitableness of the Plan's treatment of its

secured claims. As articulated by OneUnited in its Objections to Confirmation [Doc. # 1117], this was

solely an objection to the interest rate, 6.3 percent, that the Church incorporates into the new

promissory notes it would give to OneUnited. In the Joint Pretrial Memorandum it filed with the Church

on the eve of the confirmation hearing, OneUnited expanded this objection by adding that the

promissory notes "lack enforceable, standard covenants," but without specifying the "standard

covenants" whose omission allegedly renders the Plan less than fair and equitable.  The Court will

address first the interest rate.

**(i)    Interest Rate**

71.     The Church was the only party to present expert testimony regarding the fairness of the

interest rate it proposes for the New OneUnited Notes. The Church's expert was Mr. Jeffrey Kopa, whom

I found and continue to find, all the more after hearing him testify, to be qualified to testify as an expert.

What he lacked in experience as an expert witness he more than made up for in analytical skill, precise

focus on relevant questions, careful parsing of his answers, and sheer expertise.

72.     To summarize Mr. Kopa's testimony, he performed the two-step analysis prescribed in

the Supreme Court's decision in *Till v. SCS Credit Corp.*, 541 U.S. 465, 474 (2004) ("*Till*" and the "*Till*

formula approach"), first by determining that there was no efficient market for church loans, and then

by proceeding to apply *Till*'s formula methodology, under which he concluded that the proposed 6.3%

interest rate for the New OneUnited Notes is within the range of appropriate results. Mr. Kopa further

determined that appropriateness of the proposed rate is further bolstered by two confirmatory

methodologies: a review of the data that is available in the market, and an analysis under the

presumptive contract methodology occasionally employed by courts in place of *Till*.  The Court finds Mr.

Kopa's unrebutted expert testimony credible and persuasive.

73.      In opposition to Mr. Kopa's conclusions, OneUnited offered testimony by Mr. Kevin

Cohee, its CEO. Mr. Cohee's testimony was largely limited to how certain aspects of the debt the Church

proposes to issue to OneUnited would potentially violate the Bank's internal lending policies. As Mr.

Cohee was not designated as an expert, the Court precluded Mr. Cohee from providing expert opinion

testimony regarding the proposed interest rate.  Moreover, for the reasons discussed below, whether

the terms of the New OneUnited Notes are terms that comport with OneUnited's internal policies or

whether OneUnited would voluntarily make a loan on such terms are not relevant.

**(A)        Nonexistence of Efficient Market**

74.     Mr. Kopa testified that the market for lending to churches and other religious

organizations is not efficient. In his analysis, Mr. Kopa first looked to traditional sources for information

on fixed income instruments, such as Bloomberg and Capital IQ. Mr. Kopa's review of those services

yielded very little information, which led Mr. Kopa to conclude that publicly available information

through traditional reporting avenues on church loans or church bonds is not available.

75.     In light of the lack of information from traditional sources, Mr. Kopa and members of his

team turned to alternative methods of information gathering, such as speaking to individuals involved in

the business of church lending and reviewing websites of companies in the church lending business.  Mr.

Kopa testified that though these are not common methods of acquiring market information, he and his

team sought out these sources because "the traditional avenues to gain market data had proven

unfruitful" and they therefore attempted to determine what information was available. Mr. Kopa

testified that he and his team were generally unable to obtain additional information from these

conversations other than some additional documents which were cited in his expert report.

76.    Mr. Kopa also testified that individuals involved in the church bond market informed

him that there is not an active secondary market for church bonds.

77.    Mr. Kopa concluded that the market for church lending is inefficient because none of

the hallmarks of an efficient market—financial reporting, trading data, and price discovery—were

available for the church lending market. If such information were publicly available, a borrower such as

Charles Street could analyze its financials and collateral and compare them to those of other borrowers

to determine what they could expect in a market transaction, but in this case, such information is not

publicly available.

78.    OneUnited offered no evidence for the existence of an efficient market. Through his

cross-examination of Mr. Kopa, OneUnited's counsel highlighted just how thin and incomplete was the

publicly available information about loans to churches that Mr. Kopa was able to find. This served

principally to underscore the soundness of Mr. Kopa's conclusion about the non-existence of an efficient

market.

79.    The Court finds, based on Mr. Kopa's unrebutted expert testimony, that there is no

efficient market for church lending.

**(B)    Application of the *Till* Formula Method**

80.    Having determined that an appropriate rate could not be determined by recourse to an

efficient market, Mr. Kopa turned to application of the *Till* formula method. In determining the

appropriateness of the Church's proposed rate under his *Till* formula analysis, Mr. Kopa looked to the

structure of the proposed notes, the underlying collateral, and other factors to determine the

appropriate amount of risk adjustments to the base rate.  Mr. Kopa concluded that the 6.3% interest

rate proposed by the Church is within the range of appropriate results under the formulaic approach

prescribed in *Till*.

81.     In determining the appropriate rate of interest for the New OneUnited Notes under the

Till formula, Mr. Kopa began with the prime rate of 4.25% as a base rate, assigned a risk premium for the

risk of default over the life of the loan, and made an additional adjustment for risks associated with the

duration of the 20-year term of the New OneUnited Notes. Mr. Kopa testified that the prime rate is not

a risk-free rate, but that most of the 3% difference between the prime rate and the federal funds rate is

explained by credit risk.

82.     In determining the appropriate risk premium to assign to the New OneUnited Notes

above the risk inherent in the prime rate, Mr. Kopa examined the Church's historical financials and its

financial projections, had conversations with church personnel including Reverend Groover, Reverend

Adams, and Ms. Dudley-Cowans, reviewed this Court's First Confirmation Opinion, and examined other

facts and circumstances of the Church, such as its long history. Mr. Kopa examined the loan-to-value and

debt service coverage associated with the New OneUnited Notes, the current balance of unrestricted

cash and projected increase going forward after debt service begins, and the discretionary nature of

some expenses such as the PRP in determining an appropriate risk premium. Mr. Kopa also considered

that OneUnited is oversecured with respect to its notes as an additional factor in assigning a risk

premium. Mr. Kopa concluded that these factors resulted in an appropriate risk premium of between 1%

and 2%, which falls in the lower end of the typical range under Till.

83.      In evaluating the revenue streams that would support repayment of the New

OneUnited Notes, Mr. Kopa examined the Church's historical revenue and projected revenue,

conducted discussions with Church personnel, and reviewed this Court's conclusion from the prior

confirmation hearing that it is reasonable to assume some lift in revenues following emergence from

bankruptcy. Mr. Kopa testified that he relied on the Church's reporting of its own financial information

in his analysis and was comfortable doing so because the Church has established the CSF to assist the

Church's financial management, and the Examiner had implemented a number of improvements and

controls to the Church's reporting process. In analyzing the revenue streams the Church will use to

support its repayment under the Third Plan, Mr. Kopa noted that the Church has historically reported

revenues at a similar level to what it is currently projecting for future revenue and the increases are

small.

84.      In assigning an appropriate risk premium, Mr. Kopa considered that, overall, OneUnited

would be oversecured, but just barely so, on the New OneUnited Notes. Mr. Kopa determined that

based on the amount of the New OneUnited Notes and the stipulated collateral values, the loan-to-

value for the New OneUnited Notes is 96%. And he noted that church bonds are generally issued at

loan-to-value rations of 75% or less. Mr. Kopa testified that the loan-to-value ratio of the New

OneUnited Notes is an incremental risk factor.  He further testified that the 506(b) Stipulation, which

was entered into after he first performed this analysis, did not significantly impact the risk premium

adjustment set forth in his analysis.

85.      Mr. Kopa also analyzed the ratio of the loan amount to the value of the collateral *plus*

the Church's unrestricted cash balance, which yielded a ratio of 88%. The point of this exercise was

unclear.  The extent of cash reserves, though highly relevant to feasibility, is an element of a loan-to-

value quantification unless that cash is part of the promised collateral (which increases the value

component of the ratio), or is immediately used to pay down principal, as a down payment (which

decreases the loan component of the ratio). Here it is neither.  It is irrelevant that OneUnited relied on

essentially the same metric in deciding to underwrite the RRC Loan.  Still, I don't understand Mr. Kopa to

have used the 88% figure as the true loan-to-value ratio, only as a separate relevant metric. And he

appropriately recognized the high loan-to-value ratio as an incremental risk factor. Also, the Church's

significant cash reserves *are* relevant to loan-to-value analysis in a different way.  They make it far less

likely that the Church will default in the early years of the loan, allowing the loan-to-value ratio to

become more healthy (by amortization of debt and appreciation of the collateral) before the lender

might have to have recourse to the collateral. In short, they make the loan-to-value ratio slightly less

relevant.

86.    Mr. Kopa also analyzed the debt service coverage ratio for the New OneUnited Notes,

both under the assumption that the PRP would continue and under the assumption that it would end.

Mr. Kopa testified that eliminating the PRP would provide "a fairly significant margin by which pre-debt

service income exceeds [the Church's] debt service." Mr. Kopa testified that the 506(b) Stipulation did

not significantly impact his analysis of the Church's debt service coverage ratio. Following the 506(b)

Stipulation, Mr. Kopa updated his analysis of the Church's debt service coverage ratio, and concluded

that under the scenario in which the Church discontinues the PRP, the Church will have a projected debt

service coverage ratio of 1.53.

87.    Mr. Kopa testified that he also assessed the duration of the New OneUnited Notes in

determining an appropriate interest rate under the *Till* formula. In order to account for the longer

duration of the New OneUnited Notes, Mr. Kopa testified that in addition to the risk premium he

assigned, he added the spread between the rate for five-year Treasury bonds and the rate for 20-year

Treasury bonds. The difference between the 20-year Treasury rate (2.65%) and the five-year treasury

rate (1.83%) is 0.82%. This spread has not significantly changed since the date of Mr. Kopa's report. The

addition of this tenor spread compensates OneUnited for the passage of time, as the risks of

nonpayment are already accounted for in the risk premium Mr. Kopa assigned.

88.      Accordingly the Court finds, based upon Mr. Kopa's unrebutted *Till* analysis, that the 6.3% rate of interest proposed for the New OneUnited Notes is fair and equitable.

### (C)      Application of the Presumptive Contract Method

89.      Mr. Kopa also evaluated the proposed interest rate for the New OneUnited Notes using the presumptive contract method, and the Court finds that this analysis further confirms the proposed rate is fair and equitable. The presumptive contract method entails examining the loan originally provided to the Debtor and adjusting for changes in market conditions.

90.      The presumptive contract analysis performed by Mr. Kopa adjusted for both changes in market conditions and the increase in the proposed duration of the New OneUnited Notes compared to the original loan.  Mr. Kopa testified that the contract rate at issuance of the original OneUnited Church Loan was 0.375% lower than the prime rate at the time of issuance. At the current prime rate of 4.25%, that would yield an implied loan rate for a five-year term under current market conditions of 3.875%. Mr. Kopa then added the spread between the five-year BBB rate and the 20-year BBB rate to adjust for the difference in maturity. The spread between these two rates was 1.701%, resulting in a presumptive contract rate of 5.576%.

91.      Mr. Kopa used this spread to account for the difference in maturity because the BBB rate is the lowest investment grade rate. He determined it was an appropriate proxy because this rate is for debt which is investment-grade, but unsecured, and he determined that those two differences offset one another, the Church New notes being less than investment grade but also secured. Mr. Kopa testified that the presumptive contract method approach was confirmatory.  The Court agrees and finds this evidence supportive of its conclusion that the Debtor's proposed rate of 6.3% is fair and equitable.

### (D)      Utility of Market Information

92.      Mr. Kopa further testified that, although he concluded that the market was inefficient, he nonetheless found some utility in the admittedly limited information about church lending rates that

he was able to find.  Given the opacity of the market, Mr. Kopa's review of publicly available information

included both church loans and church bonds because both are forms of church lending and both

options are potentially available to a Church going to the market for a loan.  Mr. Kopa does not contend

that this information, or the conclusion he draws from it, could stand alone as a basis for making an

appropriate rate determination.  Rather, he maintains only that the information, such as it is, is

consistent with, and to that extent confirmatory of, the rate he arrived at by the *Till* formula method.

93.     The Court finds that the market information in question is of very little utility. As Mr.

Kopa himself testified, it is very incomplete and therefore opaque.  It cannot itself support a market rate

determination under *Till*; nor do I understand Mr. Kopa to suggest otherwise. The best that can be said

for it—and it is worth saying—is that it does not on its face place in doubt the conclusion Mr. Kopa

reached by the *Till* formula method. For that limited purpose, I find Mr. Kopa's well-supported and well-

reasoned analysis of this information helpful.  Still, it makes no difference; I would agree with Mr. Kopa's

conclusion under the *Till* formula method even without this help.

94.     In much the same way and to the same end, Mr. Kopa found that the terms of the New

Tremont Note, which are the result of a negotiated agreement between the Church and Tremont, are

consistent with the proposed interest rate for the New OneUnited Notes. I find that Tremont's

agreement with the Church as to the treatment of its secured claim in the Plan is, though entered at

arm's length, likely too affected by a host of other considerations to be reflective of the market, and

therefore of no help.

**(E)     Conclusion as to Interest Rate**

95.     On the strength of Mr. Kopa's unrebutted *Till* formula method analysis, and for the

further reasons articulated above, I find that that the 6.3% rate of interest proposed for the New

OneUnited Notes is fair and equitable.

**(II)      Covenants**

96.      The existing Church Loan and Construction Loan notes and mortgages contain loan covenants.

97.      OneUnited asks for a finding that the Church Loan and Construction Loan notes and mortgages contain "standard" loan covenants, but OneUnited has presented no expert or other testimony as to which covenants are standard; nor has it specified the particular covenants as to which it seeks this finding. Nor has it established that lending practices at OneUnited, including the covenants it normally includes in loans it makes, are standard in any sector of the lending industry or with respect to particular types of loans or somehow normative.

98.      In conjunction with confirmation of the First Plan, the Court found that "in view of OneUnited's conduct in this case and since its declaration of default, it should be expected that OneUnited would use standard covenants for maximum leverage, beyond their intended purpose." The Court continues to so find.

99.      In conjunction with confirmation of the First Plan, the Court further stated, with respect to covenants in the promissory notes being given in a future plan, that "[t]he Court would insist that collateral be insured . . . and that nonpayment be an event of default after a suitable grace period. Beyond that, the Court will consider other covenants provided they are fashioned in a manner acceptable to CSAME [the Church] or to otherwise allay CSAME's valid concern."

100.      In the Objections to Confirmation it filed as to the present plan, OneUnited did not identify particular covenants whose absence from the Plan notes and mortgages OneUnited now contends renders the treatment of its secured claims less than fair and equitable. (In fact its objection under § 1129(b) was not based at all on insufficiency of covenants.) Nor has OneUnited adduced evidence that at any time prior to the hearing on confirmation, it identified to the Church any such covenants.

**f.      Findings Regarding Good Faith**

**(i)      Purpose in Proposing Plan**

101.      The Church has proposed the Plan to address the universe of its outstanding debts to creditors, including OneUnited, Tremont, Thomas, and the City of Boston.  The Church's bankruptcy filing was prompted and necessitated by OneUnited's threat of foreclosure on the Church Building and the two other properties that together constitute the Church campus. That threat continues today. The Plan was proposed to avert foreclosure, to address the Church's debt in manners consistent with the Bankruptcy Code, and to permit the Church to continue in existence as a worshipping community. This purpose of reorganization is evident in the Plan and its various features and is a legitimate and appropriate purpose for filing a plan. A congregation seeking to preserve its sanctuary building is acting in furtherance of a core bankruptcy purpose. The Court finds that that the Plan was filed in good faith and is straight-forwardly consistent with the purposes of the Bankruptcy Code.

102.      Throughout the Chapter 11 Case, the Church has consistently attempted to negotiate with creditors to resolve their claims and the treatment thereof in a plan of reorganization. Three versions of the First Plan contained various settlement offers to OneUnited or other concessions to the terms of the New OneUnited Notes. The initial version of the Third Plan also contained a settlement offer to OneUnited. The Church also made numerous written settlement offers to the Bank outside of its plans of reorganization.

103.      Since proposing the Third Plan, the Church has reached significant agreements with its largest creditors. The Church negotiated the treatment of the claims of Tremont and Thomas Construction that is set forth in the Plan. And the Church even reached a limited agreement with OneUnited, the 506(b) Stipulation, as to the extent of OneUnited's allowable claim under section 506(b).

### (ii)       Anonymous and Restricted Donation

104.       The Third Plan provides for a $50,000 anonymous and restricted donation from a third party (the "Anonymous Donation," "Anonymous Donor"). The Anonymous Donation has two restrictions—it must be used towards the Church's day-to-day operations, and it may not be used to pay amounts due to OneUnited.; but the Church otherwise has full discretion as to when the funds will be used and on what operating expenses.

105.       OneUnited alleges that the anonymity of the Anonymous Donor demonstrates bad faith on the part of the Church, because the Bank cannot evaluate the Anonymous Donor's motives for the Anonymous Donation and its restrictions. I find that the Anonymous Donor's motive in making the donation and in placing the restriction on it is the Anonymous Donor's only, not the Church's motive. The Church did not request the restriction on the Anonymous Donation's use.  Rev. Groover knows the identity of the Anonymous Donor but has never spoken to him about the subject of his offer of a $50,000 donation in connection with the Plan. Rev. Groover does not know why the Anonymous Donor placed a restriction on its use and is not prepared even to assume that the Anonymous Donor harbor's animosity toward OneUnited.  And there is no evidence that the Church requested that the donation be made anonymously.

106.       Money is fungible. Though the anonymous donation may not itself be used to fund debt service to OneUnited, it would free up other monies that the Church receives to be used for paying OneUnited. The Anonymous Donor's money is as green as anyone's, and the Church exhibits no bad faith by accepting this donation and the enhanced liquidity it affords the Church, especially for purposes of meeting debt service to OneUnited, which will be its priority should be Plan be confirmed. Indeed, I would question the good faith of looking this gift horse in the mouth.

107.       Rev. Groover testified credibly that donors to the Church sometimes request anonymity for their donations.  They do so sometimes because they prefer for their gift, rather than their name, to

be in the spotlight, and sometimes because they prefer to keep their wealth and ability to donate

private, among other reasons. In this case, the Bank has previously subpoenaed and deposed individuals

who have tried to support the Church with large donations.  Whatever the reason, the Church's policy is

to honor the request for anonymity.

108.    The Anonymous Donor's purpose in placing its restriction on the donation remains pure

speculation. Perhaps it was just to express animosity (which is hardly unusual in bankruptcy cases), but

other reasons are quite conceivable, and no finding is possible here. However, I can and do find that *if* it

was an expression of animosity, the expression was the donor's, not the Church's.

### (iii)    Notation on Promissory Notes

109.    The facts concerning the notation on the promissory note consist mostly of procedural

history, which I take from the docket in this case.

110.    In 2014, the Court ordered that the proceeds from the sales of the RRC Property, the

Storefronts, and the Milton Property, totaling $3,285,000, be placed and held in an escrow account of

Choate, Hall & Stewart LLP ("Choate"), pending further order of the Court. The proceeds remained

property of the bankruptcy estate.

111.    The purpose of the escrow arrangement was simply to segregate the escrowed funds,

which were cash collateral of OneUnited collateral, in a manner that ensured that the Church could not

use them without Court authorization.  No notice of attorney's lien had yet been filed in the case, and

the escrow was not established to protect the interests of OneUnited's attorneys in OneUnited's

recoveries and distributions in this bankruptcy case.

112.    In February 2017, OneUnited moved for relief from the automatic stay to receive a

distribution of the funds in escrow in partial satisfaction of its secured claims.  On March 8, 2017, and in

response to OneUnited's motion, Choate filed a Notice of Attorney's Lien [Docket No. 955] in the

amount of $343,523.57, and Pierce Atwood LLP ("Pierce Atwood") filed a Notice of Attorney's Lien

[Docket No. 953] in the amount of $1,426,599.00. The Notices of Attorney's Lien asserted liens under

state law not against the Church or property of its bankruptcy estate but against OneUUnited and its

rights and recoveries this bankruptcy case.  Each Notice, in virtually identical language, gave notice that,

pursuant to Mass. Gen. Laws ch. 221, § 50, the firm in question was asserting an attorney's lien to the

specified extent "for unpaid fees and expenses incurred in connection with its representation of

[OneUnited] in the above-referenced Chapter 11 proceeding and any proceedings related thereto, upon

any and all causes of action, counterclaims, proofs of claim, or claims of OneUnited, upon any and all

judgments, decrees, or other orders entered in favor of OneUnited, and upon the proceeds derived

therefrom." OneUnited withdrew its motion for relief, and no order for distribution of proceeds to

OneUnited was entered at that time.

113.    The Church filed the first iteration of its Third Plan on March 27, 2017. This iteration of

the Plan did not include certain anticipated exhibits thereto, including the promissory notes that the

Church was proposing in the Plan to give to OneUnited.  The proposed treatment of OneUnited's Church

Secured Claim in that plan required the quantification of the Church Secured Claim.

114.    To that end, on May 16, 2017, OneUnited filed an amended proof of claim in which it

amended its claim to include (among other things) close to $4 million in postpetition attorney's fees;

and on May 30, 2017, the Church filed an objection to the amended proof of claim in which it argued

that the fee component of the Church Secured Claim should be denied in its entirety, in part on the basis

that some of the fees in issue were fees that, vis-à-vis its attorneys, OneUnited had not paid and was in

fact disputing.

115.    On June 28, 2017, the Church filed its First Amended Third Plan. At section 4.9, this

iteration of the Plan included, for the first time, the following provisions:

Section 4.9. *Payments to New Church Note*

(a) Following the Effective Date, and pending resolution of each
attorneys' lien asserted pursuant to Section 4.1(b) (the "Asserted Attorneys'

Liens"), the Reorganized Debtor shall make payments on the New Church
Note to Choate, in lieu of making payments to the holder of such note.
Choate shall hold such payments in escrow pending further order of the
Bankruptcy Court.

(b) If the amount of the Asserted Attorneys' Liens determined by the
Bankruptcy Court to be valid and allocable to the OneUnited Church Secured
Claim (the "Church Claim Attorneys' Liens") exceeds the sum of the Milton
Proceeds, the Storefronts Proceeds, and the amounts held in escrow by
Choate pursuant to Section 4.9(a), the Reorganized Debtor shall continue to
make payments on the New Church Note in escrow to Choate until the
Church Claim Attorneys' Liens have been repaid in full. Following repayment
in full of the Church Claim Attorneys' Liens, the Reorganized Debtor shall
make payments on the New Church Note to the holder of such note.

(c) Notwithstanding Sections 4.9(a) and 4.9(b), the Reorganized
Debtor will make future payments on the New Church Note to the holder of
such note upon the Reorganized Debtor's receipt of a joint, written, and
irrevocable direction signed by each attorney or law firm that asserts an
attorneys' lien pursuant to Section 4.1(b).

116.    This iteration of the Plan also was the first that included, as exhibits, the new promissory

notes that the Church proposed to give to OneUnited.  The New Church Note (but neither the New

Parsonage Note nor the New Parking Lot Note) contained the following language, all capitalized, at its

very top:  "THIS NOTE IS SUBJECT TO LIENS IN FAVOR OF [--] UNDER MASSACHUSETTS GEN. LAWS C. 221

§ 50. ANY PERSON PURCHASING OR OTHERWISE ACQUIRING THIS NOTE IS HEREBY PROVIDED NOTICE

OF SUCH LIENS AND TAKES THIS NOTE SUBJECT TO SUCH LIENS. SEE MASS. GEN. LAWS C. 106 § 9-330.

THIS NOTE ALSO HAS PROVISIONS FOR PAYMENT TO PERSONS OTHER THAN THE HOLDER OF THE NOTE,

AS SET FORTH BELOW." The New Church Note (but neither the New Parsonage Note nor the New

Parking Lot Note) also included the following "provisions for payment to persons other than the holder":

From and after the date that any attorney's liens on this Note have been
determined by the bankruptcy court, the Church shall make all payments
due on this Note to the persons holding the rights to such attorney's liens,
pro rata according to the amounts of liens so determined. In the event that
payments are made before the determination of such liens, the payments
shall be made into escrow as directed by the bankruptcy court. In either case
(direct payment to attorney's lien holders or into escrow), (a) the Church
shall send a notice to the Bank stating the amount and date of such

payments and (b) such payments are, and shall be deemed, timely payments
to the Bank under this Note, and shall be credited against amounts due.

117.     By the date on which the First Amended Third Plan was filed, OneUnited had been

represented in this bankruptcy case by at least six law firms who had appeared in the case. And, also in

connection with this case, OneUnited had retained still other firms that had not filed appearances. Two

of OneUnited's firms had filed notices of attorney's liens. It was not clear whether others might yet do

the same.

118.     On July 5, 2017, the Church filed its next iteration of the Plan, the Second Amended

Third Plan.   It included the same Section 4.9 and the same New Church Note as was contained in the

First Amended Third Plan.

119.     On July 10, 2017, the Court entered an order that approved the Church's disclosure

statement as to the Second Amended Third Plan and established a number of deadlines relating to the

Plan confirmation litigation, including an Attorney's Lien Bar Date, a term defined by reference to the

Second Amended Third Plan.  This order established July 21, 2017 as the date by which current and

former counsel to OneUnited who had appeared in the Chapter 11 Case who wished to assert "an

attorneys' lien under M.G.L. c. 221, § 50 or any other applicable law with respect to the Milton

Proceeds, the Storefront Proceeds, or the RRC Proceeds (if not previously subject to order of the

Bankruptcy Court" must file on the docket in this bankruptcy case a notice of attorneys' lien. The order

(perhaps by oversight—the reason is unclear) did not set a deadline for assertion of an attorney's lien

against other amounts that OneUnited might recover in or through the case, such as payments on the

New Church Note.

120.     No further notice of attorney's lien has been filed in the case to date.

121.     The Court's July 10 order also scheduled the evidentiary hearing on confirmation to

begin on September 26, 2017.  As that date approached, the Church's objection to OneUnited's claim

remained in controversy; OneUnited continued to claim, as against the Church, fees that, as against

Choate and Pierce Atwood, it continued to maintain it did not owe; and no procedure for resolution of OneUnited's fee disputes with Pierce Atwood and Choate was underway, certainly not in time to resolve those matters before the confirmation hearing. The Church argued that it would be necessary and appropriate for this Court to adjudicate, in conjunction with Church's objection to OneUnited's Amended Proof of Claim (which was scheduled to be heard in conjunction with confirmation of the Plan), the firms' asserted attorney's liens against OneUnited. OneUnited disagreed.

122.    On August 16, 2017, the Court, issued a memorandum of decision as to its jurisdiction over and authority to adjudicate the attorney's liens disputes and determined that they needed to be adjudicated in conjunction with the Church's objection to OneUnited's Amended Proof of Claim.  On August 18, 2017, the Court accordingly established a procedure to get that process under way. The order required that on or before September 8, 2017, if either Pierce Atwood or Choate sought to have its attorney's lien determined in this bankruptcy case, it must file in this Court an adversary complaint for that purpose.

123.    At a status conference held on August 30, 2017, OneUnited reported that it had reached an agreement in principle to resolve its fee dispute with Choate and that it would file an amendment to its Church Secured Claim to remove therefrom any reliance on fees it may owe to Pierce Atwood.

124.    In view of this report, the Court extended to September 22 the deadline for Pierce Atwood and Choate to file complaints to determine the validity and extent of their attorney's liens.

125.    On September 8, 2017, OneUnited filed a motion for release of funds from escrow. In the motion, OneUnited reported that it had agreed with Choate to settle any and all disputes between them, including, without limitation, Choate's Notice Of Attorney's Lien, for $252,000, to be paid from the funds in escrow, but that if the funds were not released from escrow and paid to Choate by September 30, 2017, Choate, in its sole discretion, would be entitled to terminate the agreement.

Accordingly, OneUnited went on to move that the Court authorize and direct that escrowed funds in the amount of $252,000 be released from escrow and paid to Choate.

126.    The Church filed a limited objection to the Motion for Release of Funds, noting procedural difficulties in the motion and its service. On September 19, 2017, after a hearing, the Court denied that motion without prejudice to OneUnited's filing, for the same purpose, a motion for relief from the automatic stay, with appropriate service, to effectively foreclose on a portion of the funds held in the escrow account.  At the same time, the Court further extended to October 16, 2017, the date by which Choate would be required to file a complaint to determine the validity and extent of its attorney's lien.

127.    Also on September 19, 2017, OneUnited filed a further amendment to its proof of claim that effectively removed from its Church Secured Claim any remaining reliance of that claim on fees that OneUnited owed to Pierce Atwood.  As a result, the Court promptly vacated as to Pierce Atwood the order requiring it to file a complaint to determine the validity and extent of its attorney's lien.

128.    On September 20, 2017, OneUnited filed a motion for relief from the automatic stay to allow the release of $252,000 from escrow to fund its settlement with Choate. The Court scheduled the matter to be heard on September 29, 2017.

129.    On September 21, 2017, the Church filed the next iteration of its Plan, the First Modified Second Amended Third Plan.  It included the same Section 4.9 and the same New Church Note as was contained in the previous two iterations of the Third Plan.

130.    On September 25, 2017, the Church filed yet another iteration of its Plan [Docket No. 1186], again called the First Modified Second Amended Third Plan.  It included the same Section 4.9 and the same New Church Note as was contained in the previous three iterations of the Third Plan.

131.    The confirmation hearing began on September 26 and continued through September 29, 2017.  On September 26, 2017, the Church and OneUnited announced that they had reached a

settlement of the Church's objection to OneUnited's amended proof of claim but needed further time to

memorialize the agreement. In view of this announcement, the Court canceled the evidentiary hearing

on the objection to claim (which was to have been conducted together with the evidentiary hearing on

confirmation).

132.     On September 29, 2017, with no objection having been filed, the Court, at the

commencement of that day's session of the evidentiary hearing on confirmation, granted OneUnited's

motion for relief from the automatic stay as to the funds in escrow with which it sought to fund its

settlement with Choate. In the order, the expressly authorized and directed Choate, as escrow agent, to

immediately release $252,000 from the escrowed funds to itself as creditor of OneUnited, pursuant to

OneUnited's settlement with Choate. Only upon the making of this distribution did Choate cease to

assert a lien against OneUnited's recoveries in this case and did the Court finally cease to have

jurisdiction over the disposition (as between OneUnited and its former law firms) of funds to be

distributed in this case to OneUnited. Even at this juncture, however, Pierce continued to assert an

attorney's lien against OneUnited's recoveries in the case.

133.     At the conclusion of the September 29 session of the evidentiary hearing, the Church,

through counsel, announced that in light of that morning's disposition of the motion for relief from stay

and the consequent resolution of OneUnited's settlement with Choate, and in light of prior rulings by

the Court as to the extent of its jurisdiction over the attorney's liens against OneUnited, the Church

would be filing a further modification of the Plan, to remove language dealing with the attorney's liens.

134.     On October 3, 2017, the Church and OneUnited filed the stipulation resolving

OneUnited's § 506(b) claim. Among other things, it included an agreement by the Church not to object

to a further motion by OneUnited for relief from automatic stay to receive a distribution of Sale

Proceeds from escrow, subject to holdbacks sufficient to cover (among other items) Pierce Atwood's

attorney's lien.  On October 13, 2017, the Church filed a motion for approval of this stipulation, and on

November 3, 2017, the Court granted that motion.

135.    On October 6, 2017, OneUnited filed the further motion for relief from stay that was

contemplated in the stipulation resolving the § 506(b) claim (the "Second Motion for Relief"), seeking

relief from automatic stay to receive a distribution of sale proceeds from escrow, subject to holdbacks

sufficient to cover (among other items) Pierce Atwood's attorney's lien.  Pierce Atwood filed a limited

objection to the motion.  On October 25, 2017, after hearing the motion and expressing concerns about

the extent of the holdbacks, the Court directed OneUnited, after further discussion with Pierce Atwood,

to submit a proposed order that addressed the Court's concerns. It did, and the Court entered the order

on October 30, 2017.

136.    The order resolving the Second Motion for Relief did the following four things:  (i) it

allowed release of some funds from escrow to OneUnited; (ii) it retained $1,694,280.64 in escrow to

cover certain claims and liens, including Pierce Atwood's attorney's lien on any distribution to

OneUnited, to the extent of $1,426,599.00; (iii) it changed the escrow agent from Choate to OneUnited's

current counsel; and (iv) it specified the conditions under which the retained funds could be released

from escrow.

137.    This order, for the first time, modified the existing escrow to protect Pierce Atwood's

interest in a prospective distribution to OneUnited. This new escrow arrangement fully covered the

attorney's lien that Pierce Atwood has asserted in this case; by doing so, it left OneUnited free to receive

other distributions, such as under the Plan promissory notes, without compromising Pierce Atwood's

asserted lien.  It effectively identified and secured for Pierce Atwood's benefit funds sufficient to cover

Pierce Atwood's asserted lien.[8]

---

[8] To be clear, the order did not purport to determine the validity or extent of the asserted lien.

138.    Until this time, any distribution of funds to OneUnited would be subject to a possible claim by Pierce Atwood that the distribution in question was payable to Pierce Atwood instead of to OneUnited.  This subjected the Church to uncertainty as to its proper payee on Plan promissory notes. The Church had a strong and legitimate interest in knowing precisely how and to whom it must make payments on Plan promissory notes, so as to receive proper credit for each such payment. It could not risk not receiving credit by virtue of having paid the wrong entity.

139.    It is true, as OneUnited contends, that the escrowed funds have at all times been sufficient to cover the two asserted attorney's liens in full. However, until this order's creation of a new escrow arrangement, the escrow did not exist to protect Pierce Atwood, and the universe of payments to OneUnited against which Pierce Atwood might assert its lien was not limited.  This was a problem for the Church, and until it was resolved by this order, the proposed notation on the New Church Note, together with the related provisions in the Plan, were justified and not indicative of bad faith.

140.    On October 6, 2017, the Church filed the further modified iteration of the Plan that it had promised on the last day of the confirmation hearing, the version that constitutes the Plan presently under consideration. In it, the New Church Note does not contain the language of which OneUnited complains; and the language that theretofore appeared at § 4.9 of the Plan is intentionally omitted.

**(iv)    Grant of Junior Mortgage to Tremont**

141.    I reiterate by reference the findings in paragraph 10 above.

142.    On May 30, 2012, Tremont filed a proof of claim in the case, asserting a secured claim—secured by a mortgage on the Church Building—in the amount of $451,629.93. On June 21, 2017, Tremont filed an amended proof of the same claim, increasing the amount (to include accrued postpetition interest) to $493,274.05. At no time has an objection been filed by any party to the validity or extent of Tremont's original or amended proof of claim.

(v)    **Offer of Compromise**

143.    OneUnited now argues that the duration of the offer of compromise in an earlier

iteration of the Third Plan is a basis for a finding that the Plan was not proposed in good faith.

OneUnited states that the offer was left open only three days, but had it been offered in good faith, the

Church would have given OneUnited more time to consider it. OneUnited first articulated this objection

to confirmation not prior to the confirmation but in its post-confirmation hearing memorandum of law,

which it filed on the deadline for the parties' post-hearing submissions.  The relevant facts were known

to OneUnited long before the court-established deadline for filing objections to confirmation. The timing

of the objection effectively deprived the Church of an opportunity to present evidence on this particular

objection to the Plan and to address it in its post-hearing submissions.

144.    The offer of compromise appeared in the original Third Plan, which the Church filed on

March 27, 2017.  By its terms, it was to remain open not for three days but until the third business day

after approval of the disclosure statement. The Court approved the disclosure statement on July 10,

2017.  The offer remained open through July 13, 2017, some 108 days from when it was first made.

145.     When this was pointed out to OneUnited at closing arguments, its attorney responded

by changing somewhat the basis of the objection: he conceded that OneUnited had known about the

offer for quite some time, but now he added, as the real gravamen of this objection, that the original

plan did not include exhibits, which were to contain important details of the proposed treatment of

OneUnited's claim, especially the actual language of the proposed notes and mortgages, and also that

the Church still had not produced its historical financial data and financial projections, all of which were

necessary to evaluate the offer.

146.    The docket shows that the Church first filed its liquidation analysis on June 2, 2017

[Docket No. 1004], its historical financial information on June 5, 2017 [Docket No. 1007], the proposed

notes and mortgages on June 28, 2017 [Docket No. 1027], and its three-year projections also on June 28,

2017 [Docket No. 1028].  The Bank thus had everything it says it needed some 15 days before the offer

expired.

147.     The Church stated, and OneUnited did not deny, that OneUnited never called the

Church to express interest in the offer or to ask for an extension of it.

148.     OneUnited states that it was not harmed by the duration of the offer of compromise.

**g.     Findings Regarding Liquidation in Chapter 7**

149.     In accordance with the liquidation analysis that the Church has submitted, which is

comprehensive, persuasive, and uncontroverted, I find that if the Church were liquidated under chapter

7 as of the effective date of the Plan, unsecured creditors would receive no distribution.

**RULINGS OF LAW**

**a.   Jurisdiction**

The matter before the Court is the confirmation of a chapter 11 plan.  It arises under the

Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district

court in 28 U.S.C. § 1334(b) and, by a standing order of reference, codified at L.R. 201, D. Mass., referred

to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  It is a core proceeding within the meaning of 28

U.S.C. § 157(b)(1).  28 U.S.C. § 157(b)(2)(L) (core proceedings include confirmations of plans).  The

bankruptcy court accordingly has authority to enter final judgment.

**b.   Standard and Burden**

Section 1129 of the Bankruptcy Code governs confirmation of a chapter 11 plan and sets forth

the requirements for confirmation.  11 U.S.C. § 1129.   Where, as here, an impaired class has voted to

reject a plan, the plan may be confirmed only if it (a) satisfies every applicable provision of § 1129(a)

other than subsection (a)(8) (requiring, as to each class, that it either have accepted the plan or be

unimpaired) and (b) does not discriminate unfairly and is "fair and equitable" with respect to the

dissenting classes' impaired claims.  11 U.S.C. §1129(b)(1); *RadLAX Gateway Hotel, LLC v. Amalgamated*

*Bank*, 566 U.S. 639, 132 S. Ct. 2065, 2069 (2012); *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R.

668, 678 (D. Mass. 2000).  The plan proponent bears the burden of proof.  *In re SW Boston Hotel*

*Venture, LLC*, 460 B.R. 38, 51 (Bankr. D. Mass. 2011).  The bankruptcy court has an independent

obligation to ensure that the plan satisfies the requirements.  *Id*.  The standard of proof is the

preponderance of the evidence.  *Heartland Fed. Says. & Loan Assoc'n v. Brisco Enters., Ltd. II (In re*

*Briscoe Enters. Ltd. II)*, 994 F.2d 1160, 1163-65 (5th Cir. 1993).

### c.  Section 1129(a)(1): Whether the Plan Complies with the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that "a plan comply with the applicable

provisions of this title." 11 U.S.C. § 1129(a)(1).  Courts have interpreted this provision as requiring that a

plan comply with the requirements of §§ 1122 (governing classification of claims) and 1123 (governing

the contents of a plan), as well as other Code provisions.  The Bank's Objection implicated only one of

these:  § 1122(a), concerning classification of claims.  However, as part of an approved stipulation

between the Church and OneUnited, OneUnited has withdrawn its objection to confirmation of the

Third Plan based on the classification of claims under the Third Plan.  The Bank's objection under §

1129(a)(1) is accordingly withdrawn.

The Court is independently satisfied that the Plan complies with § 1129(a)(1) and, in particular,

that its classification of unsecured claims into three classes does not run afoul of §§ 1122(a) and 1123.

Moreover, if the three implicated classes were combined into a single class, the combined class would

be deemed to have accepted the Plan:  the Plan was accepted by more than half in number and at least

two-thirds in amount of all creditors who cast votes in the three classes.[9]  *See* 11 U.S.C. § 1126(c).

---

[9] A total of five votes were cast in the three classes, four acceptances and one rejection. The three acceptances in Class 9 totaled $923,499.56 in amount, and the acceptance in Class 8 totaled at least $397,152.45 (this was the amount at the time of acceptance, given the treatment of Tremont's secured claim as then proposed, but it has increased by virtue of the stipulation quantifying One United's Church Secured Claim, which left less equity for Tremont's claim than this quantification was based on).  The sole rejection, by OneUnited, was for an unsecured claim now quantified at $263,789.31.

Therefore, even if the separate classification of these claims did contravene the rules of classification, it

would be of no consequence for the confirmability of this plan.

### d.  Section 1129(a)(2):  Whether the Plan Proponent Complies with the Bankruptcy Code

Section 1129(a)(2) is a requirement that the proponent of the plan comply with the applicable

provisions of the Bankruptcy Code.  OneUnited objected to confirmation under this subsection, stating

that the Church has twice violated its obligations under the Code in this bankruptcy case. Specifically,

OneUnited alleged (i) that the Church, as a debtor-in-possession, entered into a joint defense agreement

with affiliated entities of the A.M.E. Church without court authority, in violation of §§ 1107 and 1108 of

the Bankruptcy Code; and (ii) that the Church, as a debtor-in-possession and consequently the estate

fiduciary, has used its time in bankruptcy principally for the benefit of the First Episcopal District of the

A.M.E. Church, by efforts to obtain release or elimination of the District's obligation to OneUnited under

the District's guarantee of the RRC Loan, in violation of § 1107.  However, OneUnited has requested no

findings or rulings as to its objections under subsection (a)(2), and it did not mention them in its

memorandum of law or closing arguments. I therefore deem the objections under subsection (a)(2)

abandoned.

I further hold that the alleged conduct on which these objections are predicated is irrelevant to

the inquiry mandated by this subsection. Neither concerns the Church's conduct in proposing the

present plan. Section 1129(a)(2) of the Bankruptcy Code requires that the Church, as the Plan

proponent, comply "with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). Most courts

interpret the phrase "complies with the applicable provisions of this title" to mean complies with the

provisions of this title applicable to reorganization. See, *e.g.*, *In re Charles Street African Methodist

Episcopal Church of Boston*, 499 B.R. 66, 105 (Bankr. D. Mass. 2013) ("Section 1129(a)(2) permits the

court to revisit the adequacy of disclosure in light of what is known at confirmation."); *In re Chicago

Inves., LLC*, 470 B.R. 32, 103-04 (Bankr. D. Mass. 2012) ("Debtors have complied with the applicable

provision of the Bankruptcy Code, including sections 1125 and 1126 regarding disclosure and plan

solicitation."); *In re Landing Assocs., Ltd.*, 157 B.R. 791, 810-811 (Bankr. W.D. Tex. 1993) (Section

1129(a)(2) met even where Debtor had prior violation of cash collateral order, stating "Congress did not

intend to fashion a minefield out of the provisions of the Bankruptcy Code."). The legislative history

mentions the provision only in passing, offering as an example of compliance that the debtor meet the

disclosure requirements of § 1125 to satisfy § 1129(a)(2). See H.R. Rep. No. 95-595, at 412 (1977),

reprinted in 1977 U.S.C.C.A.N. 5963, 6368 (noting only that § 1129(a)(2) requires "that the proponent of

the plan comply with the applicable provisions of title 11, such as section 1125 regarding disclosure");

see also S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912. Certainly, if

Congress had meant that any infraction, no matter how small, should result in a denial of confirmation,

Congress would have given some clearer indication in the legislative history or made the statutory

provision far more express, but it did not. *In re Landing Assocs., Ltd.*, 157 B.R at 811.

The first of the two objections, concerning a joint defense agreement, is further wholly

unsupported. The alleged agreement does not appear to have been submitted into evidence or even

mentioned in the course of the trial. OneUnited has not indicated to me where the evidence (if any) on

which this objection is predicated may be found in the record. I have no indication of the contents of the

alleged agreement and no explanation from OneUnited as to precisely how, in its view, the agreement

violated §§ 1107 and 1108 of the Bankruptcy Code. Indeed, OneUnited's objection to confirmation is

itself noncommittal as to whether the joint defense agreement was contrary to the Church's fiduciary

obligations to the estate:  it states only that the agreement "*may or may not* have been in the Debtor's

best interests and that of its creditors and *may have been* to their detriment and only in the best

interest of the other parties to the JDA" (emphasis added).

The second basis of objection is better supported in the record but no more meritorious as an

allegation of debtor misconduct. The gravamen is that the Church has used its time in bankruptcy "in an

effort to eliminate the First District's guarantee first by trying to get a plan confirmed that contained an impermissible third party release and next by trying to eliminate the debt that had been guaranteed by the First District through a [MASS. GEN. LAWS ch.] 93A adversary proceeding." The Church did indeed attempt in more than one iteration of its First Plan to obtain a third-party release for the District, and the Court denied confirmation of that Plan in part on the basis that the release was not justified. At the same time, however, the Court also found that it had not been bad faith for the Church to seek the release.  That leaves only the Church's prosecution of the ch. 93A adversary proceeding, in which it asserted objections and counterclaims to OneUnited's claim.  That conduct was hardly undertaken solely for the benefit of the District. Whether or not the judgment therein will have preclusive effect on the OneUnited's claim against the District, the claim in question was, in the first instance, a claim against the Church and this estate, and the Church acted well within its fiduciary responsibilities in bringing the objections and counterclaims in that adversary proceeding. OneUnited's larger suggestion, that this case has been conducted solely for the benefit of the District, and not for needs of the Church itself, is patently unfounded.  In short, I find no merit in OneUnited's objections under subsection (a)(2).

That leaves only the Debtor's compliance with "the applicable provisions of this title" that are in fact the concern of subsection (a)(2).  OneUnited has voiced no concern about satisfaction of these, as the Church has enumerated them (at pp. 75-76 of its Proposed Findings and Conclusions). I conclude that § 1129(a)(2) is satisfied.

### e.  Section 1129(a)(3):  Whether the Plan has been Proposed in Good Faith

Section 1129(a)(3) requires that the Church have proposed the Plan "in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  This is "generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re Weber*, 209 B.R. 793, 797 (Bankr. D. Mass. 1997).  The requirement that a chapter 11 plan be submitted in good faith means "there must be some relation—at

least an arguable relation—between the chapter 11 plan and the reorganization-related purposes that

the chapter was designed to serve." *In re Coastal Cable T.V., Inc.*, 709 F.2d 762, 764 (1st Cir. 1983).

These include maximizing value, providing the debtor a fresh start, and reaching compromise among

disparate constituencies. *See, e.g., Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526

U.S. 434, 452 (1999) ("[T]he two recognized policies underlying Chapter 11 [are] preserving going

concerns and maximizing property available to satisfy creditors"); *In re Carp*, 340 F.3d 15, 25 (1st Cir.

2003) ("[O]ne of the Bankruptcy Code's core purposes is to give worthy debtors a fresh start."); *In re

Jamo*, 283 F.3d 392, 398 (1st Cir. 2002) (describing "the tenet that underpins the bankruptcy system—

the 'fresh start principle'"); *In re Mailman Steam Carpet Cleaning Corp.*, 212 F.3d 632, 635 (1st Cir. 2000)

("[c]ompromises are favored in bankruptcy"). "The plan" that must be filed in good faith means the plan

that is under consideration, not prior plans in the case or prior iterations of the present plan.  11 U.S.C. §

1129(a)(3) ("The court shall confirm a plan only if all of the following requirements are met: . . . (3) The

plan has been proposed in good faith").

OneUnited contends that in six ways, the Plan has not been filed in good faith, with each of the

six being an independent basis for denying confirmation.

### (i)       The Anonymous Donation

OneUnited first contends that the anonymous donation of $50,000, being both anonymous and

restricted to use for purposes other than payment of OneUnited, makes the purpose and motivation of

the Plan suspect and opaque, such that the good faith of the donor and of the Plan cannot be known.

OneUnited states that "without knowing the donor's motivations, there is no way to establish whether

there is a likelihood that the Plan will achieve a result consistent with the standards prescribed under

the Code." I have found that whatever the motivation of the donor, the donation will obviously and

significantly enhance the Church's liquidity and ability to meet debt service and its various other needs

and contingencies in the first years after confirmation. This is entirely consistent with the rehabilitative

purpose of the Bankruptcy Code. I have further found that the motivation of the donor, whatever it is, is

not the motivation of the Church in accepting it. It is the latter that counts. OneUnited has shown no

bad faith in the Church's accepting this help, and I find none.

### (ii)    Treatment of the Tremont Mortgage

OneUnited states that the Plan does not satisfy subsection (a)(3) because, in violation of a

covenant in the mortgage securing the Church Loan, the Church gave a junior mortgage on the Church

Building to Tremont and now, in further breach of the same covenant, proposes to give, through the

Plan, a junior mortgage to Tremont in satisfaction of the New Tremont Note. OneUnited argues that this

is "an act forbidden by law," presumably (though OneUnited does not say so) within the meaning of

subsection (a)(3).  OneUnited does not elaborate on this objection.

The objection has no merit.  It is not "an act forbidden by law" for a chapter 11 plan to modify

the rights of holders of secured claims.  Subject to an exception not applicable here, § 1123(b)(5) states

that "a plan may modify the rights of holders of secured claims." 11 U.S.C. § 1123(b)(5).

Nor is the proposed modification, by the granting of a junior Plan mortgage in violation of a

prepetition mortgage covenant, an act of bad faith. Tremont has filed a proof of a secured claim, and no

objection to it has been filed. The Plan must make provision for the claim asserted. Given the agreed

quantification of OneUnited's Church Claim and the agreed value of the Church Building, Tremont's

claim is partially secured, and the proposed New Tremont Mortgage, limited as it is to the extent of

Tremont's secured claim, is appropriate to that claim.  *See* 11 U.S.C. § 1129(b)(2)(A)(i)(I).  The New

Tremont Mortgage would be junior to OneUnited's New Church Mortgage, and therefore the New

Tremont Mortgage would not consume value that might otherwise inure to the benefit of OneUnited.

And insofar as OneUnited contends that the presence of the junior mortgage impairs the Church's ability

to refinance for the benefit of OneUnited, the replacement of the prepetition Tremont mortgage, which

secures debt of upwards of $450,000, with the New Tremont Mortgage, securing a principal amount of

only approximately $70,000, greatly reduces the impediment that a Tremont mortgage might pose to the Church's ability to refinance.  The granting of the New Tremont Mortgage is not inconsistent with the purposes of the Code or indicative of bad faith.

### (iii)    Escrow Provisions in New Church Note

OneUnited argues that the Plan is proposed in bad faith because, until the most recent iteration of the Plan, the proposed New Church Note contained language that, for no legitimate purpose, would have rendered the note non-negotiable and prohibited OneUnited from receiving payments on that note—those payments instead being channeled into escrow—until OneUnited's attorney's lien disputes were finally resolved, which would likely take years.  These escrow provisions were unnecessary, OneUnited argues, because at all times, there were already sufficient funds in escrow to cover all asserted attorney's liens. OneUnited implies that these provisions can only have been included in the Plan for spite, to further frustrate OneUnited's efforts to enforce its rights.

This basis of objection must be overruled on both the law and the facts.  First the law.  The relevant provisions are no longer part of the Plan, the Plan having been modified to remove them. Therefore, even if I were to find that OneUnited is right about their purpose, they still would not constitute a valid basis of objection under subsection (a)(3).  The focus of this subsection is on the Plan under consideration.

Regarding the facts, I have found that the escrow features of the Plan, those under which promissory note payments to OneUnited were channeled into escrow until the attorney's liens were resolved, which might indeed take years, were not motivated by spite or bad faith but by the Church's legitimate interest in protecting itself from the hazard of paying the wrong obligor.  And, when OneUnited finally settled and paid off Choate's lien and then obtained a new escrow order that protected the interests of Pierce Atwood, the Church moved promptly to remove the provisions in

question from the Plan, its concerns having been satisfied by other means. Therefore, even if prior

iterations of the present plan were relevant, this objection would be unfounded.

### (iv)    Terms of New OneUnited Mortgages and Notes

OneUnited further contends that the Plan is proposed in bad faith because the other terms of

the new promissory notes and mortgages that OneUnited would receive are unreasonable. The test in

subsection (a)(3) is whether the terms (or lack thereof, as the case may be) are proposed for a purpose

that is consistent with the purposes of the Bankruptcy Code.  The terms and covenants of the notes and

mortgages were put in place precisely out of genuine and well-founded concern that OneUnited would

use them inappropriately, to defeat the fresh start and reorganization that Chapter 11 is intended to

foster and that the Church is seeking in this case.  The proposed structure of the notes and mortgages

was clearly intended to serve that purpose.

OneUnited suggests, by use of the word unreasonable, that even if the overall goal is

appropriate (which I understand OneUnited does not concede), the Plan exhibits bad faith by going

overboard, by removing more standard protections than need be removed to achieve its purpose.

Again, the focus of subsection (a)(3) is on purpose, not on whether a particular covenant structure is fair

and equitable (the concern addressed by § 1129(b)). In ruling on the First Plan, the Court put the parties

on notice that, beyond certain terms and covenants on which it would insist (and which the present plan

contains), "the Court will consider other covenants provided they are fashioned in a manner acceptable

to [the Church] or to otherwise allay [the Church's] valid concern." Here, I have no evidence that

OneUnited presented the Church with a slate of proposed terms and covenants that the Church

unreasonably rejected.  Even in this objection, OneUnited has not specified the terms and conditions

that it contends the Church cannot in good faith have failed to include. Even if the proposed terms and

covenants fell short of meeting the fair and equitable standard (I express no opinion on that issue here),

it would not be by enough to indicate, in the circumstances of this case, bad faith in the Church's

proposing them.  I am well satisfied that the terms and covenants are proposed in good faith.

### (v)    Duration of Offer of Compromise

OneUnited next would have the Court find bad faith in the fact that the Plan initially included an

offer of compromise to OneUnited, in the form of an alternative treatment under the Plan, but left the

offer open until only the third business day after approval of the Disclosure Statement.  The duration,

OneUnited contends, was unnecessarily and unreasonably short, which is evidence that the Church

never meant for it to be accepted, and, as such, evidence of false pretenses and bad faith. "The Debtor

clearly never intended for OneUnited to accept the offer to compromise otherwise it would have left the

offer open for a longer, reasonable time period."

This basis of this objection was known to the Bank long before the deadline for filing its

objections to confirmation but was not articulated among those objections or at any time until after

completion of the confirmation hearing.  The timing of the objection deprived the Church of an

opportunity to present evidence on it.  OneUnited offers no defense for this timing.  I therefore overrule

the objection as untimely and inconsistent with due process.

The objection also fails on its merits.  The docket shows that the offer was first articulated 108

days before it expired.  OneUnited responds by shifting the gravamen of the objection:  during most of

that time, the Plan and disclosure statement were incomplete, lacking crucial details and information

that OneUnited would need to evaluate the offer and that the Church filed only much later. This is true,

but the docket shows that all of this information was on file no later than 15 days before the offer

expired.  In sum, by the time the offer expired, OneUnited had known of it for 108 days and had

possessed all the information it needed to process it for at least 15. The duration of the offer was not

unreasonable or evidence of bad faith.

### (vi)    Non-familiarity with Plan

OneUnited advances yet another basis of objection under subsection (a)(3): that Rev. Groover, four days before commencement of the confirmation hearing, testified at deposition that he had never seen the Plan or disclosure statement, and at the confirmation hearing he further testified that he did not know how much the Church would be required to pay to OneUnited on an annualized basis or the amount of the final balloon payments on the new OneUnited notes. The Church filed no response to this objection but did address, at the confirmation, the facts on which it is predicated.

I first consider the timeliness of the objection. The evidence on which it is based was discovered no earlier than four days before the start of the confirmation hearing, too late to have been articulated before the deadline for filing objections to confirmation. OneUnited included a nascent form of this objection in the Joint Pretrial Memorandum, filed one day before the start of the confirmation hearing, saying: "The Plan is not proposed in good faith where the Debtor's chief executive officer had never seen it from its filing on July 5, 2017 until September 23, 2017, three days before the commencement of hearings on the unseen Plan's confirmation." All of the testimony on which this objection is predicated was adduced in the first two days of the evidentiary hearing. OneUnited never moved to amend its objections to confirmation, which would have been best practice, especially since the brief articulation of this objection was deep in the Joint Pretrial Memorandum, a large document. It never filed such a motion. Still, the Church did in fact address the substance of this objection, both in its examination of witnesses and at closing argument, and therefore I am content to address the objection on its merits.

On the merits, the objection is unfounded. Rev. Groover did testify at deposition that he had not previously seen the version of the Plan that he was then presented with (apparently the Plan's third iteration—which did not differ all that much from previous iterations that OneUnited does not contend he was unfamiliar with), but he later clarified credibly that he had been confused in that testimony. The evidence shows that Rev. Groover was present when the first iteration of the Plan was presented to a

joint meeting of the three governing boards of the Church, and again later when it was presented to the

congregation as a whole.  Both meetings were attended by the Church's counsel. The Plan was

thoroughly considered at each level and adopted as a commitment of the Church as a whole.  I would

not expect the Church membership, or even its pastor—or almost any debtor, for that matter—to be

intimately familiar with the details of a plan or disclosure statement. Still, they must understand what

they are committing to, and the Church clearly does.  Rev. Groover is the Church's pastor, not its CEO

(though he earlier *likened* his role to that of a CEO). By virtue of his position, he is the head of every

committee, but he not necessarily the person on each committee who is most active on or familiar with

its affairs.  He could not possibly be.  Still, he has mobilized the membership to produce and support this

Plan, and he and they clearly understand that it will require of the membership significant debt service

on a quarterly basis and a balloon payment no later than its twentieth anniversary. Through its CSF, the

Church has in fact thoroughly studied its finances, understood its commitment, and mapped a path

forward. Rev. Groover, Ms Dudley Cowans, and the Church further understand the rough magnitude of

each, if not the precise numbers—which in fact remained unsettled during the confirmation hearing and

until approval of the 506(b) Stipulation weeks later. There is no doubt here whatsoever that the Church,

both through its leadership and among its membership, has responsibly and clear-headedly fashioned,

understood, adopted, and propounded the Plan.

(vii)    **Conclusion as to Good Faith**

The Court is convinced and hereby finds that the Plan was proposed in good faith and satisfies

the requirements of § 1129(a)(3). The Plan is designed to allow the Church to continue operating on a

stable financial foundation for the benefit of all its creditors. Throughout this chapter 11 case, the

Church has demonstrated flexibility and resilience. During the case, the Church sold several properties

to reduce its debts and now proposes to pay its remaining secured debts over time, as permitted under

the Bankruptcy Code. The Plan also provides for a recovery pool for unsecured creditors, which provides

significantly greater distributions than they would otherwise receive or be entitled to. The Plan also

embodies a settlement of various issues among the Church and its creditors—including Tremont,

Thomas Construction, and OneUnited—that could otherwise have resulted in contentious and

protracted litigation.  Accordingly, based on the totality of the circumstances surrounding the filing of

the bankruptcy case and the formation of the Plan, the Court finds and concludes that the Debtor has

proposed the Plan in good faith and not by any means forbidden by the law.

### f.  Section 1129(a)(5):  Continuance in Office of Officers

Sections 1129(a)(5)(A)(i) and (ii) require that the Plan proponent disclose the "identity and

affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or

voting trustee of the debtor," and requires a finding that "the appointment to, or continuance in, such

office of such individual, is consistent with the interests of creditors and equity security holders and with

public policy." 11 U.S.C. § 1129(a)(5)(A)(i), (ii).  OneUnited initially objected on the basis that this

requirement was not satisfied but later withdrew this basis of objection.

Pursuant to § 1129(a)(5), the Church has disclosed its officers and voting trustees in the Plan

Supplement; it has no directors. Each of the reorganized debtor's initial officers and trustees are to

continue in such position on the effective date, and the compensation of any insiders will remain the

same as it was during the bankruptcy case. There have been no objections to the appointment of the

Church's officers and directors, which the Court finds and concludes will be consistent with the interests

of holders of claims and public policy. Accordingly, the Plan satisfies § 1129(a)(5).

### g.  Section 1129(a)(7):  Best Interests of Creditors

Subsection 1129(a)(7), known as the "best interest of creditors test," requires (in relevant part):

With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class

(i) has accepted the plan; or

> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7)(A).  OneUnited initially argued that this requirement was unsatisfied, but at closing arguments it clarified that it was no longer pressing its objection as to this requirement.

I am nonetheless obligated to determine whether this requirement is satisfied. It is. This subsection requires satisfaction by the treatment of each impaired class, of which there are seven. Classes 3 and 8 are each comprised of a single member, Tremont, which in both classes voted to accept; as to these classes, § 1129(a)(7) is satisfied through subsection (a)(7)(A)(i), each holder of a claim in these class having accepted the Plan. The remaining five impaired classes are satisfied through subsection (a)(7)(A)(ii): each holder of a claim in these classes will receive as much or more as of the effective date of the plan as it would if the debtor were liquidated under chapter 7 of this title on such date.  As to the two of these classes that are comprised of nonpriority unsecured claims, Classes 7 and 9, the Church's liquidation analysis shows, and I find, that they would receive nothing in a chapter 7 liquidation; but under the present plan, holders of these claims will receive a pro rata distribution from an Unsecured Recovery Pool of approximately $160,000.  The approximate distribution as a percentage of each allowed claim remains uncertain—in the neighborhood of 5 to 10 percent—but will in any event be decidedly more than nothing.  The final three impaired classes, Classes 2, 4, and 6, each comprised of a single secured claim, will receive as much under the Plan as they would in a chapter 7 liquidation, the present value of the collateral securing their respective secured claims (as, in any event, they must to satisfy § 1129(b)(2)(A)(i)).  The Plan satisfies § 1129(a)(7)(A).

**h.  Section 1129(a)(8): Acceptance by All Impaired Classes**

Section 1129(a)(8) requires that each impaired class of claims or interests accept the Plan.  Here, four impaired classes have not accepted the Plan.  The Plan may therefore be confirmed only by satisfaction of the requirements of § 1129(b) as to each impaired class that has not accepted the Plan.

### i.  Section 1129(a)(9):  Payment in Full of Allowed Priority Claims

Section 1129(a)(9) sets forth requirements for the payment through a plan of priority claims.
The treatment of Administrative Claims and Priority Tax Claims pursuant to Article II of the Third Plan
satisfies the requirements of § 1129(a)(9).  No administrative or priority tax claim, other than the City of
Boston Tax Claim, has been filed or asserted, and the Church's professionals have already been paid
subject to prior orders or their services have been provided pro bono.  The City of Boston Tax Claim is a
priority tax claim, which will be paid from the RRC Proceeds on the effective date.  Accordingly, the
Debtor has satisfied the requirements of § 1129(a)(9).

### j.  Section 1129(a)(10):  Acceptance by at Least One Impaired Class

If any class of claims is impaired, § 1129(a)(10) requires that the plan have been accepted by at
least one impaired class, determined without including any acceptance of the plan by an insider.   11
U.S.C. § 1129(a)(10). The Plan has been accepted by three non-insider impaired classes and therefore
satisfies this requirement.

### k.  Section 1129(a)(11):  Feasibility

Section 1129(a)(11) requires a showing that

> [c]onfirmation of the plan is not likely to be followed by the liquidation,
> or the need for further financial reorganization, of the debtor or any
> successor to the debtor under the plan, unless such liquidation or
> reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).  This "feasibility test," as it is known, requires the court to independently
determine whether the Plan is workable and has a reasonable likelihood of success. See *In re SW Boston
Hotel Venture, LLC*, 460 B.R. 38, 58 (Bankr. D. Mass. 2011).  A plan proponent need only demonstrate
that there exists a reasonable prospect of success and a reasonable assurance that proponents can
comply with the plan.  *Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden
Motel & Apartments)*, 195 B.R. 294, 304-05 (D. N.J. 1996).  "A plan proponent need not guarantee the
success of the plan, but rather must introduce evidence that its plan is realistic." *SW Boston Hotel*, 460

B.R. at 58.  A court scrutinizing a plan should consider "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; and (4) the ability of management." *In re Agawam Creative Mktg. Assocs., Inc.*, 63 B.R. 612, 619-20 (Bankr. D. Mass. 1986).

Citing *In re Save Our Springs (S.O.S.) Alliance Inc.*, 632 F.3d 168 (5th Cir. 2011), OneUnited argues that prospective "voluntary donations" and "oral pledges," rather than "contracts . . . that commit [the donors] to give money in the future," without any evidence that the donors would be or were capable of honoring the pledges, are "too speculative to provide evidence of feasibility." *Id*. at 173.  It is undisputed that the Church does not receive pledges or dues from its members; donations are purely voluntary. Therefore, OneUnited would, as a matter of law, have the Court give no weight to so much of the Church's proof of feasibility as relies on increased giving from the membership.[10]  As the Church argues, *Save Our Springs* is inapposite. The Fifth Circuit's holding was predicated upon the observation that "raising funds during bankruptcy is more difficult than at other times," and addressed a debtor's plan to undertake a special fundraising effort to establish a creditor fund in only 60 days. *Id*. at 172-73. If anything, the holding in *Save Our Springs* bolsters the reasonableness of the Church's projections, which are predicated on *maintaining* the revenue levels it achieved during the bankruptcy case, a time when raising funds "is more difficult," *id*., with only modest increases.  Nor is feasibility based on a capital campaign (though the Church plans to undertake one) or a one-time special fundraising effort. It is based on the established year-after-year historical giving record of this congregation, which is itself proof of the congregation's wherewithal, willingness, and motivation to continue giving at current levels.  *Save Our Springs* thus provides no basis for excluding the evidence of projected giving on which this Plan is predicated.  Indeed, insofar as it is based on the observation that "raising funds during

---

[10] The only other source of Plan support is the promised $50,000 anonymous donation.  As one of its bases for objecting to confirmation, OneUnited originally argued that it was impossible to determine whether this donation could or would be made.  It no longer does. After the Church moved for leave to have the donation held in escrow pending Plan confirmation, OneUnited withdrew this basis of objection to the Plan.

bankruptcy is more difficult than at other times," it bolsters the reasonableness of the Church's

projections, and my finding, that emergence from bankruptcy will permit the Church to return to the

higher levels of membership donation that it achieved in the past.

My findings on feasibility are extensive and need not be repeated.  The Court is well satisfied

that the Plan enjoys a reasonable prospect of success.  This conclusion has been amply supported as to

both the Church's ability to meet Plan debt service and its ability, upon maturity of the Plan promissory

notes, to make the balloon payments that will then become due.  The Church has satisfied its burden to

establish under § 1129(a)(11) that the Plan is not likely to be followed by liquidation or further

reorganization.

### I.  Section 1129(b)

Where a plan proponent has satisfied all the applicable requirements of § 1129(a) except only

the requirement in paragraph (8) that each impaired class of claims or interests accept the plan, "the

court . . . shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and equitable,

with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

11 U.S.C. § 1129(b)(1).  OneUnited objects to the Plan's treatment of its secured claims on the basis that

it does not satisfy the specific requirements of fair and equitable treatment for secured claims that are

set forth in § 1129(b)(2)(A)(i) and (iii).[11]  It also argues that the Plan discriminates unfairly against its

Church Secured Claim because "it pledges to give some of OneUnited's collateral to a junior lienholder."

And OneUnited now also further argues that the treatment of its claims is not fair and equitable because

the Plan promissory notes and mortgages omit various terms and covenants.

---

[11] The Bank's challenge is solely to the Plan's treatment of its secured claim. The Bank does not contend that the
treatment of its unsecured claim, in Class 7, does not satisfy the fair and equitable requirement for unsecured
claims, set forth in § 1129(b)(2)(B). Nor does anyone suggest that the Plan's treatment of the Class 6 secured claim
of the City of Boston—the only other non-accepting class—is fair and equitable.  I readily conclude that the Plan's
treatment of the Class 6 and Class 7 claims satisfies § 1129(b).

### (i)        § 1129(b)(2)(A): Present Value

Subsection (b)(2)(A) states that, as to a class of secured claims, the condition that a plan be fair

and equitable with respect to that class includes satisfaction of one of three alternative requirements.

The Church takes the position that the Plan's treatment of the OneUnited secured claims satisfies the

first of these, in § 1129(b)(2)(A)(i). Under this subsection, a plan must provide "(I) that holders of such

claims retain the liens securing such claims . . . to the extent of the allowed amount of such claims," and

that  "(II) each holder of a claim of such class receive on account of such claim deferred cash payments

totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at

least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. §

1129(b)(2)(A)(i)(I) and (II).  The Plan provides that OneUnited will have mortgages on the collateral

securing its claims, thereby satisfying the first prong of § 1129(b)(2)(A)(i). OneUnited's objection focuses

on the second prong. Specifically, it disputes that the interest rate of the Plan promissory notes, 6.3%,

suffices to provide to the holder of the notes the present value of OneUnited's secured claims.

In determining whether the proposed New OneUnited Notes provide OneUnited with a

present value as of the effective date of the Plan of at least the secured amount of its claims, OneUnited

must receive an interest rate on the New OneUnited Notes to account for the time value of money and

the risk or uncertainty of the future payments. *See Till*, 541 U.S. at 474. The appropriate interest rate

used in a "cram-down" note is a factual determination made on a case-by-case basis. *See, e.g., In re

Turner*, 2013 WL 6198205 at *3 (Bankr. D. N.H. 2013).

*Till* prescribes a two-step inquiry, pursuant to which the Court must first determine

whether there is an efficient market from which to take the appropriate interest rate and, if not,

then progress to the so-called "*Till* formula approach." *Till*, 541 U.S. at 476 n.14, 479-80; *In re SW Boston

Hotel Venture, LLC*, 460 B.R. 38, 53-54 (Bankr. D. Mass 2011). Under the *Till* formula approach, the

interest rate is determined by starting with the national prime rate, "which reflects the financial

76

market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower

to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of

default." *Till*, 541 U.S. at 479. The prime rate is then adjusted upward by a risk premium to account for

the debtor's risk of nonpayment, looking at factors including the circumstances of the estate, the nature

of the security, and the duration and feasibility of the chapter 11 plan. *Id*. at 479-80. The Supreme

Court in *Till* noted that the risk adjustment should typically range between 1-3%. *Id*.

The Debtor's expert, Mr. Kopa, after researching the matter, determined that there existed no

efficient market for loans to churches and similar religious organizations.  This conclusion was reinforced

by the paucity and incompleteness of such information as he was able to find, mostly in the nature of

advertising, about loans to and bond financing for churches.  No contrary evidence was adduced, and

the expert's testimony was credible.

OneUnited suggests that the expert's determination was faulty because he failed to consider the

market for debtor-in-possession loans "where, of course, the terms of every debtor-in-possession loan

in the entire country are available on PACER."  OneUnited does not take a position on whether there

exists an efficient market for loans to churches, much less debtor-in-possession loans to churches.  It

adduced no expert testimony on the issue, and no evidence that the disparate evidence of loans to

debtors-in-possession that exists in the publicly available electronic case records of the nation's

bankruptcy courts is organized enough, and presents sufficient comparable data about the various loans

to be found therein, in a clear and easily-accessed format, to make the market efficient. A party cannot,

by saying "of course," overcome its failure to produce evidence.  Nor do I accept OneUnited's premise

that the universe of debtor-in-possession loans is the relevant database.  Most are auto loans and

residential mortgage refinancings, which are not obviously relevant to church loans. The universe of

debtor-in-possession loans to churches in the relevant look-back period is, I suspect, quite small; and no

expert has told me otherwise. I am satisfied with the soundness of Mr. Kopa's determination about the

non-existence of an efficient market, no evidence having been adduced to undermine it.

Mr. Kopa appropriately proceeded to assess the interest rate of the New OneUnited Notes

under the *Till* formula approach. As I found above, the Court credits and accepts Mr. Kopa's unrebutted

testimony that the 6.3% interest rate proposed by Charles Street for the New OneUnited Notes is based

on the prime rate with an appropriate upward risk adjustment of 1.23% and an incremental upward

adjustment for duration of 0.82%. Based on Mr. Kopa's unrebutted testimony, the Court concludes that

the 6.3% interest rate for the New OneUnited Notes provides OneUnited with the present value of at

least the amount of the stipulated value of the collateral securing each of the New OneUnited Notes.

Having concluded that the treatment of OneUnited's secured claims satisfies the requirement in

§ 1129(b)(2)(A)(i), I need not address OneUnited's argument that the same treatment does not satisfy

the "indubitable equivalence" requirement in § 1129(b)(2)(A)(iii).  The three requirements in §

1129(b)(2)(A) are alternatives, joined with an "or," and therefore a plan's treatment of a particular

secured claim need only be shown to satisfy one of the three.

### (ii) § 1129(b)(1): Discriminate Unfairly

Section 1129(b)(1) also requires, as a condition of confirmation, that the plan "not discriminate

unfairly" as to any class of claims that is impaired under, and has not accepted, the plan.  In its

Objections to Confirmation, OneUnited objected to confirmation on the basis that "the Plan

discriminates unfairly with respect to OneUnited because it pledges to give some of OneUnited's

collateral to a junior lienholder (Tremont) who became a junior lienholder in breach of OneUnited's Pre-

Petition Church Mortgage."  In its post-confirmation hearing submissions, OneUnited has sought no

ruling on this objection and offered no argument in support of it; OneUnited thus appears to have

abandoned it.[12] In any event, the objection is founded on a misunderstanding of the Plan. It would give

to Tremont a mortgage on the Church Building, but that mortgage would be junior to the mortgage it

grants to OneUnited. A junior mortgage is subject to the rights of the senior mortgage. It can take no

value (on account of exercise of the powers it grants) until the senior mortgage is satisfied in full. The

mortgage to Tremont thus does not "give some of OneUnited's collateral to a junior lienholder" and so

does not discriminate against OneUnited.

### (iii)    § 1129(b)(1):  Fair and Equitable

In its post-confirmation hearing submissions, OneUnited now further objects to confirmation on

the basis that certain terms and covenants of the Plan promissory notes and mortgages render the

treatment of OneUnited's secured claims not fair and equitable. In particular, OneUnited now complains

of seven specified terms or covenants that the Plan notes and mortgages either contain or omit:  (i) the

twenty-year term of each promissory note, being too long, imposes an excessive risk of nonpayment[13];

(ii) the mortgages contain no covenant obligating the Church to maintain the collateral; (iii) the notes

and mortgages contain no due-on-sale obligation, no clause or covenant obligating the Church to pay

the note in full, or permitting the note holder to call the note, upon a sale or transfer of the mortgaged

property; (iv) the notes and mortgages are not cross-defaulted with one another; (v) though the

mortgages, being made on the Massachusetts "Statutory Condition," thereby obligate the Church to

maintain property insurance, this covenant is enforceable only by specific performance and is not, but

should be, an event of default; (vi) the notes contain no penalty for late payment; and (vii) the notes and

---

[12] It has pressed its related objection that the Plan's grant of a junior mortgage to Tremont violates subsection (a)(3), but it has not argued that the same grant constitutes unfair discrimination against OneUnited.

[13] This particular objection, unlike the other six enumerated here, was in effect addressed in the Court's discussion of whether the treatment of OneUnited's secured claims satisfied § 1129(b)(2)(A)(i)(II) and whether it satisfied the feasibility requirement in § 1129(a)(11). The duration of the plan and its effect on risk were considered and factored into the appropriate interest rate; and the 20-year term does not impose an excessive risk of nonpayment.

 Mr. Kopa also considered the terms and covenants of the notes and mortgages in assessing the risk, and quantifying an appropriate risk premium, for the promissory note interest rates.  When he first produced his opinion and report, OneUnited had not articulated an objection under § 1129(b)(1).

mortgages permit the Church to be up to 40 days late on each payment without suffering a

consequence. OneUnited also complains more generally of "a complete and total lack of enforceable

standard covenants," but, in its proposed conclusions of law and memorandum of law, it has identified

only those enumerated above as being consequential for purposes of the fair and equitable standard.

OneUnited also complains generally that the only event of default in the notes and mortgages is

nonpayment, but, except as to the obligation to maintain property insurance, it has not specified the

other events of default (if any) that it contends the notes and mortgages should contain. Nor, except to

the extent indicated above, has OneUnited adduced specific language that it contends that notes and

mortgages must contain to rectify the alleged deficiencies.

The Court established a deadline for the filing of objections to confirmation, the deadline being

approximately one month before the start of the confirmation hearing. That period was important,

affording the Church, as plan proponent and bearer of the burden of proof, to know the specific

objections it must address at confirmation, to plan its presentation of evidence, and also, in the run-up

to the confirmation hearing, to attempt to negotiate resolutions of identified objections or, by

modifications of the Plan, to obviate them. The timely articulation of objections was especially

important as to the issue of covenants, which was also a point of contention over the First Plan. In ruling

on that plan, the Court put the parties on notice that, beyond certain terms and covenants on which it

would insist (and which the present plan contains), "the Court will [in a further proposed plan] consider

other covenants provided they are fashioned in a manner acceptable to [the Church] or to otherwise

allay [the Church's] valid concern."[14] OneUnited did timely file its Objections to Confirmation, but in that

document, it articulated no objection under § 1129(b) to the proposed terms and covenants; much less

did it identify those omitted terms and covenants (including the specific language of each) that it

---

[14] This was a reference to a concern, which the Court found justified—and continues to find justified—that
OneUnited would use standard covenants for maximum leverage, beyond their intended purpose.

considered critical to the Plan's satisfying the fair and equitable standard. Its failure to do so deprived

the Church of a fair opportunity to address them. And its failure to specify precisely what is missing but

needs to be there to make the Plan fair and equitable makes it impossible for the Court to even know

precisely what terms and covenants this objection is about.  Accordingly, I deem these late-articulated

objections to have been forfeited.

### (iv)    Conclusion as to § 1129(b)

For the reasons articulated above, the Court concludes that the Plan is fair and equitable as to

OneUnited's two classes of secured claims and the Plan's two other impaired non-accepting classes.

**CONCLUSION**

For the reasons set forth above, I conclude that the Plan satisfies each applicable requirement of

confirmation in § 1129.  The Court will enter a separate order of confirmation.


Date:  December 14, 2017

_____
Frank J. Bailey
United States Bankruptcy Judge